# Exhibit "A"

PSA and Amendments

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made and entered into this 23rd day of April, 2020 (the "**Effective Date**") by and between **REINHOLD CORPORATION**, a Florida corporation ("**Seller**"), and **JAX-PALATKA FARMS LLC**, a Delaware limited liability company ("**Purchaser**").

In consideration of the mutual covenants and provisions herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

### ARTICLE 1
### DESCRIPTION OF PROPERTY

1.1    Purchase and Sale.  Seller hereby agrees to sell, assign, and convey to Purchaser, and Purchaser agrees to purchase from Seller, in accordance with the terms and subject to the conditions contained herein, those certain parcels of land situated in Clay County, Florida consisting of approximately 13,431 acres of undeveloped land, as more particularly described and generally depicted on Exhibit A attached hereto and incorporated by reference herein (excluding an approximately .25 acre cell tower site that will be retained by Seller as more particularly identified on Exhibit A), together with all appurtenances, easements and privileges thereto belonging, including all right, title and interest of the Seller, if any, in and to all fences, gates, bridges, structures and other improvements thereon, and all Assumed Contracts as defined in Section 8.2 below, easements, rights, licenses and permits (including development rights and permits) appurtenant thereto, and any strips, gores, appurtenances, streets, alleys or ways adjoining the land (the "***Property***").  The Property includes the following:

(a)    the approximately eleven thousand six hundred ninety-eight (11,698) acre parcel of undeveloped land, as depicted on Exhibit A (the "***Base Parcel***"), which Base Parcel consists of Timber Parcel A, Timber Parcel B, Penny Farms Parcel, SR16 Parcel, and Commercial Parcel, all as more particularly identified and depicted on the map attached as Exhibit A);

(b)    the approximately one thousand three hundred eighty-nine (1,389) acres of un-activated Phase 3 of Greens Creek Mitigation Bank (the "***Mitigation Bank Parcel***"), as depicted on Exhibit A;

(c)    the approximately twenty-two (22) acre Storm Water Pond Parcel to be retained by Seller after the initial Closing as more fully set forth in Section 9.3;

(d)    approximately three hundred twenty two (322) acres (the "Iluka Buffer Parcel"), as depicted on Exhibit A, which Iluka Buffer Parcel will be optioned to Purchaser by an option to purchase as more fully set forth in Section 9.4 below; and

(e)    all timber, crops and other bio-mass growing on the Property (excluding timber to be retained by Seller as and to the extent provided in Section 9.2).

## ARTICLE 2
## PURCHASE PRICE

2.1    <u>Purchase Price</u>.  The total purchase price for the Property shall be Forty-Two Million Five Hundred Thousand and No/100 Dollars ($42,500,000.00) (the "***Purchase Price***"). The Purchase Price will be subject to adjustment based on (i) the Survey which may increase or decrease the acreage of the Property, and (ii) Seller's ability to amend its mitigation banking permit to eliminate or reduce the acreage currently within the Greens Creek Mitigation Bank.  In the event Seller (x) does not release all of the Mitigation Bank Parcel from Phase 3 of Greens Creek Mitigation Bank (the "***Mitigation Bank***"), or (y) is unable to eliminate or reduce the acreage currently within the Mitigation Bank on or before November 30, 2024, such unreleased acreage shall be subtracted from the Property based on a valuation of Two Thousand Seven Hundred Fifty and No/100 Dollars ($2,750.00) per acre.  The Purchase Price shall increase or decrease based on a valuation of Two Thousand Seven Hundred Fifty and No/100 Dollars ($2,750.00) per acre for any changes to final acreage of lands sold to Buyer based on this Section 2.1.  During the Inspection Period as set forth in Article 4, the parties will work together in good faith to allocate the Purchase Price to sections of the Property on a per acre basis.

2.2    <u>Payment of Purchase Price</u>.  Purchaser shall pay to Seller through escrow at each Closing the relevant Purchase Price, subject to prorations, adjustments and credits as set forth in this Agreement, in U.S. Dollars and by wire transfer of immediately available funds.

(a)    The Purchase Price payable at the first Closing shall be $42,500,000 (subject to adjustments as described in <u>Section 2.1</u> and elsewhere) less the sum of (i) the price for the Storm Water Pond Parcel of approximately 22 acres at $2,750 per acre, (ii) the price for the estimated 1,389 acres on the Mitigation Bank Parcel at $2,750 per acre, and (iii) the option price of the 322 acres of the Iluka Buffer Parcel at $2,750 per acre.

(b)    The Purchase Price payable at the Closing on the Storm Water Pond Parcel shall be its acreage multiplied by $2,750 per acre.

(c)    The Purchase Price payable at the Closing on lands from the Mitigation Bank Parcel shall be its acreage multiplied by $2,750.  If Seller is unable to obtain a release of the acreage from the Mitigation Bank by November 30, 2024 or close on such lands by December 31, 2024, the remaining Earnest Money Deposit shall be returned to Purchaser.

2.3    <u>Closings</u>.  There will be three (and possibly four) Closings:

(a)    A closing on the Base Parcel (anticipated to occur on or after July 31, 2020) on all of the Property excluding the Storm Water Retention Parcel described in <u>Section 9.3</u> and the lands to be released by Seller from the Mitigation Bank, and at which Closing the Iluka Buffer Parcel will be optioned;

(b)    A closing on the lands to be released from the Mitigation Bank on or prior to December 31, 2024, and

(c)    A closing on the Storm Water Pond Parcel to occur on or before December 31, 2023.



(d)    A potential closing on the Iluka Buffer Parcel pursuant to the Iluka Option if Purchaser exercises the Iluka Option on or before the earlier to occur of (i) December 31, 2022 or (ii) sixty (60) days after Purchaser closes on all or substantially all of the Iluka Tract (as hereinafter defined).

## ARTICLE 3
## EARNEST MONEY

3.1    Amount; Terms.    Purchaser shall deliver to First American Title Insurance Company ("*Escrow Agent*") within three (3) business days after the Effective Date by bank wire of immediately available funds, an initial deposit in the amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "*Initial Deposit*").  Within three (3) business days after the expiration of the Inspection Period (as defined below), Purchaser shall deliver to Escrow Agent an additional deposit in the amount of One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00) (the "*Additional Deposit*").  The Initial Deposit and the Additional Deposit are collectively referred to as the "*Earnest Money*."  The Earnest Money shall be deposited by Escrow Agent in an interest-bearing account with a national banking institution.   If the sale of the Property is consummated pursuant to the terms of this Agreement, the Earnest Money shall be paid by Escrow Agent to Seller at Closing and applied to the applicable component of the Purchase Price to be paid by Purchaser.  However, if as of the initial Closing Seller has not yet obtained a release of lands from the Mitigation Bank, the Closing on the Mitigation Bank Parcel shall be deferred and $450,000 of the Earnest Money shall be allocated thereto and shall remain in escrow.  Interest earned on the Earnest Money shall be credited to Purchaser. If the transaction closes, at Closing any interest earned on the Earnest shall be credited to Purchaser by applying the same against the Purchase Price or delivering the interest to Purchaser.

## ARTICLE 4
## INSPECTION PERIOD

4.1    Duration.  Purchaser shall have the right, subject to the terms in this Article 4, commencing on the Effective Date and ending at 5:00 p.m. on the date that is ninety (90) days after the later of (i) the Effective Date and (ii) the receipt of the Commitment (and copies of the exceptions listed therein as provided in Section 5.1) (the "*Inspection Period*"), to investigate the Property to determine whether or not the same is satisfactory to Purchaser, in Purchaser's sole discretion.

4.2    Entry and Inspection.  Seller shall make the Property available for inspection by Purchaser and Purchaser's employees, agents, and contractors upon not less than twenty-four (24) hours' notice to Seller in each instance (which notice may be provided by email).  Purchaser shall not conduct or allow any physically intrusive testing of, on, or under the property without Seller's consent, which shall not be unreasonably withheld.  All such inspections, investigations, and examinations shall be undertaken at Purchaser's sole cost and expense.  Purchaser will coordinate all on-site inspections with Seller so that Seller shall have the option of having a representative present at any and all such on-site inspections.  Purchaser shall not cause any damage to the Property during its inspections. After completing any such inspections, Purchaser shall promptly restore and repair or, at Seller's option, reimburse Seller for repair and restoration costs, with regard to any damage caused by Purchaser's inspections to substantially the same condition that existed immediately prior to such inspection, and Purchaser hereby agrees to

-3-



indemnify and hold Seller harmless from any and all claims made or causes of action brought against Seller or the Property resulting from the activities of Purchaser or any of Purchaser's employees, contractors, consultants, agents, or servants in conducting any such inspections on the Property.  Prior to entering onto the Land, Purchaser shall obtain and maintain in effect, and shall cause its agents, contractors, subcontractors and other authorized representatives to obtain and maintain in effect, a commercial general liability insurance policy with a limit of not less than $2,000,000 for each occurrence insuring Purchaser's indemnity obligations hereunder and naming Seller as an additional insured.  In the event that Purchaser terminates this Agreement during the Inspection Period (other than due to Seller's default), all materials acquired from third parties by Purchaser shall be furnished to Seller except to the extent that the same may be proprietary to Purchaser.  The terms of this Section 4.2 shall survive the Closing or the termination of this Agreement, as applicable.

4.3    Due Diligence Materials.  Promptly after the Effective Date, Seller shall make available to Purchaser copies of the following items and materials (the "***Due Diligence Materials***") at Seller's office, to the extent the same are in Seller's possession or control: copies of any materials relating to the Property, including, but not limited to, surveys, title insurance policies and commitments, engineering studies, soil investigations and reports, and environmental reports.  Purchaser acknowledges that Seller is providing the Due Diligence Materials as an accommodation to Purchaser and Seller makes no representation or warranty of any kind with respect to the completeness or accuracy of the Due Diligence Materials.  If the Purchaser elects to terminate this Agreement or this Agreement does not close for any reason, Purchaser shall return to Seller all Due Diligence Materials.

4.4    Termination.  Purchaser shall have the right at any time during the Inspection Period to notify Seller in writing that it has elected to terminate this Agreement and receive a return of the Earnest Money if Purchaser in its sole discretion for any reason or no reason determines that the Property is not satisfactory to Purchaser.  In the event of any termination of this Agreement before or after the expiration of the Inspection Period other than a termination due to Seller's default, Purchaser shall assign (to the extent assignable by Purchaser without the consent or approval of any person or entity) any governmental approvals and any pending applications for approvals obtained or made by Purchaser to Seller at no cost to Seller prior to the release of the Earnest Money to Purchaser, and Purchaser shall indemnify, defend, and hold Seller harmless for any claims by third parties for fees and costs relating to such approvals and any pending applications occurring prior to such assignment to Seller by Purchaser.

**ARTICLE 5**
**TITLE AND SURVEY**

5.1    Title.  As soon as practicable after the Effective Date, Seller shall obtain, at Seller's expense but to be reimbursed by Purchaser at Closing, (i) a title commitment (the "***Commitment***") through the Escrow Agent (the "***Title Company***"), agreeing to issue to Purchaser an owner's title insurance policy (the "***Title Policy***") in the total amount of the Purchase Price insuring fee simple title to the Property, subject only to the requirements of, and matters shown on, the Commitment, and (ii) a sixty year chain-of-title and environmental lien search (the "***60 Year Search***"), with copies of the referenced deeds and other instruments.  Seller has previously ordered such title work and anticipates receiving the same on or about April 29, 2020.  Promptly after receipt of the Commitment, Seller shall provide a copy of the Commitment



and legible copies of all documents referenced therein (to the extent publicly available copies or copies otherwise in Seller's possession are legible) to Purchaser.

(a)    Within thirty (30) days after the receipt by Purchaser of the Title Commitment and such copies of the exceptions, Purchaser shall deliver written notice to Seller (the "*Title Objection Notice*") of any defects or objections to the title appearing in the Commitment (each a "*Title Defect*" and collectively, the "*Title Defects*"). Any failure by Purchaser to timely deliver the Title Objection Notice shall be deemed Purchaser's approval of the Commitment and waiver of any objection to the matters contained therein. Within ten (10) business days after receipt of the Title Objection Notice, Seller shall provide written notice to Purchaser (the "*Title Objection Response*") of those Title Defects it elects to attempt to cure or elects not to cure and Seller shall have until Closing to cure said Title Defects.

(b)    Subject to the limitations in this paragraph, Seller shall not be required to cure any Title Defect shown as a specific exception on Schedule B-I or B-II of Commitment other than the Mandatory Removal Liens (as hereinafter defined); provided, however, that Seller agrees on or before the Effective Date to commence immediately to use commercially reasonable efforts to vacate plats of record or otherwise close or abandon roads set forth on such plats. Any failure of Seller to provide the Title Objection Response shall be deemed Seller's election to cure any such Title Defects. If Seller elects not to cure any or all Title Defects other than Mandatory Removal Liens, Purchaser may, within the earlier of ten (10) days after the receipt of the Title Objection Response or ten (10) days after the deadline for delivery of the Title Objection Response, in its sole discretion and as its sole remedy, either (y) terminate this Agreement and receive return of the Earnest Money, or (z) waive such Title Defects and consummate the Closing without reduction of the Purchase Price. If Purchaser fails to notify Seller in writing of Purchaser's election described in the preceding sentence prior to the time period set forth above, Purchaser shall be deemed to have elected clause (z). If Purchaser elects or is deemed to have elected under clause (z) above in accordance with the foregoing, then any Title Defect previously objected to by Purchaser that Seller has elected not to cure shall become a Permitted Exception.

(c)    Notwithstanding the foregoing provisions, Seller agrees that it shall satisfy, at or before Closing, (i) any monetary liens which were created by, through or under Seller (but not any liens created by, through or under Purchaser), and (ii) liens for real estate taxes for any year during which Seller owned the Property prior to the year in which Closing occurs (collectively, liens in clauses (i) and (ii) being the "*Mandatory Removal Liens*"). Seller shall be required to cure Mandatory Removal Liens as well as provide the deed(s) and affidavit(s) as are customary to permit removal or limitation of general exceptions or as are required of Seller under Article 12.

(d)    If (i) Seller agrees or is deemed to have elected in writing to cure any of Title Objections (other than Mandatory Removal Liens which must be cured by Seller) (ii) Seller has used commercially reasonable efforts to cure such Title Objections and (iii) despite such commercially reasonable efforts the same are not timely cured prior to or at Closing, then, as its sole and exclusive remedy, Purchaser may either (i) accept title as it appears with such defects without a reduction in the Purchase Price, or (ii) terminate this Agreement by giving written notice to Seller. If, by giving written notice as provided in this paragraph, Purchaser elects to terminate this Agreement, Purchaser shall have as its sole remedy the return of the Deposit, and



upon the disbursement thereof to Purchaser, this Agreement and all rights and obligations of the parties hereunder shall terminate and be null and void.

(e)    Permitted Exceptions.  It is understood and agreed that the Property is being sold by Seller to Purchaser free and clear of all liens, claims and encumbrances (but subject to Laws, ordinances and governmental regulations (including but not limited to building, zoning, land use and any subdivision ordinances and regulations) affecting the Property) except the Permitted Exceptions, and it is further understood and agreed that the conveyance by special warranty deed to be delivered by Seller at Closing shall be subject only to the following (collectively, the "*Permitted Exceptions*"):

(f)    All matters shown on the Commitment which are not objected to by Purchaser or as to which Purchaser waived its objection pursuant to Section 5.1;

(g)    Real estate taxes and assessments (but not special assessments unless agreed to by Purchaser) for the year of Closing and subsequent years which are not yet due and payable (subject to proration as set forth herein);

(h)    The following easements, restrictions or other agreements contemplated by this Agreement:

(i)    The Deed Restrictions in the Deed to be attached hereto as Exhibit 8.1 pursuant to Section 8.1;

(ii)    The Clay Pit License Agreement to be attached hereto as Exhibit 9.1 pursuant to Section 9.1;

(iii)    The Temporary Timber Cut Easement to be attached hereto as Exhibit 9.2 pursuant to Section 9.2;

(iv)    The Temporary Storm Water Pond Access Easement to be attached as Exhibit 9.3 pursuant to Section 9.3;

(v)    If previously executed, the Relocated Mitigation Bank Easement to be attached hereto as Exhibit 9.5 pursuant to Section 9.5;

and

(i)    Matters which would be disclosed by an accurate survey or inspection of the Property if as and to the extent that a survey has not theretofore been obtained, or if a survey has been obtained, the specific matters reflected in such survey.

5.2    Survey.  Purchaser shall obtain a new ALTA survey of the Property (except for parts thereof as to which Seller is required to prepare a survey as set forth in the following sentence) to be prepared at Purchaser's expense by a registered land surveyor duly licensed in the State in which the Property is located ("*Survey*").  Seller shall be responsible for obtaining a survey of the lands to be released from the Mitigation Bank and the Storm Water Retention Pond Parcel.



(a) Purchaser shall obtain its Survey at any time prior to December 1, 2020, and the parties agree to adjust (retroactively, if required) the price based upon the total acreage of the lands surveyed in the Base Parcel at $2,750 per acre.

(b) Seller shall at Seller's expense obtain (i) a survey of the land to be sold to Purchaser from the Mitigation Bank, such survey to be completed at least 15 days prior to the closing on the Mitigation Bank released lands, but in no event later than November 30, 2024, and (ii) a survey of the Storm Water Pond Parcel, such surveys to be completed at least 30 days prior to the closing on the Base Parcel.

(c) Both Purchaser and Seller shall have the right to review and comment on each Survey within ten (10) days after receipt thereof to confirm that it accurately depicts the Property. Each Survey shall be currently dated; shall show, among other things, the actual dimensions and acreage of the Property surveyed and the location on the Property surveyed of all improvements, fences, easements, roads and rights-of-way, and in the case of those created by recorded instruments shall give the recording information for such instruments; and shall show thereon a legal description of the boundaries of the Property by metes and bounds or other appropriate legal description. Each Survey shall be certified by the surveyor to Purchaser, Seller, Escrow Agent, and the Title Company, and shall be prepared in such a manner so as to allow the Title Company to delete the standard survey exception from the Commitment and in its place insert the specific survey exceptions based on the Survey. In the event the Survey reflects any adverse matters not acceptable to Purchaser, Purchaser may notify Seller of Purchaser's objections to the Survey at least fifteen (15) business days prior to the expiration of the Inspection Period (or in the case of lands from the Mitigation Bank or the Storm Pond Parcel, within 15 days following receipt of such Survey) . Objections to the Survey shall be treated as Title Defects pursuant to Section 5.1. Seller shall have the right to approve the Survey for consistency with Exhibit A attached hereto and compliance with other provisions of this Agreement, and Purchaser shall cause the surveyor to make any revisions reasonably requested by Seller consistent with the foregoing. Upon approval of the Survey by Seller and Purchaser, the legal description of the Property set forth on the Survey shall be used as the legal description of the Property for purposes of this Agreement. If obtained post-closing, Seller shall provide a quit-claim deed for such surveyed legal description. The provisions of this Section shall survive the closings.

5.3    Later Title Objections. It shall be a condition to Purchaser's obligation to proceed with Closing on the Base Parcel, the Mitigation Bank Parcel and the Storm Water Pond Parcel that between the expiration of the Inspection Period and the date of the relevant Closing, no new survey or title matter not approved during the Inspection Period or deemed approved by Purchaser during the Inspection Period pursuant to this Section 5 shall have arisen and which in the Purchaser's good faith determination materially and adversely affects the title to or the use of more than $10,000 in value of the Base Property, the Storm Water Parcel or the Mitigation Bank Parcel utilizing the value schedule attached as Schedule 5.3, unless the same is either (i) caused by, through or under the acts or omissions of Purchaser or its agents, invitees, or contractors, or (ii) is consented to or agreed to by Purchaser in writing pursuant to the terms of this Agreement. Purchaser shall notify Seller within ten (10) business days after Purchaser acquires actual knowledge of any such new title or survey matter to which Purchaser objects, and if Purchaser does not notify Seller of any objection within such ten (10) business day period, Purchaser shall

-7-

be deemed to have waived any such objection and shall proceed to Closing without any credit or reduction in the Purchase Price because of such title or survey matters.  If Purchaser properly and timely notifies Seller of any new title or survey matter to which Purchaser objects, then Seller shall have the right to extend the Closing Date by up to thirty (30) days to permit Seller to cure such objection and Seller shall use its good faith efforts to cure such defects.  However, Seller shall not be required to bring suit or otherwise spend more than $5,000.00 to effect a cure, unless such new title or survey matter (i) is caused by the intentional or willful acts of Seller after the initial date of the Survey or Commitment as applicable, or (ii) such defect is a Mandatory Removal Lien or a third party monetary lien not caused by, through or under Purchaser, in which case Seller shall be required to cure such defect(s).  If such title defect is a monetary defect not exceeding $10,000, Purchaser agrees that the Title Company may insure over such defect.  If Seller is unable or elects not to cure such objection that Seller is not required to cure, then Purchaser's sole rights shall be to either (i) terminate this Agreement prior to Closing as the same may be extended as provided herein, in which event the Earnest Money shall be returned to Purchaser, or, (ii) waive the objection and proceed to Closing without reduction in the Purchase Price; provided, however, and notwithstanding the foregoing, in the event that such objection is required to be cured by Seller pursuant to the terms of this Agreement, Purchaser may pursue the default remedies set forth in Section 14.1.

**ARTICLE 6**

**REPRESENTATIONS AND WARRANTIES OF SELLER**

6.1    Seller's Representations and Warranties.  Subject to the possible qualification set forth in Section 6.2 below, Seller hereby represents and warrants to Purchaser the following matters are true and correct in all material respects as of the Effective Date and as of the Closing Date:

(a)    Seller is a corporation that is duly organized, validly existing and in good standing under the laws of the State of Florida.  Seller will keep in full force and effect through the Closing Date its legal existence.

(b)    Seller owns fee simple title to the Property, subject only to the Permitted Exceptions.

(c)    The execution, delivery and performance by Seller of this Agreement is within the authority of Seller, has been authorized by all necessary proceedings and do not and will not contravene any provision of law, trust agreement, partnership agreement, any other organizational papers or any amendments thereof or any written agreement or contract to which Seller is a party. The person signing this Agreement on behalf of Seller is authorized to do so.

(d)    There is no material action, suit or proceeding pending or, to Seller's Knowledge, threatened against or affecting the Property, or arising out of the ownership, management, or operation of the Property, this Agreement or the transactions contemplated hereby which would have an adverse effect on Seller's ability to consummate the transaction contemplated by this Agreement.

(e)    Since January 1, 2013, Seller has received no written notice from any municipal or other governmental authority of any presently outstanding and uncured violation of

-8-

any zoning ordinance or related law; and to Seller's Knowledge Seller has received no written notice from any municipal or other governmental authority of any presently outstanding and uncured violation of any zoning ordinance or related law for any prior period.

(f)     Excluding Seller's removal of timber pursuant to Section 9.2 set forth herein, no timber has been cut or removed from the Property since January 1, 2020, except for routine fire line maintenance.

(g)     Except as set forth on Schedule 6.1(g) or any additional leases or licenses executed or renewed as permitted by Section 8.2 with respect to the Assumed Contracts (as defined in Section 8.2 below), there are no outstanding service contracts, licenses or leases concerning the Property or any portion thereof that will not be terminated by Seller at or prior to Closing.

(h)     As of the date of this Agreement, there are no special assessments affecting any portion of the Property.

(i)     As of the date of this Agreement, there is no pending or, to Seller's Knowledge, threatened condemnation of any portion of the Property.

(j)     Except as disclosed on Schedule 6.1(j), to Seller's Knowledge no portion of the Property has been utilized as a garbage or trash dump for refuse material, such terms to exclude occasional disposal of trash from time to time by illegal dumpers as may occur on rural timber tracts.

(k)     To Seller's Knowledge no underground storage tanks (other than for water) have been utilized on the Property except as disclosed on Schedule 6.1(k).

(l)     Except as disclosed on Schedule 6.1(l) for former cattle dip vat or otherwise disclosed in any environmental reports provided to the Purchaser by Seller, to Seller's Knowledge, except for the use of herbicides, pesticides, fertilizer and petroleum product in connection with the silvicultural activities and other Hazardous Substances in background quantities, all in compliance with applicable laws and rules: (i) neither Seller nor Seller's employees or contractors have discharged Hazardous Substances on the Property and (ii) no third party has discharged Hazardous Substances on the Property.

(m)     Except as set forth in Schedule 6.1(m) for the obligation to construct the realignment of Gary Road, other than instruments, if any, recorded in the Official Public Records of Clay County, Florida or except as specified in the Commitment: (i) Seller is not a party to any agreement or covenant entered into after January 1, 2004 with any governmental, quasi-governmental, community association, not-for-profit entity or environmental organization or other person or entity that would alter, limit or restrict the use or development of the Property after Closing, (ii) to Seller's Knowledge there is no agreement or covenant which would alter, limit or restrict the use or development of the Property after Closing, and (iii) Seller has not been a party to any litigation in which a judgment has been sought or entered that would limit or restrict the use or development of the Property after Closing. Purchaser understands that Clay County, the State of Florida, have by law enacted zoning and land use restrictions.



(n)    Except as disclosed on Schedule 6.1(n) and except for the potential navigability of Greens Creek and Peters Creek, Seller has not received any written communications (or to Seller's Knowledge, oral communications) from the State of Florida or other governmental authorities claiming ownership of any part of the Property as swamp lands, sovereign lands, or artificially filled or exposed lands.

(o)    Seller is not a "foreign person" or "disregarded entity" within the meaning of the IRC of 1986, as amended.

(p)    Seller (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website,

https://www.treasury.gov/ofac/downloads/sdnlist.pdf

or at any replacement website or other replacement official publication of such list and (ii) is currently in compliance with and will at all times during the term of this Agreement remain in compliance with the regulations of the Office of Foreign Asset Control of the Department of the Treasury and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

(q)    As used in this Agreement:

"Hazardous Substances" means any petroleum product, radioactive material, or any substance defined as "toxic" or "hazardous" or regulated as such under state or federal law.

"Seller's Knowledge" shall have the meaning set forth in Section 6.3(d) below.

6.2    Qualifications to Seller's Representations and Warranties.

(a)    As of the date of this Agreement Seller affirms that Seller in good faith believes that all of Seller's representations and warranties are true and correct in all material respects as stated.

(b)    As the material accuracy of Seller's representations and warranties is a condition precedent to Purchaser's obligation to close under Section 10.1(b), Purchaser shall have a right to terminate this Agreement if a representation or warranty of Seller is not true in any material respect in the event that Seller does not effectuate a cure of such any such matter within twenty (20) days of notice or discovery of such material matter.  Purchaser shall have a period of ten (10) days after expiration of Seller's cure period to terminate this Agreement in the event Seller fails to cure such matter.

(c)    As to the representations and warranties in paragraphs 6.1(e) through 6.1(n), Seller will be delivering to Purchaser and Purchaser's counsel certain disclosure materials at least thirty (30) days prior to the end of the Inspection Period in a manner that causes such materials to be a "Seller's Disclosure Document" as set forth in paragraph 6.2(g) below.  Seller further covenants to provide Purchaser with copies of any fact, notice, claim or demand received or otherwise discovered by Seller during the term of this Agreement which would materially

-10-



change any representation or warranty given by Seller.  If such "Seller's Disclosure Document(s)" or such notice reveal that a representation or warranty in paragraphs (d) through (n) is untrue, Seller shall promptly identify in writing to Purchaser and Purchaser's counsel the representation or warranty deemed untrue and the specific aspects thereof, such matter thereupon being an "*Exception Matter.*"  To that extent disclosed as an *Exception Matter,* such representation and warranty shall be deemed modified if Purchaser does not exercise Purchaser's right to terminate as to the parcel involved and proceeds to Closing on such Parcel.  The parties acknowledge and agree that prior to closing on the Base Parcel, Purchaser shall only be able to terminate this Agreement as to all parcels.

(d)    Should Purchaser prior to the relevant parcel Closing independently acquire actual knowledge other than through an *Exception Matter* that a representation or warranty as to a specific matter pertaining to a parcel is not true, Purchaser shall promptly notify Seller.  Such representation and warranty shall be deemed modified if Purchaser does not exercise Purchaser's right to terminate and proceeds to Closing on such parcel pursuant to the terms set forth above.

(e)    Upon any termination of this Agreement by Purchaser as a result of an *Exception Matter* or other actual knowledge acquired by Purchaser as stated in paragraph (d), neither party shall have any further rights or obligations hereunder except as expressly provided for herein.

(f)    Notwithstanding the foregoing, in the event that any such breach of a representation or warranty is caused by Seller after the Effective Date through a breach of Seller's covenants set forth in this Agreement, Purchaser may pursue the default remedies set forth in Section 14.1.

(g)    "Seller's Disclosure Documents" means a document made available to Purchaser and its counsel on or prior to that date which is thirty (30) days prior to expiration of the Inspection Period and which document has been uploaded to a shared data site between Purchaser, Purchaser's counsel and Seller that sets forth the date of the documents uploaded to such data site.

6.3    Limitations Regarding Representation and Warranties.

(a)    Purchaser acknowledges and agrees that Seller, except as set forth herein or in any of the closing documents, has not made, does not make and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether expressed or implied, oral or written, past, present or future, of, as to, concerning or with respect to the Property including, without limitation:

(i)    Value, nature, quality or condition of the Property;

(ii)    Income to be derived from the Property;

(iii)    Suitability of the Property for any and all activities and uses which Purchaser may conduct thereon;

(iv)    Compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body;

-11-



(v)    Habitability, merchantability, marketability, profitability or fitness for particular purpose of the Property;

(vi)    Manner or quality of the construction or of the materials incorporated into the Property; or

(vii)    Manner, quality, state of repair or lack of repair of the Property.

(b)    Except for the representations and warranties made by Seller (i) contained herein or in any of the closing documents, or (ii) provided to Purchaser's environmental consultants in form attached as Schedule 6.3(b), Purchaser further acknowledges and agrees that Purchaser has been given the opportunity to inspect the Property and will be able to conduct additional inspections during the Inspection Period. Purchaser further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information and makes no representations as to the accuracy or completeness of any such information. Purchaser agrees that Seller is not, and shall not be, liable or bound in any manner by any verbal or written statements, representations, or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, or such person's agent, employee, servant or any other person related to such broker. Purchaser further acknowledges and agrees that to the maximum extent permitted by state, local and federal law, the sale of the Property as provided for herein is made on a "AS IS" condition and basis with all faults. It is understood and agreed that the Purchase Price has been adjusted by prior negotiations to reflect that all of the Property is sold by Seller and purchased by Purchaser subject to the foregoing.

(c)    Without limiting the above, Purchaser on behalf of itself waives its right to recover from, and forever releases and discharges, Seller, Seller's affiliates, partners, trustees, shareholders, beneficiaries, directors, officers, employees and agents of each of them, and their respective heirs, successors, personal representatives and assigns, from any and all demands, claims, legal or administrative proceedings, losses, liabilities, damages, penalties, fines, liens, judgments, costs or expenses whatsoever including, without limitation, attorneys' fees and costs, whether direct or indirect, known or unknown, foreseen or unforeseen, that may arise on account of or in any way be connected with the Property, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 6901, et seq.), the Resources Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901, et seq.), the Clean Water Act (33 U.S.C. Section 1251, et seq.), the Safe Drinking Water Act (14 U.S.C. Section 1401, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801, et seq.), the Toxic Substance Control Act (15 U.S.C. Section 2601, et seq.), and Chapters 376 and 403, Florida Statutes, all as amended or modified, **except for** (i) a breach of Seller's representations or warranties concerning such matters or (ii) any discharge of Hazardous Substances made by Seller on the Property, but excluding discharges related to the Cattle Dip Vat identified on Schedule 6.1(l).

(d)    As used in this Agreement, or in any other agreement, document, certificate, or instrument delivered by Seller to Purchaser,

(i)    the phrase "to Seller's Knowledge", or any similar phrase shall mean the actual, not constructive or imputed, knowledge of George Egan, without any

-12-

obligation on his part to make any independent investigation of the matters being represented and warranted, or to make any inquiry of any other persons, or to search or examine any files, records, books, correspondence and the like, and there shall be no personal liability on the part of such person absent actual, willful fraud, and

(ii)    the phrase "to Purchaser's knowledge", or any similar phrase shall mean the actual, not constructive or imputed, knowledge of Greg Alexander, without any obligation on his part to make any independent investigation of the matters being represented and warranted, or to make any inquiry of any other persons, or to search or examine any files, records, books, correspondence and the like, and there shall be no personal liability on the part of such person absent actual, willful fraud.

(e)    The provisions of this Article 6 shall survive Closing or earlier termination of this Agreement. The representations and warranties of Seller contained in Section 6.1 are made as of the Effective Date and shall be deemed to be remade on and as of the date of the Closing, and shall survive the Closing for only a period of nine (9) months from and after the relevant Closing Date with respect to any claim that is not asserted in writing (with specificity as to the facts giving rise thereto) by Purchaser to Seller within such period.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

7.1    <u>Purchaser's Representations and Warranties</u>.    Purchaser hereby represents, warrants and covenants to Seller the following matters are true and correct as of the Effective Date and as of the Closing Date:

(a)    Purchaser is a limited liability company that is duly organized, validly existing and in good standing under the laws of the State of Delaware. Purchaser will keep in full force and effect its legal existence and all licenses and franchises necessary for the conduct of its business. The person signing this Agreement on behalf of Purchaser has been authorized to do so.

(b)    The execution, delivery and performance by Purchaser of this Agreement is within the authority of Purchaser, has been authorized by all necessary proceedings and does not and will not contravene any provision of law, Purchaser's operating agreement, articles of organization, other organizational documents or any amendment thereof. Upon execution and delivery by Purchaser, this Agreement will be the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

(c)    Purchaser (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, https://www.treasury.gov/ofac/downloads/ sdnlist.pdf, or at any replacement website or other replacement official publication of such list and (ii) is currently in compliance with and will at all times during the term of this Agreement remain in compliance with the regulations of the Office of Foreign Asset Control of the Department of the Treasury and any statute, executive order (including the September 24, 2001,

-13-



Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

(d)    There are no judgments outstanding against Purchaser or petitions, suits, claims, causes of actions or moratoria or any other proceedings pending or threatened against Purchaser before any court or other governmental, administrative, regulatory, adjudicatory, or arbitrational body of any kind, which if decided adversely to the Purchaser would adversely affect Purchaser's ability to perform the obligations of the Agreement.

7.2    Survival. All the provisions of Article 7 shall survive Closing.

**ARTICLE 8**
**DEED RESTRICTIONS; RESTRICTED USE; OPERATIONS PRIOR TO CLOSING;**
**CERTAIN ENVIRONMENTAL MATTERS**

8.1    Deed Restrictions. The Deed shall restrict a portion of the Property consisting of approximately thirty (30) acres adjacent to the southwest quarter of the new interchange to the First Coast Expressway as more particularly depicted on the map attached hereto as Exhibit A (the "*Interchange Parcel*") from being sold, ground leased or leased for ten (10) years from the Closing Date. In addition, for a period of seven (7) years after the Closing Date, Purchaser shall be restricted from changing the zoning or obtaining entitlements and/or development rights for the development of the Interchange Parcel; provided, however, Purchaser shall be permitted to construct roads or other horizontal infrastructure through the Interchange Parcel but only to the extent such infrastructure is for the benefit of other portions of the Property. Furthermore, Seller shall restrict all of the Property at Closing from being utilized as a wetland mitigation bank or gopher tortoise bank with credits available for sale to third parties (other than in each case of the foregoing 70% owned affiliates as stated below) until such time as the earlier to occur of the following: (i) the Mitigation Bank no longer has any credits, (ii) the Mitigation Bank no longer continues to pursue actively sale of such credits, or (iii) thirty-five (35) years after the Closing Date. Notwithstanding these restrictions, nothing shall preclude the Purchaser from (w) developing the Property for commercial use, residential use or any other use except for those specifically listed and prohibited above, (x) subjecting portions of the Property to conservation easements to obtain wetland credits required to permit development on other portions of the Property, (y) creation of banks for endangered species that provide credits required to permit development on other portions of the Property; provided that any of such credits are not sold, transferred or utilized for offsite development to any third parties other than affiliates of Purchaser with at least seventy percent (70%) common ownership, or (z) creating wetland mitigation or gopher tortoise credits for the use of Purchaser or any affiliate of Purchaser with at least 70% common ownership. The restrictions set forth in this Section 8.1 are collectively referred to herein as the "*Deed Restrictions*". Seller and Purchaser shall agree upon the form of the Deed prior to expiration of the Inspection Period, such Deed shall be attached by amendment to this Contract prior to expiration of the Inspection Period.

8.2    No Conveyance or Encumbrance. From and after January 1, 2020, Seller shall not encumber, convey, lease, license or transfer any interest in any of the Property prior to the Closing, excluding however (i) annual hunting and apiary leases/licenses on arm's length terms and in accordance with Seller's historic business practices (provided that deer hunting with dogs and hog/boar hunting with dogs will not be permitted other than for retrieval purposes), which

-14-



licenses and leases shall be assumed by Purchaser at Closing (the "*Assumed Contracts*"); and (ii) encumbrances that Seller may in the ordinary course of its business record to effectuate the terms of this Agreement, e.g., a notice of an environmental permit for the storm water pond on the Storm Water Pond Parcel.

8.3    Operations Prior to Closing.  From and after January 1, 2020, Seller shall not suffer or permit any timber to be cut or removed from the Property prior to Closing, excluding, however sales of timber from the Timber Parcel where Purchaser is compensated as and to the extent provided in Section 9.2 or pursuant to routine fire-line maintenance.  Seller shall continue to operate the Property in accordance with prudent timber management practices prior to Closing.  Seller will use commercially reasonable efforts to maintain through closing any agricultural or "green belt" discounts from Clay County for ad valorem taxes on the Property that were in effect in 2019.  Seller shall not discharge Hazardous Materials onto the Property between the Effective Date and the Closing.

8.4    Loss Prior to Closing.  Should timber or improvements on the Property suffer a loss from casualty or other causes, the Purchase price shall be reduced by the amount of such loss net of the cost of and recovery from salvage operations, but only if such net loss amount exceeds $100,000.00, in which case the entire net loss shall reduce the Purchase Price.  The amount of loss shall be determined by a forester mutually acceptable to Seller and Buyer, F&W Forestry is agreed to be an acceptable forester.  Notwithstanding the foregoing, in the event that the amount of the loss net of the cost of and recovery from salvage operations exceeds $500,000.00, either party may terminate this agreement by providing written notice to the other within twenty (20) days of receipt of written notice of the net loss from F&W Forestry.

8.5    Cooperation with Environmental Assessment.  Seller shall cooperate with Purchaser's environmental consultants and shall use commercially reasonable efforts to furnish to them any information reasonably requested within Seller's knowledge or control; provide that nothing shall require Seller to represent and warrant the accuracy of the information so provided except as to the information provided in the form on Schedule 6.3(b).

**ARTICLE 9**
**PROPERTY AGREEMENTS**

Purchaser and Seller agree on the following items and shall agree on forms of the following, indicated documents on or prior to the end of the Inspection Period:

9.1    Clay Pit License Agreement.  For a period of five (5) years after Closing, Seller shall reserve the right to access the clay pit located on the Property in the approximate location as set forth on the map attached hereto as Schedule 9.1 (the "*Clay Pit*") in order to remove up to thirty (30) truckloads of clay each year from the Clay Pit.  Seller and Purchaser shall use good faith efforts to mutually agree on the footprint of clay removal from the Clay Pit during the Inspection Period.  Seller shall not be required to pay or reimburse Purchaser for removal of the clay from the Clay Pit up to the allocated amount as agreed upon between Seller and Purchaser. Seller and Purchaser shall enter into a license agreement at Closing granting Seller rights to access the Clay Pit and to remove such amounts of clay therefrom (the "*Clay Pit License Agreement*"). Seller and Purchaser shall agree upon the form of the Clay Pit License Agreement prior to expiration of the Inspection Period, including agreement as to the dimensions and



sloping requirements for the Clay Pit, and it shall be attached by amendment to this Contract prior to expiration of the Inspection Period. The Clay Pit License Agreement shall contain insurance requirements and indemnifications in favor of Purchaser similar to those elsewhere contained in favor of Seller in this Agreement.

9.2    Temporary Timber Cut Easement. Either prior to or after Closing, but during the calendar year 2020, Seller shall have the right to access the Property (pursuant to a temporary easement if after Closing (the "*Temporary Timber Cut Easement*") in order to cut and remove timber on approximately five hundred forty-six (546) acres of the Property in the approximate location depicted on the map attached hereto as Schedule 9.2 attached hereto (the "*Timber Parcel*"). Seller estimates that its timber operations on the Timber Parcel will generate approximately Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) in gross revenue. To the extent that Seller receives in excess of Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00), Seller shall pay such excess to Purchaser at Closing, if the timber cut is completed prior to Closing, or promptly remit such excess amount to Purchaser if such timber cut is completed after the Closing Date. In addition, Seller, at its sole cost and expense, shall rake, bed and herbicide the Timber Parcel to the extent harvested by Seller pursuant to its customary timber management practices. Purchaser agrees to pay for any double bedding requested by Purchaser to the extent such exceeds Seller's customary timber management practices. Purchaser shall be responsible for the expense of purchasing and replanting seedlings on the harvested component of the Timber Parcel. The term of the Temporary Timber Cut Easement shall be extended on a day for day basis for any period of days during the initial term that any mill that Seller typically sells product to is either (i) temporarily closed or (ii) paying less than $27.00 per ton for chip-n-saw or $17.00 per ton for pulp, provided however that in no event shall Seller's right to cut and remove timber extend beyond that date which is two years after the closing on the Base Parcel. Seller and Purchaser shall agree upon the form of the Temporary Timber Cut Easement prior to expiration of the Inspection Period, and it shall be attached by amendment to this Contract prior to expiration of the Inspection Period. The Temporary Timber Cut Easement shall contain insurance requirements and indemnifications in favor of Purchaser similar to those elsewhere contained in favor of Seller in this Agreement. This Section 9.2 survives the Closing.

9.3    Storm Water Pond. Purchaser and Seller agree that there is approximately a twenty-two (22) acre storm water pond to be constructed on a portion of the Property in the area identified on the map attached hereto as Schedule 9.3 attached hereto (the "*Storm Water Pond Parcel*"). At the initial Closing, Seller shall retain the Storm Water Pond Parcel until such time as (i) the storm water pond construction is completed by Seller's contractor and (ii) Seller' engineer has certified in writing that the storm water pond constructed thereon has been substantially completed in accordance with the permit issued authorizing such construction (collectively, the "*Trigger Event*"). Seller shall retain all revenue from dirt or other materials sold from the Storm Water Pond Parcel prior to conveyance of such parcel to Purchaser. Seller shall be obligated on or before November 30, 2023, to cause (i) permitting of the Storm Water Pond Parcel, (ii) its contractor to complete construction of the storm water retention pond as permitted, and (iii) certification by Seller's engineer as above set forth. Within thirty (30) days of Seller providing written notice to Purchaser of the Trigger Event, Seller and Purchaser shall close on the Storm Water Pond Parcel. At the initial Closing, Seller shall retain temporary access for inspection and monitoring purposes (and not for the hauling of materials or dirt) over a trail

-16-



road to the Storm Water Pond Parcel pursuant to a license agreement to be agreed upon by the parties during the Inspection Period, and it shall be attached by amendment to this Contract prior to expiration of the Inspection Period. The license agreement shall contain insurance requirements and indemnifications in favor of Purchaser similar to those elsewhere contained in favor of Seller in this Agreement. At Closing for the Base Parcel, (i) Seller shall escrow the closing documents required to convey the Storm Water Pond Parcel with Escrow Agent, and (ii) Purchaser shall escrow the component of the Purchase Price associated with the Storm Water Pond Parcel with Escrow Agent. Within thirty (30) days of written notice from Seller to Purchaser of the Trigger Event, Seller and Purchaser shall break escrow and close on the Storm Water Pond Parcel. The parties shall record a short form contract of sale for the Storm Water Parcel that recites Seller's right to remove soil, Seller's obligation to complete construction of the Pond, and Seller's obligation to convey the Storm Water Parcel to Purchaser. During the Inspection Period the parties shall agree upon the short form of the contract to be recorded and it shall be attached by amendment to this Contract prior to expiration of the Inspection Period. This Section 9.3 survives the Closing.

9.4    Iluka Buffer Parcel. At the Closing of the Base Parcel, Seller, as optionor, shall enter into an option with Buyer, as optionee, for the 322 Acre Iluka Buffer Parcel for an option fee of $50,000.00 (the "**Option Fee**"), said option to expire on the earlier of (i) December 31, 2022, or sixty (60) days after Purchaser closes on all or substantially all of the Iluka Tract. The map of the Iluka Buffer Parcel is shown on Schedule 9.4. Optionee shall have the right under option at any time on or after the initial Closing to acquire the Iluka Buffer Parcel from Seller for Two Thousand, Seven Hundred Fifty Dollars ($2,750) per acre less the Option Fee. Buyer may exercise its option by notice in writing to Seller at any time prior to expiration of the option. The form of the option (the "**Iluka Option**") will be agreed upon and attached during the Inspection Period as Exhibit 9.4.

(a)    Prior to expiration of the Iluka Option, Seller shall not convey, encumber or alienate its fee simple interests in the Iluka Buffer Parcel or otherwise engage in any corporate transaction that would invalidate the restrictions on the Iluka lands in the Restriction Agreement. Seller shall not consent to any change or amendment to the Restriction Agreement without the consent of Purchaser.

(b)    If Iluka should notify Seller pursuant to Section 2 of the Restriction Agreement that Iluka is electing to sell all or any portion of the lands covered by the Restriction Agreement (the "**Iluka Tract**") to a third party, Seller will notify Purchaser within three (3) business days. Should Purchaser request, Seller shall exercise the right of first refusal on the Iluka Tract provided that monies are placed in escrow by Purchaser sufficient to permit the purchase of the lands, and Purchaser makes available any escrowed deposit required by such exercise. Such purchase and the related costs thereof shall be funded by Purchaser (i) through a wholly-owned special purpose limited liability company owned by Seller whose interests are certificated and pledged to Purchaser, (ii) by means of a purchase money mortgage on the lands being purchased, or (iii) by other means acceptable to Purchaser and Seller. Seller agrees to convey beneficial ownership of the lands purchased from Iluka or its successors to Purchaser immediately following Seller's acquisition. Purchaser shall pay the reasonable attorneys' fees of Seller in connection with such transaction provided that Seller utilizes counsel in Florida acceptable to Purchaser.



(c)    Seller agrees upon request of Purchaser to terminate the Restriction Agreement upon purchase of the Iluka Buffer Parcel by Purchaser from Seller pursuant to the Iluka Option.

(d)    This Section 9.4 shall survive the Closing.

9.5    Relocated Mitigation Bank Access Easement.    Prior to Closing, Seller and Purchaser shall obtain an easement from a third party required to relocate the current access easement granted to Seller, the St. Johns River Water Management District ("*SRJWMD*") and Army Corp of Engineers ("*ACOE*") that provides access to Seller, SJRWMD and ACOE to Greens Creek Mitigation Bank located adjacent to the Property as shown on Schedule 9.5. Seller and Purchaser will work to establish the relocated access for Seller, SJRWMD and ACOE from Spring Bank Road located to the south of Greens Creek Mitigation Bank (the "*Relocated Mitigation Bank Access Easement*"). Seller and Purchaser shall agree upon the form of the Relocated Mitigation Bank Access Easement prior to expiration of the Inspection Period, together with any required third-party grantor necessary to obtain such easement, and the form of Relocated Mitigation Bank Access Easement shall be attached by amendment to this Contract prior to expiration of the Inspection Period. Seller shall bear the sole cost and expense of any survey costs related to establishing the exact parameters of the Relocated Mitigation Bank Access Easement.

9.6    Mineral Rights. Purchaser acknowledges that Seller does not own an undivided fraction of the mineral rights on approximately two hundred thirty (230) acres of the Property shown on Schedule 9.6 (the "*Encumbered Property*"), which mineral rights are currently owned 50% by Seller, 40% by a third party and 10% by another third party (collectively, the "*Mineral Rights*"). The Encumbered Property is a portion of the Base Parcel. Seller shall use commercially reasonable efforts to purchase that portion of the Mineral Rights that Seller does not own or obtain a release of the right of entry from both third party owners prior to Closing, at Seller's sole cost and expense. In the event that Seller is unable to purchase all of the Mineral Rights or eliminate the rights of entry with respect to such non-owned Mineral Rights at the initial Closing of the Encumbered Property, the Purchase Price for the Encumbered Property shall be reduced to $1,750.00 per acre (the "*Reduced Price*"). At the initial Closing of the Encumbered Property, Seller shall retain its 50% undivided ownership of the Mineral Rights if it received the Reduced Price. Seller agrees not to exercise a right of entry with respect to the retained Mineral Rights. Notwithstanding the foregoing, Purchaser agrees to pay Seller an additional $1,000.00 per acre for the Encumbered Property (the "*Additional Consideration*") within thirty (30) days of when and if Seller obtains all of the Mineral Rights or otherwise causes all rights of entry to be removed with respect to the Mineral Rights on the Encumbered Property; provided that (i) such obtainment of all of the Mineral Rights or removal of entry occurs on or before December 31, 2025, and (ii) the Title Company issues and endorsement adding "without right of entry" to the Title Policy on the Encumbered Property or otherwise deletes all exceptions in the policy related to reservation of the Mineral Rights on the Encumbered Property. Seller agrees to transfer its ownership of the Mineral Rights to the Purchaser via quit claim deed at the earlier to occur of (i) receipt of the Additional Consideration simultaneously from Purchaser or (ii) December 31, 2025 to the extent that Seller is not owed the Additional Consideration pursuant to this Section 9.6 as of such date. This Section 9.6 shall survive the Closing.

-18-

9.7     Development Agreement for Gary Road. At the Closing of the Base Parcel, Seller and Purchaser shall enter into a development agreement (the "**Gary Road Development Agreement**") obligating Purchaser to relocate Gary Road south of SR 16 at its intersection with SR 16 in the general configuration set forth on Exhibit B attached hereto (the "**Gary Road Realignment**"). Purchaser shall be solely responsible for the design, permitting and construction costs of the Gary Road Realignment, which may include posting a bond with Clay County, Florida to secure the completion of the construction of the Gary Road Realignment. The parties acknowledge and agree that the specific location of the Gary Road Realignment will be permitted and approved by Clay County, Florida, and may not exactly comport with the configuration set forth on Exhibit B. The Gary Road Development Agreement shall address the required time period for Purchaser to design, permit and construct the Gary Road Realignment, which realignment project shall be completed on or before June 30, 2022, subject to force majeure, together with any credit enhancements, financial assurance requirements and self-help rights required by Seller or Clay County to secure the performance by Purchaser of the Gary Road Realignment. Seller and Purchaser shall agree upon the form of the Gary Road Development Agreement prior to expiration of the Inspection Period, and it shall be attached by amendment to this Contract prior to expiration of the Inspection Period.

9.8     Property/Timber/Hunting Management Agreement. At Closing, Seller and Purchaser shall enter into a management agreement (the "**Property Management Agreement**") engaging Seller at customary market rates as manager of the Property for timber services and hunting leases for an initial period of five (5) years after Closing. The Property Management Agreement shall contain customary market rate provisions, including without limitation, termination provisions by Purchaser and Seller, optional extensions, and non-solicitation of Seller employees. Seller and Purchaser shall agree upon the form of the Property Management Agreement prior to expiration of the Inspection Period, and it shall be attached by amendment to this Contract prior to expiration of the Inspection Period as Schedule 9.8. Purchaser will provide Seller with an initial draft of the Property Management Agreement for Seller's review and comment within thirty (30) days of the Effective Date.

## ARTICLE 10
## CONDITIONS PRECEDENT TO CLOSING

10.1     Purchaser's Conditions. Purchaser's obligation to close hereunder is subject to the satisfaction or waiver (as applicable) by Purchaser in writing, of the conditions precedent set forth below.

(a)     Title Insurance. The Title Company shall be unconditionally committed to issue an ALTA Form B title insurance policy insuring Purchaser's fee estate in the Property, in the amount of the purchase price subject only to (i) the Permitted Exceptions, and (ii) any item voluntarily imposed by Purchaser at the Closing.

(b)     Seller's Representations; No Default. Seller's representations and warranties contained in this Agreement shall be true and correct in all material respects as of the Closing Date (subject to the provisions of Section 6.2) and there shall be no default by Seller under this Agreement.

-19-



(c)    Seller's Deliveries. Seller shall have complied with all of its covenants and obligations hereunder, including the execution and delivery into escrow of all items required to be executed and delivered by it under Article 11.

(d)    Property Documents. Seller and Purchaser have agreed on the form of the documents set forth in Article 9 of this Agreement (the "Property Documents") prior to the expiration of the Inspection Period.

(e)    Failure of Conditions Precedent. The conditions precedent set forth in this Section 10.1 are solely for Purchaser's benefit and can be waived only by Purchaser in writing.

10.2    Seller's Conditions. Seller's obligation to close hereunder is subject to the satisfaction or waiver by Seller, in writing, of the conditions precedent set forth below.

(a)    Purchaser's Representations; No Default. Purchaser's representations and warranties contained in this Agreement shall be true and correct as of the Closing Date in all material respects and there shall be no default by Purchaser under this Agreement.

(b)    Purchaser's Deliveries. Purchaser shall have complied with all its covenants and obligations hereunder, including the execution and delivery into escrow all items as required to be executed and delivered by it under Article 11.

(c)    Property Documents. Seller and Purchaser have agreed on the form of the documents set forth in Article 9 of this Agreement (the "Property Documents") prior to the expiration of the Inspection Period.

(d)    Failure of Conditions Precedent. The conditions precedent set forth in this Section 10.2 are solely for Seller's benefit and can be waived only by Seller in writing.

## ARTICLE 11
## CLOSING

11.1    Closing. The initial closing of this transaction (the "**Closing**") on the Base Parcel shall occur through escrow at the offices of Escrow Agent, on or before the date (the "**Closing Date**") which is the later of (i) July 31, 2020 or (ii) thirty (30) days after the expiration of the Inspection Period. However, upon at least fifteen (15) days' written notice to Purchaser prior to the then-scheduled Closing Date, Seller shall have the right, in Seller's sole discretion, to extend the Closing Date. Notwithstanding the foregoing, in no event shall the initial Closing Date on the Base Parcel, as extended by Seller pursuant to this Section 11.1, occur after December 31, 2020, unless mutually agreed upon in writing by Seller and Purchaser. Furthermore, Seller shall have the right, but not the obligation, to close separately the lands being sold to Purchaser from the Mitigation Bank provided that the Closing on the Mitigation Bank parcel shall occur on or before December 31, 2024 (the "Second Closing"). If the lands from the Mitigation Bank are not sold at the initial closing, $450,000 of the Earnest Money shall be carried forward for the Mitigation Bank Closing. After the Mitigation Bank Closing has occurred or the time therefore expired, only $5,000 shall thereafter be held in escrow for the Storm Water Pond Parcel closing.

11.2    Seller's Deliveries at Closing. At each Closing to the extent applicable, Seller shall deliver or cause to be delivered to Purchaser through escrow the following documents:

-20-



(a)    Special Warranty Deed(s) executed by Seller conveying the Property to Purchaser (the "**Deed**"), subject to the Permitted Exceptions and the Deed Restrictions; (Purchaser agrees that Seller, for convenience on the Base Parcel, may execute and deliver simultaneously to Purchaser up to four (4) deeds based on the allocated values for separate components of such parcel;

(b)    Owner's Affidavit executed by Seller sufficient to permit the Title Company to remove exceptions for the "gap", mechanics liens, and parties in possession;

(c)    Non-Foreign Affidavit executed by Seller stating that Seller is not a foreign person for purposes of the Internal Revenue Code;

(d)    Closing Statement executed by Seller, setting forth credits and closing costs in connection with the transaction evidenced by this Agreement;

(e)    Clay Pit License Agreement (as defined in Section 9.1), which shall be recorded;

(f)    Temporary Timber Cut Easement, if required pursuant to Section 9.2, which shall be recorded;

(g)    Option Agreement for Iluka Buffer Parcel (as defined in Section 9.4), which shall be recorded;

(h)    Relocated Mitigation Bank Access Easement (as defined in Section 9.5), which shall be recorded;

(i)    Gary Road Development Agreement as defined in Section 9.7);

(j)    Property Management Agreement (as defined in Section 9.8);

(k)    Assignment of all Assumed Contracts, permits, development rights and general intangibles pertaining to those portions of the Property being conveyed, all to the extent assignable;

(l)    possession of the Property; and

(m)    such other documents, if any, as Purchaser, Purchaser's lender, or the Title Company may reasonably request in order to effectuate the transaction contemplated by this Agreement.

11.3    <u>Purchaser's Deliveries at Closing</u>.  At each Closing, to the extent applicable, Purchaser shall deliver to Seller through escrow the following:

(a)    the Purchase Price at the time and in accordance with the provisions of Article 2;

(b)    Closing Statement executed by Purchaser;

(c)    Clay Pit License Agreement (as defined in Section 9.1);

(d)     Temporary Timber Cut Easement, if required pursuant to Section 9.2;

(e)     Iluka Option for Iluka Buffer Parcel (as defined in Section 9.4);

(f)     Relocated Mitigation Bank Access Easement (as defined in Section 9.5);

(g)     Gary Road Development Agreement (as defined in Section 9.7);

(h)     Property Management Agreement (as defined in Section 9.8); and

(i)     such other documents, if any, as Seller, Seller's attorney, Seller's lender, or the Title Company may reasonably request in order to effectuate the transaction contemplated by this Agreement.

## ARTICLE 12
## CLOSING COSTS AND PRORATIONS

12.1   Closing Costs.  Purchaser and Seller shall each pay their own attorney's fees.

(a)     At each Closing to the extent applicable, Seller shall pay

(i)     all costs (including recording costs) associated with curing any Title Defects that Seller is required to cure,

(ii)     the documentary stamp tax on the Deed,

(iii)     recording costs for the Deed,

(iv)     the costs of the Survey of the lands from the Mitigation Bank and the Storm Water Pond Parcel, and

(v)     if not paid by Seller prior to Closing, consideration to third parties to acquire the Mineral Rights.

(b)     At each Closing to the extent applicable, Purchaser shall pay

(i)     all search fees and premiums for the owner's title insurance policy and any loan title insurance policy (when Purchaser shall reimburse Seller for the cost of the title search and 60 Year Search), at the Butler Rate unless Purchaser's counsel receives the equivalent of the Agent's portion of the premium;

(ii)     the costs of the Survey on the Property other than lands being sold from the Mitigation Bank or the Storm Water Pond Parcel,

(iii)     any fees associated with financing the Purchase Price,

(iv)     any premiums for endorsements to the owner's or loan title insurance policies, and

(v)     the Gary Road Bond or other financial assurances required by the Gary Road Development Agreement.



(c)    Any other closing costs or expenses shall be paid pursuant to local custom where the Property is located.

12.2    <u>Taxes and other Pro-rations</u>. All lease/license revenues, utilities, real estate taxes, charges and assessments affecting the Property ("**Taxes**"), shall be prorated on a per diem basis as of the date of Closing, date of Closing belonging to Purchaser.   The tax pro-ration shall use the November amount unless the actual tax bill is known, in which case the pro-ration shall take into account the maximum discount for early payment, if any.  If any Taxes have not been finally assessed as of the date of Closing for the current fiscal year of the taxing authority, then the same shall be prorated at Closing based upon the most recently issued bills therefore, taking into account the maximum discount for early payment, if any.  Upon the request of either party the taxes shall be re-prorated when the final tax bill is known.

12.3    <u>Assessments</u>.    Certified, confirmed or ratified liens for governmental improvements or special assessments as of the Closing Date, if any, shall be paid in full by Seller (except those which are payable in installments, in which event the current installment shall be prorated), and pending liens for governmental improvements or special assessments as of the Closing Date shall be assumed by Purchaser.

12.4    <u>Survival</u>.  All of the provisions of Article 12 shall survive Closing and the execution and delivery of the Deed.

**ARTICLE 13**
**RISK OF LOSS**

13.1    <u>Condemnation</u>.  If, prior to the Closing, an action is initiated to take all or any material part of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may, prior to ten (10) days after receipt of notice from Seller of such action, but in no event later than the Closing, either (a) terminate this Agreement except for any surviving obligations under Section 4.2 and receive a refund of the Earnest Money, or (b) consummate the Closing, in which event all of Seller's assignable right, title, and interest in and to the award of the condemning authority relating solely to the Property shall be assigned to Purchaser at the Closing and there shall be no reduction in the Purchase Price.

13.2    <u>Risk of Loss.</u> As between Purchaser and Seller, Seller shall bear the risk of loss as to the Property until the Closing.

**ARTICLE 14**
**DEFAULT**

14.1    <u>Purchaser's Remedies</u>.  If the sale is not completed as herein provided solely by reason of any material default of Seller, Purchaser shall be entitled, as its sole and exclusive remedy, to either (i) terminate this Agreement and receive a refund of the Earnest Money, or (ii) treat this Agreement as being in full force and effect and pursue only the specific performance of this Agreement, provided that Purchaser must commence any action for specific performance within ninety (90) days after the scheduled Closing Date. Purchaser waives any right to pursue any other remedy at law or equity for such default of Seller, including, without limitation, any

-23-

right to seek, claim, or obtain damages, punitive damages, or consequential damages. Notwithstanding the foregoing,

(a)    If, after the Effective Date and prior to Closing, Seller intentionally encumbers (excluding any encumbrances contemplated by Section 8.2 herein) or conveys lands in a manner that would frustrate the remedy of specific performance, Purchaser shall be entitled to initiate an action and pursue a claim against Seller for any actual damages sustained by Purchaser up to an amount equal to the difference between the value of the Property (valued without regard to the improper conveyance or encumbrance) and the Purchase Price stated herein, but Purchaser shall not be entitled to recover, and Purchaser hereby waives, any punitive, exemplary, extra-contractual or speculative damages; and

(b)    where Seller contumaciously refuses to perform Seller's obligation to close, Purchaser may elect, in lieu of specific performance, to recover damages from Seller equal to Purchaser's out-of-pocket costs for expenses relating to this Agreement, including attorneys' fees and due diligence costs not to exceed 1% of the Purchase Price for the Base Parcel (which remedy shall terminate upon any closing by Purchaser on the Base Parcel). Except as provided in the preceding sentence and except for remedies for Seller's failure to perform the Management Agreement or to construct and convey the Storm Water Retention Pond, in no case shall Seller ever be liable to Purchaser under any statutory, common law, equitable, or other theory of law, either prior to or following the Closing, for any lost rents, profits, "benefit of the bargain," business opportunities, or any form of consequential damage in connection with any claim, liability, demand, or cause of action in any way or manner relating to the Property, the condition of the Property or under this Agreement.

(c)    Purchaser agrees that its recourse against Seller for remedies prior to Closing under this Agreement or under any other agreement, document, certificate or instrument delivered by Seller to Purchaser, or under any law applicable to the Property or this transaction, shall be strictly limited to Seller's interest in the Property, and that in no event shall Purchaser seek or obtain any recovery or judgment against any of Seller's other assets (if any) or against any of Seller's partners (or their constituent partners) or any member, director, officer, employee, beneficiary or shareholder of any of the foregoing (but only prior to Closing and only so long as Seller has not encumbered or conveyed all or any portion of the Property).

(d)    Furthermore, Purchaser agrees that Seller shall have no liability to Purchaser post-closing for any breach of Seller's covenants, representations or warranties hereunder or under any other agreement, document, certificate or instrument delivered by Seller to Purchaser for the real estate closing or under any law applicable to the Property or this transaction, excluding, however, Seller's performance under the Management Agreement or under the agreement to construct the Storm Water Retention Pond or Seller's liability for casualty damage to timber unless the valid claims for all such breaches collectively aggregate more than Twenty Thousand Dollars ($20,000.00).

14.2    Seller's Remedies. If the sale is not completed as required herein solely by reason of Purchaser's material default or if Purchaser fails to timely fund any portion of the Earnest Money which is not cured within three (3) Business Days after written notice, then Seller shall be entitled to retain the Earnest Money, as liquidated damages (and not as a penalty) as Seller's



sole remedy and relief. Seller and Purchaser have made these provisions for liquidated damages as it would be difficult to calculate on the date hereof, the amount of actual damages for such breach and agree that these sums represent reasonable compensation to Seller for such breach. The foregoing to the contrary notwithstanding, the provisions of this section shall not limit or affect any of Seller's rights and remedies at law or in equity after the Closing with respect to a breach by Purchaser any of Purchaser's surviving obligations under Section 4.2 or Section 15.2.

**ARTICLE 15**

**MISCELLANEOUS**

15.1    <u>Notices</u>. Any notice, request, or other communication required or permitted to be given under this Agreement shall be in writing, addressed to each party at its address as set forth below, and shall be delivered by (i) hand delivery, (ii) commercial courier service (such as Federal Express), (iii) United States registered or certified mail, return receipt requested, postage prepaid, or (iv) email (with delivery confirmation) or facsimile transmission (with delivery confirmation). Any notice, request, or other communication sent by email or facsimile transmission must also be delivered via the methods set forth in subsection (i), (ii), or (iii) above. Any such notice shall be considered delivered on the date of hand delivery, the date of delivery by commercial courier service, the date that is three (3) days after deposit in the United States mail, or upon transmission by email or facsimile. By giving at least five (5) days' prior written notice thereof, any party may from time to time and at any time change its mailing address hereunder. Any notice by any party may be given by such party's legal counsel. The parties respective notice addresses are as follows:

|  |  |
|---|---|
| If to Seller: | Reinhold Corporation<br>Attn: George M. Egan<br>1845 Town Center Blvd., Ste. 100<br>Fleming Island, Florida 32003<br>Phone: (904) 269-5857<br>Email:  GEgan@reinholdcorporation.com |
| With a copy to: | Driver, McAfee, Hawthorne & Diebenow, PLLC<br>One Independent Drive, Suite 1200<br>Jacksonville, Florida 32202<br>Attn.: Matthew S. McAfee, Esq.<br>Phone: (904) 301-1269<br>Email: mmcafee@drivermcafee.com |
| If to Purchaser: | JAX-PALATKA FARMS LLC<br>Attn: Rick Feaser<br>9 West 57th Street, Suite 5000<br>New York, NY 10019-2701<br>Fax: (212) 826-1265<br>E-mail:       richie@ruanecuniff.com |

-25-



With copies to:  Mr. Dennis Carey
(none if blank)  977 Stagecoach Road
Oglethorpe, GA 31068
Fax: (478) 472-7098
email: pinetimber@windstream.net

and to

Rogers Towers, P.A.
Attn: John T. Sefton, Esq.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, Florida 32207
Fax: (904) 396-0663
E-mail: jsefton@RTLAW.com

With a copy to  First American Title Insurance Company
Escrow Agent  2301 Maitland Center Parkway, Suite 450
Maitland, Florida 32751
Attn: Stefanie Lollis
Phone: (407) 691-5276
Email: slollis@firstam.com

15.2  Brokers.  Each party represents to the other party that neither it nor any of its agents, affiliates, shareholders, or partners have dealt with any person or entity that might have a claim for sales or brokerage commission or finder's fee with respect to the transaction contemplated by this Agreement with the exception of Shield Properties, Inc., whose fee shall be paid by Purchaser pursuant to a separate agreement.  The parties hereto agree that each party will indemnify, defend, and hold harmless the other from and against any loss or liability arising from a claim for any such commission or fee by any other broker or similar person or entity claiming to have acted through the indemnifying party or its agents, affiliates, shareholders, or partners, including, without limitation, reasonable attorneys' fees and costs incurred at or prior to a legal proceeding, including on appeal and in any bankruptcy or similar proceedings, resulting from a breach of this Section 15.2.  The provisions of this Section 15.2 shall survive Closing.

15.3  Escrow Agent.

Escrow Agent agrees to hold, keep and deliver the Earnest Money and all other sums delivered to Escrow Agent in accordance with the terms and provisions of this Agreement. Escrow Agent shall not be entitled to any fees or compensation for its services hereunder. Escrow Agent shall be liable only to hold said sums and deliver the same to the parties named herein in accordance with the provisions of this Agreement, it being expressly understood that by acceptance of this Agreement Escrow Agent is acting in the capacity as a depository only and shall not be liable or responsible to anyone for any damages, losses or expenses unless same shall have been caused by the gross negligence or willful malfeasance of Escrow Agent.

In the event of any disagreement between Purchaser and Seller resulting in any adverse claims and demands being made in connection with or for the monies involved herein or affected hereby, Escrow Agent shall be entitled to refuse to comply with any such claims or demands so



long as such disagreement may continue; and in so refusing Escrow Agent shall make no delivery or other disposition of any of the monies then held by it under the terms of this Agreement, and in so doing Escrow Agent shall not become liable to anyone for such refusal; and Escrow Agent shall be entitled to continue to refrain from acting until (a) the rights of the adverse claimants shall have been finally adjudicated in a court of competent jurisdiction of the monies involved herein or affected hereby, or (b) all differences shall have been adjusted by agreement between Seller and Purchaser, and Escrow Agent shall have a period not exceeding three (3) business days after receipt by Escrow Agent of any notice or request to perform any act or disburse any portion of the monies held by Escrow Agent under the terms of this Agreement. Further, Escrow Agent shall have the right at all times to pay all sums held by it (i) to the appropriate party under the terms hereof, or (ii) into any court of competent jurisdiction after a dispute between or among the parties has arisen, whereupon Escrow Agent's obligations hereunder shall terminate.

Seller and Purchaser jointly and severally agree to indemnify and hold harmless Escrow Agent from any and all costs, damages and expenses, including reasonable attorney's fees, that Escrow Agent may incur in its compliance of and in good faith with the terms of this Agreement; provided, however, that this indemnity shall not extend to any acts of gross negligence or willful malfeasance on the part of the Escrow Agent.

15.4   Confidentiality.  Purchaser agrees to keep confidential and not to use, other than in connection with its determination whether to proceed with the purchase of the Property in accordance with Article 4 hereof, any of the documents, material or information regarding the Property supplied to Purchaser by Seller or by any third party at Seller's request, including, without limitation any environmental site assessment reports furnished to Purchaser except to Purchaser's consultants on a "need to know" basis.  Seller similarly agrees to keep such information confidential and abide by the same restrictions on disclosure, including disclosures to Seller's consultants.  In addition, neither Purchaser nor Seller shall disclose (prior to or after Closing) the existence of this Agreement or of any of the terms hereof, or issue any press release or other information to the public regarding the transaction contemplated herein, except as may be required by the law, including the securities laws and laws relating to financial reporting. Purchaser and Seller agree to indemnify and hold harmless each other from and against any and all losses, damages, claims and liabilities of any kind (including, without limitation, reasonable attorneys' fees) arising out of a breach of this Section 15.4.  Except as set forth below, the provisions of this Section 15.4 shall survive the Closing or earlier termination of this Agreement. No press release (before or after Closing) may be issued by Seller or Purchaser disclosing the price or the terms of the sale or the identity of the party not making the disclosure without the mutual consent of the parties.  As to information concerning a parcel, this provision shall terminate thirty (30) days following the Closing on the parcel.

15.5   Entire Agreement.  This Agreement and the Exhibits hereto embody the entire agreement between the parties relative to the subject matter, and there are no oral or written agreements between the parties, nor any representations made by either party relative to the subject matter, which are not expressly set forth in this Agreement.  This Agreement supersedes all prior negotiations, written agreements, or other understandings between the parties.

-27-



15.6    Amendment. This Agreement may be amended only by a written instrument executed by Seller and Purchaser. No waiver of any provision of this Agreement shall be valid unless it is in writing and is signed by the party against which it is sought to be enforced.

15.7    Headings. The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement

15.8    Capitalized Terms. All capitalized terms used in this Agreement but not immediately thereafter defined shall have the meanings ascribed to such terms as set forth elsewhere in this Agreement.

15.9    Time of the Essence. Time is of the essence of this Agreement. However, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the law of the United States or the State in which the Property is located, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

15.10    Governing Law; Venue. This Agreement shall be construed in accordance with and governed by the laws of the State of Florida without regard to conflicts of law principles and the laws of the United States pertaining to transactions in Florida. Seller and Purchaser consent and agree that the county in which the Property is located shall be the exclusive, proper, and convenient venue for any legal proceeding in federal or state court relating to this Agreement, and each party hereby waives any defense, whether asserted by motion or pleading, that said county is an improper or inconvenient venue.

15.11    Successors and Assigns. This Agreement shall bind and inure to the benefit of Seller, Purchaser and their respective heirs, executors, administrators, personal legal representatives, successors and assigns. Notwithstanding the foregoing, Purchaser shall not assign, sell, convey, encumber or otherwise transfer Purchaser's rights under this Agreement without the prior written consent of Seller except to an entity controlled by or under common control with Purchaser. Any assignment or other transfer in violation of this Section 15.11 shall be void. In the event Seller approves any assignment, Purchaser shall not be released from liability under this Agreement and shall be jointly and severally liable with the permitted assignee.

15.12    Invalid Provision. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid or unenforceable provision or by its severance from this Agreement.

15.13    Attorneys' Fees. In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages as herein provided, reasonable attorneys', paralegals', or expert witnesses' fees and costs incurred in such suit at trial or on appeal or in connection with any bankruptcy or similar proceedings.



15.14  Multiple Counterparts. This Agreement may be executed in a number of identical counterparts, each of which for all purposes is deemed an original, and all of which constitute collectively one (1) agreement, but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

15.15  Non-Merger. In addition to the specific language of non-merger found in certain sections of this Agreement, any provision hereof which by its terms would be performed after Closing shall survive the Closing and shall not merge in the Closing or in the Deed, except as specifically provided to the contrary herein.

15.16  Waiver of Jury Trial.  EACH PARTY TO THIS AGREEMENT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED UPON THIS AGREEMENT OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT CONTEMPLATED AND EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF DEALING, COURSE OF CONDUCT, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO.

15.17  Required Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

15.18  Recording. This Agreement or any notice or memorandum hereof shall not be recorded in any public record. A violation of this prohibition shall constitute a material breach of Purchaser, entitling Seller to terminate this Agreement.

15.19  Third Party Beneficiaries. Neither Seller nor Purchaser intend that any third party receive any benefits under this Agreement, and no third party shall claim any right or benefit hereunder; provided, however, that Escrow Agent is an intended third party beneficiary of all provisions of this Agreement pertaining to Escrow Agent and the holding and disbursement of the Earnest Money by Escrow Agent.

15.20  Relationship of Parties. Nothing contained in this Agreement is intended to, or shall, or shall be deemed to, (a) create a joint venture, partnership, fiduciary, or other relationship between Purchaser and Seller except as arms-length purchaser and seller of the Property; or (b) authorize either party to bind the other in any manner whatever.

15.21  Captions and Section Headings. Captions and Section headings contained in this Agreement are for convenience and reference only, and in no way define, describe, extend or limit the scope or content of this Agreement or the intent of any provision hereof.

*[remainder of page intentionally left blank; signature page follows]*

**IN WITNESS WHEREOF**, Purchaser and Seller have executed this Agreement as of the Effective Date.

SELLER:

**REINHOLD CORPORATION**, a Florida corporation

By: _George M. Egan_

Print Name: _GEORGE M. EGAN_

Its: _CEO_

Date: _4/22/2020_ , 2020

PURCHASER:

**JAX-PALATKA FARMS LLC**, a Delaware limited liability company

By: _____

Print Name: _____

Its: _____

Date: _____, 2020

ESCROW AGENT:

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____

Print Name: _____

Its: _____

-30-

**IN WITNESS WHEREOF**, Purchaser and Seller have executed this Agreement as of the Effective Date.

**SELLER:**

**REINHOLD CORPORATION**, a Florida corporation

By: _George M. Egan_

Print Name: _GEORGE M. EGAN_

Its: _CEO_

Date: _April 22_____, 2020

**PURCHASER:**

**JAX-PALATKA FARMS LLC**, a Delaware limited liability company

By: _____

Print Name: _GREGORY ALEXANDER_

Its: _MANAGING MEMBER_

Date: _____4/24_____, 2020

**ESCROW AGENT:**

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____

Print Name: _____

Its: _____

-30-

**IN WITNESS WHEREOF,** Purchaser and Seller have executed this Agreement as of the Effective Date.

**SELLER:**

**REINHOLD CORPORATION,** a Florida corporation

By: _George M. Egan_

Print Name: _GEORGE M. EGAN_

Its: _CEO_

Date: _April 22_ , 2020

**PURCHASER:**

**JAX-PALATKA FARMS LLC,** a Delaware limited liability company

By: _____

Print Name: _GREGORY ALEXANDER_

Its: _MANAGING MEMBER_

Date: _____, 2020

**ESCROW AGENT:**

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _Helen M. Hardwick_

Print Name: _HELEN H. HARDWICK_
_ESCROW ADMINISTRATOR_

Its: _____

-30-

Current Schedules and Exhibits

| | | |
|---|---|---|
| Exhibit "A" -- | RE parcel numbers and Map of real property | |
| Exhibit "B" -- | Proposed Configuration of Gary Road | |
| | | |
| Schedule 6.1(g) -- | List of existing leases and licenses | |
| Schedule 6.1(j)-- | List of areas of property, if any, utilized as garbage or trash dump | |
| Schedule 6.1(k)-- | List of underground storage tanks | |
| Schedule 6.1(l) -- | Map of hazardous discharge areas, including cattle dip vat | |
| Schedule 6.1(m) -- | List of certain agreements imposing development restrictions on Property | |
| Schedule 6.1(n) -- | Certain communications claiming ownership as swamp, sovereign, artificially filled or exposed lands. | |
| Schedule 6.3(b) -- | Terracon information request for Owner | |

| | | |
|---|---|---|
| Schedule 9.1 -- | Map of Clay Pit Area | |
| Schedule 9.2 -- | Map of Timber Cut Easement | |
| Schedule 9.3 -- | Map of Storm Water Pond Parcel and Plans & Specifications and Permit | |
| Schedule 9.4 -- | Map of Iluka Buffer Parcel (322 Acres) | |
| Schedule 9.5 -- | Map of Mitigation Bank Parcel and proposed relocation of Mitigation Bank Access Easement | |
| Schedule 9.6 -- | Map of 230 Acres not possessing all mineral rights | |

Exhibits to be Created During Inspection Period:

| | |
|---|---|
| 8.1 -- | Deed Restrictions in Special Warranty Deed for Base Parcel |
| 9.1-- | Clay Pit License Agreement |
| 9.2-- | Temporary Timber Cut Easement |
| 9.3(a) | Temporary Storm Water Pond Access Easement |
| 9.3(b) | Short Form of Contract to be recorded for Storm Water Pond Parcel |
| 9.4 -- | Form of Iluka Option |
| 9.5 -- | Relocated Mitigation Bank Access Easement |
| 9.7 -- | Gary Road Development Agreement |
| 9.8 -- | Form of Property Management Agreement |



## EXHIBIT A

### RE Parcel Numbers and Map for Real Property

**Reinhold Corporation
South of SR 16
Map of Real Property
1 of 2**



04-08-2020

Exhibit A – Page 1

**Reinhold Corporation**
**South of SR 16**
**Map of Real Property**
**2 of 2**







04-09-2020

Less and except, an approximately 0.25 acre cell tower site as shown below

Exhibit A – Page 2

**Reinhold Corporation**
**South of SR 16**
**Map of Real Property**
**Cell Tower Zoom**



600         0         600         1200 US Feet

04-19-2020

RE Parcel Numbers

| PARCEL | | Gross Acres | Est. Acres Included | Est. Net Acres |
|---|---|---|---|---|
| S T R | ID | 2019 | | |
| 01 07 25 | 010601 000 00 | 403.210 | | 403.210 |
| 02 07 25 | 010602 000 00 | 380.490 | | 380.490 |
| 03 07 25 | 010610 000 00 | 640.400 | | 640.400 |
| 04 07 25 | 010611 000 00 | 629.530 | | 629.530 |
| 05 07 25 | 010613 000 00 | 653.530 | | 653.530 |
| 13 06 25 | 010434 000 00 | 574.969 | 392.14 | 392.140 |
| 15 06 25 | 010587 000 00 | 373.791 | | 373.791 |
| 15 06 25 | 010587 001 00 | 18.101 | | 18.101 |
| 16 06 25 | 010591 000 00 | 282.980 | | 282.980 |
| 16 06 25 | 021652 000 00 | 1.185 | | 1.185 |
| 16 06 25 | 021655 000 00 | 0.638 | | 0.638 |
| 16 06 25 | 021658 000 00 | 0.865 | | 0.865 |
| 16 06 25 | 021671 000 00 | 14.000 | | 14.000 |
| 16 06 25 | 021675 000 00 | 0.344 | | 0.344 |
| 16 06 25 | 021737 000 00 | 79.931 | | 79.931 |
| 16 06 25 | 021746 001 00 | 12.500 | | 12.500 |
| 17 06 25 | 010593 000 00 | 351.210 | | 351.210 |
| 17 06 25 | 010593 001 00 | 61.030 | | 61.030 |
| 17 06 25 | 021651 000 00 | 23.590 | | 23.590 |
| 17 06 25 | 021689 000 00 | 10.980 | | 10.980 |
| 17 06 25 | 021705 000 00 | 8.282 | | 8.282 |
| 17 06 25 | 021726 000 00 | 29.500 | | 29.500 |
| 17 06 25 | 021739 000 00 | 73.731 | | 73.731 |
| 17 06 25 | 021741 000 00 | 0.308 | | 0.308 |
| 17 06 25 | 021742 000 00 | 15.050 | | 15.050 |
| 17 06 25 | 021744 000 00 | 11.057 | | 11.057 |
| 17 06 25 | 021744 001 00 | 1.340 | | 1.340 |
| 18 06 25 | 010530 000 00 | 539.290 | . | 539.290 |
| 18 06 26 | 015602 000 00 | 157.270 | 5.62 | 5.620 |
| 19 06 25 | 010531 000 00 | 522.110 | | 522.110 |
| 19 06 26 | 015608 000 00 | 291.400 | 258.2 | 258.200 |
| 20 06 25 | 010594 000 00 | 659.361 | | 659.361 |
| 21 06 25 | 010535 000 00 | 324.310 | | 324.310 |
| 21 06 25 | 010595 000 00 | 240.279 | | 240.279 |
| 22 06 25 | 010537 000 00 | 75.350 | | 75.350 |
| 22 06 25 | 010597 000 00 | 507.849 | | 507.849 |
| 24 06 25 | 010541 000 00 | 642.500 | | 642.500 |
| 25 06 25 | 010542 000 00 | 229.989 | | 229.989 |
| 26 06 25 | 010543 000 00 | 652.350 | | 652.350 |

Exhibit A – Page 4

| | | | | |
|---|---|---|---|---|
| 27 06 25 | 010544 000 00 | 549.170 | | 549.170 |
| 27 06 25 | 010600 000 00 | 84.860 | | 84.860 |
| 28 06 25 | 010546 000 00 | 653.370 | | 653.370 |
| 29 06 25 | 010547 000 00 | 319.680 | | 319.680 |
| 30 06 26 | 015642 000 00 | 215.231 | | 215.231 |
| 31 06 26 | 015647 000 00 | 145.740 | | 145.740 |
| 32 06 25 | 010550 000 00 | 119.119 | | 119.119 |
| 33 06 25 | 010551 000 00 | 598.560 | | 598.560 |
| 34 06 25 | 010552 000 00 | 629.510 | | 629.510 |
| 35 06 25 | 010553 000 00 | 625.200 | | 625.200 |
| 36 06 25 | 010554 000 00 | 245.891 | | 245.891 |
| | | 13,681 | | 13,313 |
| | | | | |
| | Estimated Partial Acreage | | | |
| | Within Town of Penney Farms | | | |
| | Other South of 16 | | | |
| | * Acreage does not include platted roads which are owned by Reinhold | | | |

Exhibit A – Page 5

## EXHIBIT B

### Proposed Configuration of Gary Road



## EXHIBIT 8.1

### Deed Restrictions in Special Warranty Deed for Base Parcel

[to be created during Inspection Period]

Exhibit 8.1 – Page 1

**EXHIBIT** Error! Reference source not found.

**Clay Pit License Agreement**

[to be created during Inspection Period]

Exhibit 9.1 – Page 1

**EXHIBIT** Error! Reference source not found.

**Temporary Timber Cut Easement**

[to be created during Inspection Period]

Exhibit 9.2 – Page 1

**EXHIBIT** Error! Reference source not found.**(a)**

**Temporary Storm Water Pond Access Easement**

[to be created during Inspection Period]

Exhibit 9.3(a) – Page 1

**EXHIBIT** Error! Reference source not found.**(b)**

**Short Form of Contract to be Recorded for Storm Water Pond Parcel**

[to be created during Inspection Period]

Exhibit 9.3(b) – Page 1

**EXHIBIT** Error! Reference source not found.

## Form of Iluka Option

[to be created during Inspection Period]

Exhibit 9.4 – Page 1

**EXHIBIT** Error! Reference source not found.

**Relocated Mitigation Bank Access Easement**

[to be created during Inspection Period]

Exhibit 9.5 – Page 1

**EXHIBIT** Error! Reference source not found.

**Gary Road Development Agreement**

[to be created during Inspection Period]

Exhibit 9.7 – Page 1

**EXHIBIT** Error! Reference source not found.

**Form of Property Management Agreement**

[to be created during Inspection Period]

Exhibit 9.8 – Page 1

## SCHEDULE Error! Reference source not found.

### List of Existing Leases and Licenses

Hunting Leases

| Springbank Road Hunt Club | 713 acres |
|---|---|
| Leasee: Doug Doran | (386) 937-3521 |
| 107 Carriage Place<br>Palatka, Florida 32177 | ddoran03@yahoo.com |

| LJF Hunting Club, Inc. | 4,455 acres* - Has a camp area |
|---|---|
| Leasee: Larry Floyd | (904) 786-9423 |
| 8845 Herlong Road<br>Jacksonville, Florida | ann@kevinfloydphotography.com |
| *Currently has ~300 acres not leased as a buffer for the construction of State Road 23 and the corresponding borrow ponds that will be added back once construction is completed. | |

| Shadowlawn South Hunt Club | 5,189 acres - Has a camp area |
|---|---|
| Leasee: Daryll Futch | (904) 669-0138 |
| P.O. Box 725<br>Palatka, Florida 32178 | dwfutch38@yahoo.com |

| Triple "J" Hunting Club | 1,350 acres |
|---|---|
| Leasee: Johhny Smith | (904) 525-9818 |
| 4216 Saunders Road<br>Green Cove Springs, Florida 32043 | johnnyjmack@gmail.com |

| Rogers Hunt Club | 508 acres |
|---|---|
| Leasee: John Rogers | (904) 591-1550 |
| 5428 Sharron Road<br>Green Cove Springs, Florida 32043 | jrogers5482@gmail.com |

| Bell Farm Hunt Club | 989 acres |
|---|---|
| Leasee: Cooper Murphy | (904) 545-9693 |
| 2852 Ravines Road<br>Middleburg, Florida 32068 | coopermurphy@bellsouth.net |

| Thunder Road Hunt Club | 139 acres |
|---|---|
| Leasee: Horace Starling | (904) 669-9922 |
| 3291 State Road 16 West<br>Green Cove Springs, Florida 32043 | bigfoot100450@aol.com |

Licenses

1. Temporary License Agreement between Seller and Superior Construction Company Southeast, LLC dated May 15, 2019, to be modified to provide temporary access across (i) the haul route depicted on the permit application for the Stormwater Retention Pond Parcel more particularly set forth on Schedule 9.3 hereto and (ii) a fifty foot (50') wide section of the Base Parcel as more particularly set forth on the map and photo that immediately follow.



**Reinhold Corporation**
**Clay County, Florida**
**Additional Superior**
**Access**

Exhibit A

Schedule 6.1(g) – Page 2



Schedule 6.1(g) – Page 3

**SCHEDULE** Error! Reference source not found.

**List of Areas of Property, If Any, Utilized as Garbage or Trash Dump**

None.

**SCHEDULE** Error! Reference source not found.

## List of Underground Storage Tanks

The Camp Areas depicted on the map below may contain underground septic tanks.

**Reinhold Corporation**
**Clay County, Florida**
**Hunting Leases**









04-13-2020

Schedule 6.1(k) – Page 1

**SCHEDULE** Error! Reference source not found.

## Map of Hazardous Discharge Areas, Including Cattle Dip Vat

**Reinhold Corporation
Cattle Dip**



Schedule 6.1(l) – Page 1

**SCHEDULE** Error! Reference source not found.

**List of Certain Agreements Imposing Development Restrictions on Property**

1.  Unrecorded understanding with Clay County, Florida to construct a temporary access to Gary Road on the Property in the general configuration set forth on Exhibit B above and as described in Section 9.7 of this Agreement.  Seller regards the obligation as a verbal commitment even though it is not a legally binding obligation with the County.

## SCHEDULE Error! Reference source not found.

### Certain Communications Claiming Ownership as Swamp, Sovereign, Artificially Filled or Exposed Lands

1.  FDEP letter dated May 13, 2010 regarding ownership of submerged lands of Greens Creek.

<u>**SCHEDULE** Error! Reference source not found.</u>

**Terracon Information Request for Owner**

**Client/User Required Questionnaire**

| Person Completing Questionnaire | Name:<br>Company: | Phone:<br>Email: |
|---|---|---|
| Site Name | | |
| Site Address | | |
| Point of Contact for Access | Name:<br>Company: | Phone:<br>Email: |
| Access Restrictions or Special Site Requirements? | ___No ___Yes (If yes, please explain) | |
| Confidentiality Requirements? | ___No ___Yes (If yes, please explain) | |
| Current Site Owner | Name:<br>Company: | Phone:<br>Email: |
| Current Site Operator | Name:<br>Company: | Phone:<br>Email: |
| Reasons for ESA<br>(e.g., financing, acquisition, lease, etc.) | | |
| Anticipated Future Site Use | | |
| Relevant Documents? | Please provide Terracon copies of prior Phase I or II ESAs, Asbestos Surveys, Environmental Permits or Audit documents, Underground Storage Tank documents, Geotechnical Investigations, Site Surveys, Diagrams or Maps, or other relevant reports or documents. | |

**ASTM User Questionnaire**

In order to qualify for one of the Landowner Liability Protections (LLPs) offered by the Small Business Relief and Brownfields Revitalization Act of 2001 (the "Brownfields Amendments"), the user must respond to the following questions. Failure to provide this information to the environmental professional may result in significant data gaps, which may limit our ability to identify recognized environmental conditions resulting in a determination that "all appropriate inquiry" is not complete. This form represents a type of interview and as such, the user has an obligation to answer all questions in good faith, to the extent of their actual knowledge.

1) Did a search of recorded land title records (or judicial records where appropriate) identify any environmental liens filed or recorded against the property under federal, tribal, state, or local law (40 CFR 312.25)?
___No ___Yes (If yes, explain below and send Terracon a copy of the title records or judicial records reviewed.)

2) Did a search of recorded land title records (or judicial records where appropriate) identify any activity and use limitations (AULs), such as engineering controls, land use restrictions, or institutional controls that are in place at the property and/or have been filed or recorded against the property under federal, tribal, state, or local law (40 CFR 312.26)?
___No ___Yes (If yes, explain below and send Terracon a copy of the title records or judicial records reviewed.)

3) Do you have any specialized knowledge or experience related to the site or nearby properties? For example, are you involved in the same line of business as the current or former occupants of the site or an adjoining property so that you would have specialized knowledge of the chemicals and processes used by this type of business (40 CFR 312.28)?
___No ___Yes (If yes, explain below)

4) Do you have actual knowledge of a lower purchase price because contamination is known or believed to be present at the site (40 CFR 312.29)?
___No ___Yes ___Not applicable (If yes or Not applicable, explain below)

5) Are you aware of commonly known or reasonably ascertainable information about the site that would help the environmental professional to identify conditions indicative of releases or threatened releases (40 CFR 312.30)?
___No ___Yes (If yes, explain below)

6) Based on your knowledge and experience related to the site, are there any obvious indicators that point to the presence or likely presence of contamination at the site (40 CFR 312.31)?
___No ___Yes (If yes, explain below)

Comments or explanations:

Please return this form with the signed authorization to proceed.          Proposal No.

Schedule 6.3(b) – Page 1

### SCHEDULE Error! Reference source not found.

## Map of Clay Pit Area

**Reinhold Corporation**
**Current and Historical Clay Pits**



4000    0    4000    8000 US Feet

04-15-2020

Schedule 9.1 – Page 1

## SCHEDULE Error! Reference source not found.

### Map of Timber Cut Easement

**Reinhold Corporation**
**2020 Harvest**



04-19-2020

Schedule 9.2 – Page 1

| 2020 Harvest Volumes & Estimated Values | | | | | | | | | | | Apr-20 |
| | | Growth Rate | | | | | | Thin | Volume | Total | |
| Comp | Stand # | cds/ac/year | Acres | Origin | Species | Est. Year | Land Type | Stand Type | Year | ton/acre | Tons | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020 25 yr Clearcut SF 1 | 6 | 1.0 | | P | Sl | 1985 LF | Plantation - Slash Low Flatwoods | 2004 & | 65.5 | 3,207 | |
| 2020 25 yr Clearcut SF 2 | 8 | 1.3 | | P | Lb | 1994 LF | Plantation - Loblolly Low Flatwoods | 2010 | 72.0 | 7,705 | |
| 2020 25 yr Clearcut SF 2 | 10 | 1.6 | | P | Sl | 1993 LF | Plantation - Slash Low Flatwoods | 2015 | 72.9 | 7,341 | |
| 2020 25 yr Clearcut SF 3 | 8 | 1.2 | | P | Sl | 1994 LF | Plantation - Slash Low Flatwoods | 2010 | 64.5 | 3,679 | |
| 2020 25 yr Clearcut SF 4 | 13 | 1.2 | | P | Sl | 1994 LF | Plantation - Slash Low Flatwoods | 2010 | 60.8 | 11,676 | |
| 2020 25 yr Clearcut SP 6 | 7 | 1.1 | | P | Sl | 1992 LF | Plantation - Slash Low Flatwoods | 2008 | 63.4 | 2,726 | |
| | | | 546 | | **Clear Cut Totals** | | | | | | 36,134 | $794,943 |
| 2020 SF 2 | 13 | 1.3 | | P | Sl | 2005 LF | Plantation - Slash Low Flatwoods | | 56.0 | - | |
| 2020 SP 2 | 13 | 1.3 | | P | Sl | 2006 LF | Plantation - Slash Low Flatwoods | | 52.2 | - | |
| | | | 0 | | **Thinning Totals** | | | | | | - | $0 |
| | | | | | **Grand Totals** | | | | | | 36,134 | $794,943 |

Schedule 9.2 – Page 2

## SCHEDULE 9.3

### Map of Storm Water Pond Parcel and Plans & Specifications and Permit

**Reinhold Corporation**
**Pond E - 22 acres**



600          0          600          1200 US Feet

04-19-2020

Plans: England-Thims & Miller, Inc. plans for Reinhold Stormwater Pond E under ETM No. 14-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.



SJRWMD Permit Number 158424-2 located at the following email address:

https://permitting.sjrwmd.com/epermitting/jsp/Search.do?theAction=searchDetail&permitNumber=160768

Clay County site plan approval for Reinhold Stormwater Pond E; IMS#RES_SP-202000003 issued April 6, 2020.

## SCHEDULE 9.4

## Map of Iluka Buffer Parcel (322 Acres)



**Reinhold Corporation
Iluka Buffer
322 acres**

04-19-2020

Schedule 9.4 – Page 1

**SCHEDULE** Error! Reference source not found.

## Map of Mitigation Bank Parcel and Proposed Relocation of Mitigation Bank Access Easement



Reinhold Corporation
Clay County, Florida

04-19-2020

Schedule 9.5 – Page 1

## SCHEDULE Error! Reference source not found.

### Map of 230 Acres Not Possessing All Mineral Rights

**Reinhold Corporation**
**230 acres of Mineral Rights**



## First Amendment to Purchase and Sale Agreement

This FIRST AMENDMENT PURCHASE AND SALE AGREEMENT (the "Agreement") is made and entered into this 8ᵗʰ day of September, 2020 (the "**Effective Date**") by and between **REINHOLD CORPORATION**, a Florida corporation ("**Seller**"), and **JAX-PALATKA FARMS LLC**, a Delaware limited liability company ("**Purchaser**").

RECITALS:

(A)    Seller and Purchaser entered into a "Purchase and Sale Agreement" dated as of April 24, 2020 (the "*PSA*").

(B)    Seller and Purchaser desire to amend the PSA as set forth herein.

NOW THEREFORE, Seller and Purchaser agree to amend the PSA as follows:

1. Survey and Acreage Issues. New paragraphs 5.2(d), 5.2(e), 5.2(f) and 5.2(g) are added to the PSA to read as follows:

(d) Some of the boundary and interior roads are considered "public" by means other than formal dedication (e.g., such as by deed, county maintenance or public use). These roads are Saunders Road, Sharon Road, Springbank Road, and Gary Road. The Survey will survey the centerline of such roads; provided, that the Deed(s) (as defined in the PSA) will less and except such roads. If the deed dedicating or creating such roads has a defined width, the Surveyor shall use such width. Where such roads do not have a defined width in a vesting deed of dedication, the surveyor will assume certain widths for each road, as more particularly set forth below, for purposes of acreage for each road. Saunders Road will have an assumed width of 50 feet; Sharon Road (or Sharon Grade Road) will have an assumed width of 50 feet; Springbank Road will have an assumed width of 60 feet; and Gary Road will have an assumed width of 40 feet. The Deeds will convey to the centerline of the roads that are on the interior of the Property, but such Deeds will be subject to rights of the county and public for use of such roads. The Purchase Price shall be reduced by $2,750 times the acreage of the Property located in the roads that are located in the interior of the Property.

(e) Some of the platted lands contain roads that do not exist in the field and that are not insurable as owned by Seller. The non-existent roads that are not owned by Seller are limited to those roads shown on the Plat of Long Branch City at PB 2, page 26 (the "*Long Branch City Plat*") consisting of approximately fifty-one (51) acres total, of which thirty-two (32) acres are located in the Town of Penny Farms and nineteen (19) acres are located outside the Town of Penny Farms.

These roads on the Long Branch City Plat are not likely to be abandoned (or eliminated through re-platting) prior to Closing. However, Seller commits to use commercially reasonable efforts to work with Purchaser in abandoning such roads after Closing (or the road elimination through re-platting), and Purchaser shall cooperate in connection with such abandonment or re-platting. Purchaser shall be responsible for the cost of any survey required by Clay County or the Town of Penney Farms in connection with such

3257516_8 - 8/20/2020 1:32:26 PM

plat abandonment or re-platting of Purchaser's lands, while Seller shall be responsible for the cost of any survey required by Clay County or the Town of Penney Farms in connection with such plat abandonment or re-platting of Seller's lands. The Survey shall calculate the area of the relevant lands assuming that such non-existent roads have been abandoned on Purchaser's lands on the Long Branch City Plat (the "*Area Subject to Plat*"), and the surveyor shall then estimate the area of the roads non-existent in the field on the Long Branch City Plat (the "*Non-Existing Road Area*"), with such areas furnished to Seller and Purchaser. If Closing occurs prior to County/City abandonment of such non-existent roads or removal of the roads through re-platting such that ownership in Purchaser of the former roads is not insurable at ordinary rates by the Title Company, Purchaser shall pay to Seller on the Closing of such lands an amount equal to (i) the "Area Subject to Plat" multiplied by the Purchase Price of $2,750 per acre less (ii) an escrow reserve (the "*Platted Road Reserve*") equal to the "Non-Existing Road Area" multiplied by the $2,750 Purchase Price per acre. At Closing Purchaser shall place the amount of the Platted Road Reserve into escrow. Such amount shall be payable to Seller upon an abandonment or re-platting which removes the roads from the Long Branch City Plat. If such abandonment or re-platting is not completed for all or some of the roads non-existent in the field on the Long Branch City Plat or before December 31, 2023, the Purchase Price shall be reduced by $2,750 for each acre of the non-existent in the field roads which have not vested in Purchaser (or its successor and assigns) through such re-platting or abandonment, which remaining sums shall be disbursed from escrow to Purchaser.

(f)     Where the title company is unwilling to insure Purchaser's ownership of roads within platted areas of Sections 17, 18 and 19, T6S, R25E free and clear of any easements created by the plat, Seller at its expense shall proceed to have the plats abandoned both before and after Closing. In particular, Seller shall use commercially reasonable efforts to cause the abandonment of the following plats: Florida Farms & Industries plats of

i)   Section 18 and the E 1/2 of Section 19, T6S, R25E dated January 5, 1922, recorded at Plat Book 2, page 28,

ii)  Sections 18 and the E 1/2 of Section 19 dated February 2, 1923, recorded at Plat Book 2, Page 33,

iii) Section 18 dated April 21, 1923, recorded at Plat Book 2, Page 35,

iv)  portions of Section 17, TS, R25E as shown in Plat "A" of Florida Farms and Industries Company at Plat Book 2, page 27 that lie West or South of lands in Plat of Long Branch City (Plat Book 2, Page 26),

v)   Section 20, T6S, R25E that are part of Plat Book 2, Page 27, and

vi)  portions of Sections 22 and 27 that are part of Plat Book 2, page 27 (excluding Adams Road and Saunders Road)(collectively (i) through (vi) above may be referred to herein as the "*FFI Plats*").

3257516_8 - 8/20/2020 1:32:26 PM

Seller shall use commercially reasonable and diligent efforts to have the FFI Plats abandoned as soon as practical following the Initial Closing, but in all events on or before September 1, 2022, including as needed legal counsel and consultants at Seller's Expense. Purchaser shall cooperate in connection with such abandonment. Seller shall keep Purchaser informed of the progress. Should Seller not be successful on or before September 1, 2022 in causing the plat abandonment, Seller shall hire such additional counsel and consultants as Purchaser may reasonably request to assist Seller in the abandonment of the Plats through September 1, 2024. Notwithstanding the foregoing, Seller shall have the right to re-plat rather than abandon the FFI Plats for lands in Sections 17, 22 and 27 provided such replat is approved by Purchaser, which approval shall not be unreasonably withheld, conditioned or delayed.

(g) The Surveyor shall locate the two cemeteries (one described at Book O, page 235 and the other having been identified as existing on the ground) and estimate their acreage. If the total acreage of the cemeteries does not exceed one acre, Purchaser shall accept title subject to such cemeteries without reduction in the Purchase Price. If the total acreage of the cemeteries exceeds one acre, the Purchase Price shall be reduced for the acreage of the cemeteries at $2,750 per acre. As the cemeteries were not created by, through or under Seller, they shall not be mentioned in the relevant Special Warranty Deed(s), other than as an exception to the legal description [1]or per a general survey exception.

2. <u>Mitigation Bank Easements</u>. The following language is added to Section 9.5 of the PSA:

The existing easement for access by the St. Johns River Water Management District to the Mitigation Bank is recorded at OR 3369, page 1374 (the "*Existing SJRWMD Easement*"). If Closing occurs on the relevant lands occurs prior to abandonment of the Existing SJRWMD Easement, Seller shall be obligated to use commercially reasonable efforts at Seller's expense to relocate such easement on or before December 31, 2023. At Closing it is anticipated that Redshirt Farms LLC ("*Redshirt*") will place in escrow an easement in form attached as the "*Redshirt Farms Substitute Easement*," to be delivered post-Closing to the St. Johns River Water Management District and effective simultaneously with abandonment of the Existing SJRWMD Easement. At Closing, it shall be a condition to Seller's obligation to close as set forth in Section 10.2 of the PSA that (i) Redshirt will deliver to Seller an easement for access to Phase I, Phase II and Phase III of the Mitigation Bank, pursuant to the easement form attached hereto as Exhibit "A," (the "*Redshirt Farms Easement*") which easement permits Seller to grant hunters a license over a relocated access easement if and when constructed near the Westerly boundary of the property of Redshirt in Section 7, T7S, R25E, subject to any required consent of the St. Johns River Water Management District and the Army Corp of Engineers, if applicable; and (ii) Purchaser will provide Seller with a license over Hercules Grade Road to provide access for hunters under valid hunting licenses with Seller to the Mitigation Bank Parcel, together with Parcel I and Parcel II of the Mitigation Bank, pursuant to the access license attached hereto as Exhibit "B" (the "*Hercules Grade Access License*").

---

[1] One of the cemeteries is listed as a less than except parcel in the title commitment for the South half of Section 3.

3.  Gary Road Traffic Signal Agreement. At Closing Seller and Purchaser shall execute the "*Gary Road Traffic Signal Agreement*" in form attached as Exhibit "C" hereto.

4.  Closing on S 1/2 of Section 3, T7S, R25E Deferred. The title commitment for the S 1/2 of Section 3, T7S, R25E (less certain lands identified in the title commitment delivered on June 26, 2020), has numerous requirements arising from Title Company concerns over tax deeds and other matters. Seller represents that Seller has initiated a suit to quiet title to cure the B-1 Items and that the Title Company has approved the pleadings in the lawsuit, being Case No. 2020-CA-535, Circuit Court, Fourth Judicial Circuit, Clay County, Florida. As the civil action cannot be completed by the Initial Closing, such lands (being estimated at 251 acres unless otherwise determined) shall not be conveyed at the Initial Closing and the Purchase Price payable at the Initial Closing shall be (i) reduced by the acreage of such lands multiplied by $2,750 per acre in the amount of $690,250.00 (the "*Section Three Reserve*") and (ii) the Section Three Reserve shall be escrowed by Purchaser at Closing pending finalization of the civil action in the manner as more particularly set forth below. Seller, at its sole cost and expense, agrees to use commercially reasonably efforts to diligently prosecute the quiet title action to its conclusion, including appeals, if any. If the quiet title action is successful on or before December 31, 2024, the lands covered by this Commitment will be closed within thirty (30) days following the entry of the final judgment, the lapse of the appeal period without an appeal (or the delivery of the appellate court Mandate) and the Title Company's removal of the B-I items related thereto. Should the quiet title action not be finalized and rendered insurable by the Title Company by December 31, 2024, Purchaser shall have the right to elect on or before such date in writing to Seller to either (i) accept such title as Seller can provide at $2,750 per acre, or (ii) delete such acreage as to which title cannot be cleared from the sale and reducing the Purchase Price by $2,750 per acre in which case such land shall be retained by Seller.

5.  Storm Water Pond. The acreage for the Storm Water Pond Parcel is increased from twenty-two (22) acres to twenty six (26) acres.

6.  Iluka Buffer Parcel. Section 1.1(d) is hereby modified to reduce the Iluka Buffer Parcel to 314.39 acres.

7.  Mineral Rights. Section 9.6 is hereby deleted and replaced with the following:

Purchaser acknowledges that Seller does not own an undivided fraction of all of the mineral rights on the Property as set forth in the Commitment. Other than mineral rights owned by the State of Florida without a right of entry, the Commitment discloses that Seller does not own all of the mineral rights along two chains of title. First, Seller does not own an undivided fraction of mineral rights on approximately two hundred forty (240) acres of the Property as shown on replacement Schedule 9.6 attached hereto, which mineral rights are currently owned 50% by Seller and 50% by other third parties without right of entry (the "*Encumbered 240 Acres*"). Seller obtained its 50% undivided interest in the mineral rights for the Encumbered 240 Acres through tax deeds, which acquired interest contained an ongoing right of entry. Seller has filed a quiet title action to render its title marketable to its 50% undivided fraction of the mineral rights in the Encumbered 240 Acres, which if successfully concluded will eliminate any third party rights of entry to the mineral rights for

3257516_8 - 8/20/2020 1:32:26 PM

the Encumbered 240 Acres. Second, Seller does not an own an undivided fraction of the mineral rights on approximately one hundred and sixty (160) acres of the Property as shown on replacement Schedule 9.6 attached hereto, with a three/sixteenth interest in such mineral rights owned by third parties with a right of entry (the "*Encumbered 160 Acres*"), which Encumbered 160 Acres are also subject to the quiet title action set forth in this Section 7. The Encumbered 240 Acres and Encumbered 160 Acres may be collectively referred to herein as the "*Encumbered Property*". Seller's (i) 50% undivided interest in the Encumbered 240 Acres and its 55% undivided interest in the Encumbered 160 Acres are currently subject to the quiet title action and (ii) the third party owners of the undivided three-sixteenth interest in the Encumbered 160 Acres are collectively referred to herein as the "*Mineral Rights*". Purchaser acknowledges and agrees that it accepts the outstanding mineral rights in the Encumbered Property referenced in the Commitment that do not have a right of entry as insured in the Title Policy.

The Encumbered Property is a portion of the Base Parcel. Seller shall use commercially reasonable efforts to (i) successfully conclude the quiet title action on the Encumbered 240 Acres and Encumbered 160 Acres and (ii) purchase that portion of the Mineral Rights that Seller does not own or obtain a release of the right of entry from third party owners on the Encumbered 160 Acres at Seller's sole cost and expense. In the event that Seller is unable to purchase all of the Mineral Rights or eliminate the rights of entry with respect to such non-owned Mineral Rights at the initial Closing of the Encumbered Property, the Purchase Price for the Encumbered Property shall be reduced from $2,750.00 to $1,750.00 per acre (the "*Reduced Price*").

At the initial Closing of the Encumbered Property, Seller shall retain its undivided ownership of the Mineral Rights for the Encumbered 160 Acres and Encumbered 240 Acres if it received the Reduced Price. Seller agrees not to exercise a right of entry with respect to the retained Mineral Rights. Notwithstanding the foregoing, Purchaser agrees to pay Seller an additional $1,000.00 per acre for the Encumbered Property (the "*Additional Consideration*") within thirty (30) days of when and if, and to the extent, Seller successfully concludes the quiet title action with a final judgment no longer appealable, obtains all of the Mineral Rights or otherwise causes all rights of entry to be removed with respect to the Mineral Rights on any portion of the Encumbered Property; provided that (i) such successful conclusion of the quiet title action and/or obtainment of all of the Mineral Rights or removal of entry occurs on or before December 31, 2025, and (ii) the Title Company issues and endorsement adding "without right of entry" to the Title Policy on the respective portion of the Encumbered Property or otherwise deletes all exceptions in the policy related to reservation of the Mineral Rights on the respective portion of the Encumbered Property. Purchaser shall escrow the Additional Consideration at the Closing of the Base Parcel. Seller agrees to transfer its ownership of the Mineral Rights to the Purchaser via quit claim deed at the earlier to occur of (i) receipt of the Additional Consideration simultaneously from Purchaser or (ii) December 31, 2025 to the extent that Seller is not owed the Additional Consideration pursuant to this Section 9.6 as of such date. This Section 9.6 shall survive the Closing.

8. Purchase Price Allocations of Base Parcel. Pursuant to Section 2.1 of the Agreement, the Purchaser is permitting Seller to allocate the Purchase Price for the Base Parcel as set forth

on the map and spreadsheet attached as Exhibit "D" with respect to Timber Parcel, Penny Farms Parcels, SR16 Parcel, and Commercial Parcel as set forth therein, all constituting part of the Base Parcel. Seller and Purchaser currently intend to close on the Base Parcel without a survey. The parties agree that Purchase Price shall increase or decrease based on a valuation of Two Thousand Seven Hundred Fifty and No/100 Dollars ($2,750.00) per acre for any changes to final acreage of lands sold to Purchaser pursuant to this Agreement regardless of the allocated purchase price for such parcel. Seller and Purchaser agree to provide a credit or debit based on the true up at the next closing contemplated by the Agreement after the parties agree on the final survey for the Base Parcel.

9. _Updated Environmental Due Diligence_. Purchaser shall have right, but not the obligation, to update its Phase I environmental site assessment on the Mitigation Bank Parcel and Storm Water Pond Parcel at least sixty (60) days prior to the scheduled closing date for such respective parcel. If such updated Phase I environmental site assessment reflects a Recognized Environmental Condition as set forth in such updated report that was not present in any report received by Purchaser prior to the Effective Date of this Amendment and was not caused by or through the acts of Purchaser, Purchaser shall be entitled to elect in written notice to Seller to not close on such parcel and receive a return of that portion of the Earnest Money associated with such Closing.

10. _Rights of Reversion of Saunders Road_. Seller currently has a right of reversion for Saunders Road as set forth in Deed Book 37, Page 478, public records of Clay County, Florida (the "_Rights of Reversion_"). Seller anticipates that Clay County will require Seller to release its Rights of Reversion in connection with the plat abandonment or re-plat of the Plats. In the event that Seller either (i) completes the plat abandonment or re-plat of the Plats and does not surrender its Rights of Reversion to Clay County, or (ii) is unsuccessful in abandoning the plat or replat of the Plats on or before September 1, 2024 (each a "_Trigger Event_"), Seller will deed its Rights of Reversion to Purchaser pursuant to a Deed for Rights of Reversion attached hereto as Exhibit "E" (the "_Deed of Rights of Reversion_"). Seller shall execute and deliver the Deed of Rights of Reversion at Closing into escrow pending a Trigger Event. If Seller releases the Rights of Reversion to Clay County prior to the Trigger Event, the Deed of Rights of Reversions shall never be delivered to Purchaser and shall be destroyed.

11. _Closing on Base Parcel_. Purchaser desires to have the first closing within a month from this First Amendment, and both parties agree to cooperate to obtain a prompt closing. Other provisions of the PSA are hereby ratified and confirmed except as modified herein.

12. _Forms Attached_.

a) The agreed-upon forms for the following instruments and documents are attached: Special Warranty Deeds (Exhibit 8.1), Clay Pit License Agreement (Exhibit 9.1), Temporary Timber Cut Easement (Exhibit 9.2), Stormwater Pond Access License (Exhibit 9.3(a), Short Form for the Stormwater Pond Contract (Exhibit 9.3(a), Iluka Buffer Parcel Option (Exhibit 9.4), recordable Short form of the Iluka Buffer Parcel Option (Exhibit 9.4), Relocated Access Easement to SJRWMD for the Mitigation Bank lands (Exhibit 9.5), Gary Road Development Agreement (Exhibit 9.7).

3257516_8 - 8/20/2020 1:32:26 PM

b) The following new forms are approved by Seller and Purchaser as appropriate, and are agreed to be delivered by Purchaser and/or Seller as applicable as a signatory thereto:

Exhibit "A".  Redshirt Farms Easement to be granted by Redshirt to Seller for ingress/egress from Sharon Grade to the Mitigation Bank parcels (inclusive of Phase III), including the right in Seller to relocate the easement to the Westerly portion of Redshirt's property; and

Exhibit "B".  Hercules Grade Access License over Hercules Grade Road to be granted by Purchaser to Seller for ingress/ingress from Hercules Grade Road to the Mitigation Bank parcels (inclusive of Phase III) to provide access to hunters.

Exhibit "C".  Gary Road Traffic Signal Agreement regarding the cooperation of Seller and Purchaser for a full traffic light signal at Gary Road and SR 16, including cost sharing components as set forth therein.

Exhibit "E".  Deed of Rights of Reversion in which Seller conveys its Rights of Reversion as set forth therein to Purchaser if Seller does not surrender such Rights of Reversion to Clay County prior to the Trigger Event.

13. Redshirt Farms Easement.  Seller and Purchaser acknowledge and agree that Farm Credit of Florida, ACA in its sole capacity and as agent/nominee for Florida Federal Land Bank Association, FLCLA ("*Redshirt Lender*") will consent and agree to non-disturb the easement rights granted to Seller under the Redshirt Farms Easement (the "*Lender Consent*"). Seller and Purchaser agree that Redshirt may obtain the Lender Consent after Closing and in that event the Redshirt Farms Easement will be held in escrow pending receipt of the Lender Consent. In the event that the Lender Consent is not received within thirty (30) days of Closing, Purchaser agrees to grant Seller an access easement to the Mitigation Bank parcels (inclusive of Phase III) in the same location as the Existing SJRWMD Easement. The provisions of this section shall survive Closing.

14. Storm Water Pond Parcel.  In the event that Purchaser fails to close on the purchase of the Storm Water Pond Parcel for any reason other than a default by Seller under the PSA, Purchaser shall grant an access easement to Seller and its invitees across a portion of the Property as is reasonably necessary to provide Seller, its contractors and invitees with access to the Storm Water Pond Parcel. The provisions of this Section shall survive Closing.

Wherefore, Purchaser and Seller have executed this Agreement as of the day and year first above written.

3257516_8 - 8/20/2020 1:32:26 PM

*Signature Page to First Amendment*
*to Purchase and Sale Agreement*

| SELLER: | PURCHASER: |
|---|---|
| **REINHOLD CORPORATION**, a Florida corporation | **JAX-PALATKA FARMS LLC**, a Delaware limited liability company |
| By: _George M. Egan, CEO_ | By: _Greg Alexander, as its sole member_ John T. Sefton    president |
| Date: _Sept 4 2020_ , 2020 | Date: _____, 2020 |
| **ESCROW AGENT:** | |
| **FIRST AMERICAN TITLE INSURANCE COMPANY** | |
| By: _____ | |
| Print Name: _____ | |
| Its: _____ | |

## Exhibit A

### Redshirt Farms Easement

[see attached]

Prepared by and Return to:
Matthew S. McAfee, Esq.
Driver, McAfee, Hawthorne & Diebenow, PLLC
One Independent Drive, Suite 1200
Jacksonville, Florida 32202

### ACCESS EASEMENT AGREEMENT
### (Redshirt to Reinhold)

**THIS ACCESS EASEMENT AGREEMENT** (the "*Agreement*") is made and entered into as of the _____ day of _____, 2020, between **REDSHIRT FARMS, LLC**, a Florida limited liability company, having an address of 960194 Gateway Blvd #103, Fernandina Beach, Florida 32034 ("*Grantor*") and **REINHOLD CORPORATION**, a Florida corporation having an address at 1845 Town Center Boulevard, Suite 105, Fleming Island, FL 32003 ("*Grantee*").

### WITNESSETH:

**WHEREAS**, Grantor is the owner of certain real property fronting on Sharron Road and located in Clay County, FL, more particularly described in **Attachment 1**, attached hereto and incorporated herein by reference ("*Property*");

**WHEREAS**, Grantee has granted to the St. Johns River Water Management District (the "*District*") and the Florida Department of Environmental Protection (i) that certain Conservation Easement dated January 3, 2012 and recorded in Official Records Book 3369, Page 1342 of the public records of Clay County, Florida (the lands subject thereto being the "*Phase I Lands*") and (ii) that certain Conservation Easement dated September 18, 2013 and recorded in Official Records Book 3578, Page 1369 of the public records of Clay County, Florida (the lands subject thereto being the "*Phase II Lands*"). Such two easements over the Phase I Lands and Phase II Lands are referred to collectively as the "*Conservation Easements.*").

**WHEREAS**, **Attachment 2** contains a legal description of the Phase I Lands and Phase II Lands. Also shown on **Attachment 2** is a legal description of the "*Phase III Lands*", which consist of an area that Reinhold Corporation has intended to place under conservation easements, but as to which Reinhold Corporation is currently seeking to release from any obligation so to encumber.

**WHEREAS**, the lands encumbered by the two recorded Conservation Easements, being the Phase I Lands and the Phase II Lands, are hereinafter referred to as the "*Conservation Easement Areas*," which term shall also include the Phase III Lands *if and only if* a conservation easement is hereafter placed on the Phase III lands with similar restrictions. The Conservation Easement Areas are part of a wetland mitigation bank (the "*Mitigation Bank*"). The Phase I Lands, Phase II Lands and Phase III Lands are herein collectively referred to as the "*Mitigation Parcels*".

**WHEREAS**, Grantee has requested that Grantor grant Grantee a perpetual, non-exclusive access easement so that Grantee shall have the right to access the Mitigation Parcels (regardless of whether Phase III is encumbered in the future with a conservation easement) for the purpose of (i) accessing and maintaining the Conservation Easement Areas in accordance with the Conservation Easements from time to time, and (ii) conducting forestry management and silvicultural activities on the Phase III Lands;

**WHEREAS**, Grantor has agreed to convey to Grantee a perpetual, non-exclusive forty-foot (40') access easement to the Phase I Lands, Phase II Lands, and Phase III lands running from Sharron Road over and across an existing private road located on the Property, as more particularly described and depicted in **Attachment 3**, attached hereto and incorporated herein by reference ("*Access Easement*") subject to the

1

terms herein;

WHEREAS, Grantor and Grantee contemplate that in the future the Access Easement will be re-located to the most Westerly 40 feet of the Property and a new trail road constructed thereon (the "*New Roadway*") as hereinafter provided, and

WHEREAS, subject to the terms hereof, the parties wish to create, grant and establish a perpetual, non-exclusive access easement for the purposes stated herein and wish to set forth their agreement with respect thereto below.

**NOW, THEREFORE**, in consideration of the premises, and the mutual benefits to be realized by the parties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties agree as follows:

1.  **Recitals and Definitions**. The recitals contained hereinabove are true and correct and are incorporated herein by reference. Capitalized terms used in this Agreement shall have the meanings given them unless the context shall otherwise clearly require.

2.  **Grant of Easement**.

    a.  **Access Easement**. Subject to the terms, conditions and provision of this Agreement and only for the purpose(s) stated below, Grantor hereby grants unto Grantee, and its successors and assigns, a perpetual, non-exclusive forty-foot (40') access easement for ingress and egress over and across lands described and depicted on **Attachment 3**.

    b.  **Appurtenance**. The Access Easement shall be appurtenant to the Mitigation Parcels and shall run with title thereto in accordance with Section 11 herein.

    c.  **Termination of Access Easement.** The Access Easement shall terminate if (i) the Conservation Easement Areas are no longer subject to the Conservation Easements; or (ii) as to the Phase III Lands, to the extent such Phase III Lands are not encumbered with a conservation easement and are released from the Mitigation Bank and permits related thereto, if the owner thereof subsequently obtains direct access from a public road.

3.  **Purpose**. The Access Easement shall be for the purposes of providing Grantee legal access, ingress and egress to the Phase I Lands, the Phase II Lands and the Phase III Lands solely for the purposes of

    a.  maintaining the Conservation Easement Areas and performing Grantee's obligations pursuant to the Conservation Easements and underlying permits related thereto;

    b.  conducting forestry management and silvicultural activities, and

    c.  use and enjoyment of the Mitigation Parcels, but solely for the beneficial, direct, or indirect owners of Grantee.

**Specifically, other than pursuant to 3.c above, access for hunting or other recreational uses is not permitted over the existing trail road** (but would be available over the relocated easement as contemplated in Section 8 below). Upon completion of the New Roadway, hunt club(s) having a hunting lease(s) with Grantee on lands in the Mitigation Parcels and the members of such hunt clubs shall be permitted access over the Access Easement as re-located to the New Roadway subject to other terms of this Agreement.

4.  **Restrictions on Use**. No part of the Access Easement may be used by Grantee for purposes

2

other than those listed in Section 3, above. This easement shall be private and shall confer no rights to the general public. Grantee shall not permit any persons, other than Grantee's employees, beneficial owners, agents, and contractors, onto or to use the Access Easement without Grantor's prior written permission; other than members of hunt clubs in connection with the New Roadway as expressly permitted herein.

    a. In connection with any use of the Access Easement by Grantee, its employees, beneficial owners, agents, and contractors, Grantee shall keep all gates on the trail roads over which the Access Easement runs locked when Grantee or its employees, beneficial owners, agents, or contractors are not present at such gates.

    b. Nothing herein shall be construed to prevent Grantor from the full use and enjoyment of the Access Easement; provided, however, that the Grantor shall not unreasonably interfere with the rights granted to Grantee and others hereunder.

    c. Except for emergency purposes, use by Grantee of the Access Easement shall generally be limited to daylight hours between 1 hour in advance of sunrise and one hour after sunset absent the written consent of Grantor, which shall not be unreasonably withheld. This restriction shall not apply to hunt clubs and members utilizing the New Roadway (and the activities of Grantor in monitoring such hunt clubs) following completion of the New Roadway.

    d. All improvements by Grantee shall be made during daylight hours. Grantee shall pay the costs of all materials, labor and contracted by Grantee and its contractors to improve the Access Easement and shall permit no lien for such work to be filed on the Access Easement or Grantor's property. Should any such lien be filed, Grantee shall discharge or bond off the lien within 30 days of written notice from Grantor.

    e. Grantee accepts the access and related roads and improvements "AS IS" and exculpates Grantor from any and all liability associated with the use of this Access Easement, including, without limitation, the risks arising from the road surface or from falling trees.

5. **Improvements**. Other than maintaining the road as set forth in Section 4(d), Section 7, and Section 8 below, Grantee may not construct improvements within the Access Easement area.

6. **Grantor's Right to Relocate**. Prior to completion of the New Roadway, Grantor or any future successor in interest of the Property may relocate the Access Easement, provided (i) the Access Easement as re-located will continue to provide both legal and practical access, as described above, to and from the Phase I Lands, the Phase II Lands and the Phase III Lands; (ii) the Access Easement as so relocated shall not carry with it practical use impediments such that the Phase I Lands, the Phase II Lands and the Phase III Lands cannot be reasonably accessed for the purposes set forth above; (iii) unless Grantee otherwise agrees, the Access Easement as so relocated shall not be subordinate to any title matters other than those to which the Access Easement was subordinate prior to relocation; (iv) Grantor shall pay all costs associated with the relocation and preparing and recording in the Public Records of Clay County, Florida, an instrument effecting such relocation; and (v) Grantor and/or Grantee shall obtain any consent necessary from the St. Johns River Water Management District or the Army Corp of Engineers, if applicable, required to utilize such new connection to the Conservation Easement Areas. If all of the foregoing conditions are complied with, then Grantee shall execute such instruments as may be reasonably requested in order to effect and confirm the relocation of the Access Easement. Grantee acknowledges that Grantor may eventually relocate the Access Easement near to or at the Westerly boundary of the Property (as described in Attachment 1), subject to obtaining the appropriate governmental consents. However, **if Grantee pays for the road location pursuant to Section 8, Grantor shall not have the right to further re-locate such Access Easement without the written consent of Grantee.**

3

7.    **Maintenance & Repair of Existing Trail Road (prior to re-location of Access Easement)**. Subject to the terms of this Section, Grantee or Grantor, at its sole cost and expense, may maintain the existing trail road constituting the current Access Easement (prior to its re-location) such that it continues to provide vehicular access to the Mitigation Parcels.

a.    Grantee shall not alter or modify the Access Easement (or drainage systems of same) without the prior written consent of Grantor, which shall not be unreasonably withheld. Grantee shall notify Grantor in writing at least five (5) business days before making any repairs or improvements. Such written notice shall specify the repairs intended and the anticipated cost.

b.    If Grantee or its agents, beneficial owners, employees, invitees, licensees or contractors damages the Access Easement, Grantee shall have the responsibility to repair the Access Easement to its prior condition at its sole cost and expense, normal wear and tear excepted.

c.    In the event a Grantee is unable to access the Mitigation Parcels for the purposes stated in Section 3 above, Grantee shall notify Grantor in writing of the inaccessibility. Grantor will make commercially reasonable efforts to restore access within forty-five (45) days of the date of receipt of Grantee's notice, or, by notice in writing to Grantee, shall permit Grantee to make such improvements.

8.    **Grantee's Right to Relocate; Completion and Maintenance**. Grantee shall have the right to re-locate the easement to the Westerly forty feet (40') of the lands owned by Grantor abutting the Westerly line of Section 7, T7S, R25E, provided that Grantee first constructs a roadway (the "New Roadway") thereon, all subject to the provisions of this section. Grantee shall begin to construct the New Roadway within six (6) months following receipt from SJRWMD and the ACOE, if applicable, of any required consent to re-clear the Southernmost East-West trail road in the Phase I Lands, such road located just North of the Southerly boundary of Sections 5 and 6, TS, R25E, or any other consent required by the Conservation Easements or permits associated therewith; provided, however, Grantee shall not be required to commence construction of the New Roadway until Grantor has cleared the relocated Access Easement as set forth below.

a.    Prior to such re-location Grantee shall give written notice to Grantor. Such notice shall be sufficient to allow the prudent and practical sale and removal of timber by Grantor on the lands on which the Access Easement is to be re-located. Within thirty (30) days of providing notice to Grantor, Grantee shall provide the construction plans for the New Roadway for approval and shall have sufficient markings in the field that logging companies can remove all timber on the land (but not stumps) where the New Roadway is to be located. Grantor agrees to provide promptly and reasonably Grantor's approval of such plans, subject only to objections which may reasonably be made in good faith. Grantor shall subsequently clear such timber from the relocated Access Easement within 30 days of such approved plans.

b.    In constructing the New Roadway Grantee shall install gates (i) where the New Roadway intersects Sharron Road and (ii) where the existing east-west trail road within the Property intersects the New Roadway and (iii) if no gate is currently there, at the North end of the New Roadway where it enters Section 5. The gates shall be of no less quality that the current gate of Grantor on Sharron Road. Grantee shall also install (i) culverts sufficient to provide drainage for the New Roadway or to cross any small waterways, (ii) any bridges to the extent required to cross any waterway. The roadway constructed shall permit the passage of logging trucks, and the roadway shall contain an adequate roadbed for a trail road. If Grantee fails to complete construction of the New Roadway within six (6) months following Grantor's written notice to Grantee that Grantor has cleared the timber from the

4

relocated Access Easement, Grantor shall have the right to complete construction of the New Roadway at Grantee's expense, which shall promptly be reimbursed on demand, and if not reimbursed within 30 days shall bear interest at the prime rate of interest as quoted in the Wall Street Journal plus four percent (4%) (not to exceed the maximum rate of interest allowed by law) from and after the date of demand.

c.  Grantee shall bear all costs of the construction and the maintenance of the New Roadway, except to the extent the New Roadway is damaged by Grantor, its contractors or invitees. Grantee shall immediately bond off any lien filed against Grantor's property as a result of Grantee's construction or maintenance of the New Roadway.

d.  Within three (3) months following construction of the New Roadway, Grantee, at Grantee's expense (i) shall cause the same to be surveyed and certified to Grantor, and (ii) shall use commercially reasonable efforts to cause the easement(s) previously executed by in favor of the St. Johns River Water Management District for access to the Conservation Lands to be terminated. Grantor shall fully cooperate with the foregoing.

e.  Upon completion of the New Roadway and relocation of the Access Easement to the New Roadway in a recorded modification to this Agreement, the Access Easement in favor of Grantee over the existing trail road shall terminate and the Access Easement shall no longer encompass the existing trail road. The "Access Easement" shall thereupon be comprised only of the New Roadway. Following construction of the New Roadway, the parties shall record an instrument in the public records of Clay County, Florida acknowledging the re-location of the Access Easement.

f.  Notwithstanding the provisions of the second to last sentence of Section 3, hunt clubs and their members shall be permitted to utilize the New Roadway as permitted by Grantee from time to time, all in accordance with the provisions of Attachment 4. The hunt club(s) and its members are referred to as "*Permittees.*"

g.  Upon construction of the New Roadway, Grantee shall maintain the New Roadway as needed and as further may be required by the St. Johns River Water Management District, subject to Grantor's obligation to repair any damage created thereto by Grantor, its invitees or contractors. If Grantee fails to maintain the New Roadway after twenty (20) days' written notice from Grantor, Grantor may conduct such maintenance at Grantee's expense, which shall promptly be reimbursed on demand, and if not reimbursed within 30 days shall bear interest at the prime rate of interest as quoted in the Wall Street Journal plus four percent (4%) (not to exceed the maximum rate of interest allowed by law) from and after the date of demand.

9.  **Indemnification**. To the extent of insurance coverage required to be carried hereunder or, if greater, the actual insurance carried by Grantee, Grantee shall indemnify and hold harmless Grantor from and against any and all liability, claims, actual damages, demands, fines, penalties, costs and expenditures (including reasonable attorneys' fees and costs of litigation defense and/or settlement) ("Damages") caused by the negligent acts or omissions of Grantee, any of its agents, employees, contractors, licensees, or invitees retained by Grantee and acting under Grantee's direction, the Permittees, or Grantee's beneficial owners. The foregoing indemnification shall not apply to the extent such Damages are found to be caused by the gross negligence or willful misconduct of Grantor or any of its agents, employees, contractors, licensees, or invitees (other than Grantee) retained by Grantor and acting under Grantor's direction. All indemnification obligations contained in this paragraph shall survive the expiration or sooner termination of this Agreement.

10.  **Insurance**. Grantee shall maintain and, unless insurance for such persons is maintained

5

by Grantee, shall cause its agents, licensees, invitees, and contractors agree to maintain insurance coverage in the following minimum amounts:

    a.   Commercial General Liability with limits of not less than $1,000,000.00 combined single limit bodily injury & property damage each occurrence, $2,000,000.00 general aggregate and $2,000,000.00 products/completed operations aggregate including coverage for: premises and operations, products and completed operations, contractual liability insuring the obligations of Grantee in this Agreement, independent contractors, personal & advertising injury.

    b.   Commercial Automobile Liability covering owned, hired and non-owned vehicles with limits of not less than $1,000,000.00 combined single limit bodily injury and property damage each occurrence.

    c.   Follow Form Excess liability (umbrella) insurance for bodily injury and property damage over primary employer's liability, commercial general liability, and commercial automobile liability with limits in the amount of $1,000,000.00 each occurrence and $2,000,000.00 in the aggregate;

    d.   Workers' compensation insurance covering all employees of the Grantee or its assignees who are engaged in any work on the Access Easement area in an amount required by applicable laws. Employer's Liability coverage of not less than:

        i.      Bodily Injury by Accident (Each Accident) $1,000,000.00

        ii.     Bodily Injury by Disease (Policy Limit) $1,000,000.00

        iii.    Bodily Injury by Disease (Each Employee) $1,000,000.00

    e.   In the event the Access Easement is transferred to the New Roadway as contemplated in Section 8 above, Grantee shall be required to obtain liability insurance for hunting activities an amounts not less than $1,000,000 / $2,000,000.

    f.   The insurance described above shall be obtained without liability on the part of Grantor for premiums. The insurance described in items (A), (B), (C) and (E) above shall name Grantor as an additional insured. Each of the above policies will be primary and non-contributory with respect to any policies carried by any additional insured. Any coverage carried by Grantor shall be excess insurance. Such insurance shall be placed with reputable insurance companies licensed or authorized to do business in the state of Florida and have a minimum Best's rating of A-/VIII. Grantee shall furnish evidence of such insurance coverage within ten (10) business days of Grantor's request.

    g.   Waiver of Subrogation. Each insurance policy maintained by Grantee hereunder or by Grantor with respect to the Property shall contain a waiver of subrogation clause, so that no insurers shall have any claim over or against Grantor or Grantee, as the case may be, by way of subrogation or otherwise, with respect to any claims that are insured under such policy. All insurance relating to the Property shall be only for the benefit of the party securing said insurance and all others named as insureds. Notwithstanding any contrary provisions of this Agreement, Grantor and Grantee hereby release each other from and waive all rights of recovery and claims under or through subrogation or otherwise for any and all losses and damages to property to the extent caused by a peril insured or insurable under the policies of insurance required to be maintained under this Agreement by the waiving party and agree that no insurer shall have a right to recover any amounts paid with respect to any claim against Grantor or Grantee by subrogation, assignment or otherwise.

11.    **Devolution.** The terms and provisions contained in this Agreement are covenants running

with the land, shall be binding upon and the benefits hereof inure to, the respective successors of the parties hereto except as otherwise provided below. The access rights under this instrument shall cease, terminate and provide no further access rights if (i) as to the Phase I Lands if the Phase I Lands are further subdivided without the written consent of Grantor, (ii) as to Phase II Lands if the Phase II Lands are further subdivided without the written consent of Grantor, or (iii) as to the Phase III Lands if the Phase III Lands are further subdivided without the written consent of Grantor or if the Phase III Lands are conveyed to Jax-Palatka Farms LLC or any of its affiliates. **If the Phase I Lands, Phase II Lands or Phase III Lands are hereafter conveyed by Reinhold Corporation to (an)other part(y)ies, the obligations of each separate Grantee hereunder shall be several and not joint.**

12.     **Miscellaneous.**

a.     **Notices.** Any notice which must or may be given to Grantor or Grantee or any successor or assign of any of the foregoing, under the provisions of this Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission to Grantor or Grantee (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed, with regard Grantor and Grantee at the addresses provided in the first paragraph of this Agreement. Any party may change its address for notices by serving on the other party a notice that provides the new address.

b.     **Headings.** The headings of the sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

c.     **Counterparts.** To facilitate execution, this Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

d.     **Assignment.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns; provided however, neither Party may assign or transfer its rights and duties under this Agreement without the other Party's prior written consent, which consent may be granted or withheld in such other Party's sole discretion. Notwithstanding the foregoing, either Party may assign its rights under this Agreement to an entity controlling, controlled by or under common control with such Party without the consent to the other Party, provided that (i) the assignor remains liable for obligations arising from events theretofore occurring, (ii) the assignee has and retains sufficient net worth to perform its obligations hereunder and (iii) such control relationship is continuing thereafter. Upon the failure to of such control relationship to continue, the assignor shall thereupon become fully liable for the obligations of the assignee and any successor assignees.

e.     **Written Approval.** Unless otherwise specified in this Agreement, all approvals and consents hereunder must be requested in writing by the party seeking such approval or consent to the other party, and all approvals or consents shall not be effective unless in writing. Additionally, the parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed.

f.  **Non-Waiver**.  A failure of a party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein.  In no way whatsoever shall a waiver of any term, provision or condition of this Agreement be valid unless in writing, signed by the waiving party, and only to the extent expressly set forth in such writing.

g.  **No Joint Venture or Partnership**.  None of the terms or provisions of this Agreement shall be deemed to create a partnership between or among the parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise.  Each party shall be considered a separate entity and no party shall have the right to act as an agent for the other party unless expressly authorized to do so herein or by separate instrument signed by the party to be charged.

h.  **Entire Agreement; Amendment**.  This Agreement and any exhibits hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the parties, whether written or oral, with respect to the subject matter hereof.  To be effective, any modification and/or amendment to this Agreement must be in writing and executed by the parties.

i.  **Applicable Law**.  This Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws.  Venue for any dispute between the parties with regard to this Agreement and the subject matter hereof shall lie only in Clay County, Florida.

j.  **Joint Preparation**.  The parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.

k.  **Jury Waiver**.  EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT (INCLUDING INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT) OR PERFORMANCE UNDER THIS AGREEMENT.  EACH PARTY ACKNOWLEDGES THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

l.  **Attorneys' Fees**.  If any legal or equitable action is commenced by either party against the other party to enforce or interpret any provision of this Agreement or with regard to the subject matter hereof, the party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing party its reasonable attorneys' fees and costs incurred by the prevailing party, in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

m.  **Severability**.  If any clause or provision of this Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement shall not be affected thereby. It is the express intention of the parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

8

n. **Time is of the Essence**. Time is of the essence of this Agreement.

o. **Limitation on Damages**. Neither party shall be liable to the other for any consequential, speculative or punitive damages incurred due to the fault of the other or their employees, consultants, agents, contractors or subcontractors, regardless of the nature of the fault or whether such liability arises in breach of contract or warranty, tort, statute, or any other cause of action. Consequential damages include, but are not limited to, loss of use, lost business opportunities, damage to representation and loss of profit, and all such claims are hereby waived and released.

[remainder of page intentionally left blank]

9

*Signature Page of Redshirt Farms, LLC to Access Easement*

**IN WITNESS WHEREOF**, the parties have caused this instrument to be executed in their names

Signed, sealed, and delivered
In the presence of:

**Grantor:**

**REDSHIRT FARMS, LLC**, a Florida limited liability company

Print Name: _____

By: _____

Name: _____

Print Name: _____

Its: _____

as of the day and year first above written.

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this ____ day of _____, 20___, by _____, the _____ of REDSHIRT FARMS, LLC, a Florida limited liability company, who:

( )    is personally known to me;
( )    has produced a _____ Driver's License as identification; or
( )    has produced a _____ as identification.

{Notarial Seal Must be Affixed}

Notary Signature
Print Name: _____
Notary Public, State and County Aforesaid
My commission expires:_____
Commission Number: _____

*Signature Page of Reinhold Corporation to Access Easement*

Signed, sealed, and delivered
In the presence of:

**Grantee:**

**REINHOLD CORPORATION**, a Florida corporation

_____

Print Name: _____

_____    By: _____

Print Name: _____    Name:  George M. Egan

Its: President

    **IN WITNESS WHEREOF**, the parties have caused this instrument to be executed in their names as of the day and year first above written.

STATE OF _____

COUNTY OF _____

    The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this ____ day of _____, 20__, by George M. Egan, the President of REINHOLD CORPORATION, a Florida corporation, who:

    ( )    is personally known to me;
    ( )    has produced a _____ Driver's License as identification; or
    ( )    has produced a _____ as identification.

{Notarial Seal Must be Affixed}

_____
Notary Signature
Print Name: _____
Notary Public, State and County Aforesaid
My commission expires:_____
Commission Number: _____

**Attachment 1**

Legal Description of the Property (Owned by Redshirt Farms, LLC)

THE FOLLOWING DESCRIBED LANDS LOCATED IN TOWNSHIP 7 SOUTH, RANGE 25 EAST, CLAY COUNTY, FLORIDA:

**SECTION 7:**
ALL LYING NORTH OF SHARON CHURCH ROAD, A COUNTY MAINTAINED ROAD

**SECTION 8:**
ALL LYING NORTH OF SHARON CHURCH ROAD

**SECTION 9:**
THOSE PORTIONS LYING NORTH OF SHARON CHURCH ROAD, LESS AND EXCEPT:

(1)    THE LANDS DESCRIBED IN O.R. BOOK 647, PAGE 40, PUBLIC RECORDS, CLAY COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS:

THE EAST 1/2 OF THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 OF SECTION 9; AND

THAT PORTION OF THE EAST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 LYING NORTH OF SHARON CHURCH ROAD;

(2)    THE LANDS DESCRIBED IN DEED OF GIFT TO SHARON BAPTIST CHURCH, INC. RECORDED AT O.R. 1557, PAGE 2018, PUBLIC RECORDS, CLAY COUNTY, FLORIDA BEING MORE PARTICULARLY DESCRIBED AS:

A PARCEL OF LAND SITUATED IN THE NORTHEAST 1/4 OF SECTION 9, TOWNSHIP 7 SOUTH, RANGE 25 EAST, CLAY COUNTY, FLORIDA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT A CONCRETE MONUMENT AT THE NORTHWEST CORNER OF THE NORTHEAST 1/4 OF SAID SECTION 9, AND RUN SOUTH 00 DEGREES 18 MINUTES 00 SECONDS EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4 A DISTANCE OF 408.62 FEET TO AN IRON ROD AND THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 00 DEGREES 18 MINUTES 00 SECONDS EAST, ALONG SAID WEST LINE A DISTANCE OF 465.13 FEET TO AN IRON ROD ON THE NORTHERLY MAINTAINED RIGHT OF WAY LINE OF COUNTY ROAD NO. 315, ALSO KNOWN AS SHARON ROAD; THENCE RUN NORTH 69 DEGREES 11 MINUTES 00 SECONDS EAST, ALONG SAID NORTHERLY MAINTAINED RIGHT OF WAY LINE A DISTANCE OF 100.00 FEET TO AN IRON ROD; THENCE RUN NORTH 00 DEGREES 18 MINUTES 00 SECONDS WEST, 465.13 FEET TO AN IRON ROD; THENCE RUN SOUTH 69 DEGREES 11 MINUTES 00 SECONDS WEST, 100.00 FEET TO THE POINT OF BEGINNING.

(3)    THOSE PORTIONS, IF ANY, OF:

THE EAST 1/2 OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF THE NORTHWEST 1/4, AND

THE WEST 1/2 OF THE E 1/2 OF THE SOUTHWEST 1/4 OF THE NORTHWEST 1/4,

WHICH LIE NORTH OF SHARON CHURCH ROAD.

(NOTE:  All references to roads are to the centerlines thereof.)

LESS AND EXCEPT THAT CERTAIN 1.0 ACRE PARCEL CONVEYED TO SHARON BAPTIST CHURCH MORE PARTICULARLY DESCRIBED IN THAT CERTAIN DEED RECORDED IN O.R. BOOK 1742, PAGE 370 OF THE PUBLIC RECORDS OF CLAY COUNTY, FLORIDA.

**Attachment 2**

Legal Description of the Mitigation Parcels

**Conservation Easement Areas:**

*Phase I Lands:*
A Tract of land situated in Sections 19, 29, 30, 31, Township 6 South, Range 25 East and in Sections 5, 6, Township 7 South, Range 25 East; Clay County, Florida; Said tract designated as Phase I on a Boundary Survey by Mark E. Hardenbrook, Florida Professional Surveyor and Mapper No. 5500, Dated March 5, 2010 with a File Number of H-07-213-GCMB and being more particularly described as follows:

Begin at a Concrete Monument with a Brass Plate at the Southwest corner of Section 6, Township 7 South, Range 25 East and run S 88 deg 27 min 05 sec E, along the south line of said Section 6, a distance of 5223.40 feet to a concrete monument at the southwest corner of Section 5; thence run N 89 deg 24 min 25 sec E, along the south line of said Section 5, a distance of 483.49 feet to an Iron Rod in the centerline of Union Camp Grade, a private road; thence run northerly, along said centerline with the following courses and distances: N 04 deg 56 min 59 sec W, 727.94 feet; N 10 deg 07 min 26 sec W, 107.64 feet; N 24 deg 33 min 38 sec W, 162.63 feet; N 42 deg 27 min 18 sec W, 118.46 feet; N 55 deg 03 min 49 sec W, 299.40 feet; N 45 deg 51 min 11 sec W, 136.17 feet; N 29 deg 49 min 31 sec W, 158.67 feet; N 19 deg 09 min 22 sec W, 168.51 feet; N 09 deg 49 min 50 sec W, 443.90 feet; N 02 deg 36 min 27 sec W, 176.13 feet; N 03 deg 00 min 18 sec E, 3501.60 feet to an Iron Rod in the centerline intersection of Hercules Grade, a private road; thence run westerly and northwesterly with the following courses and distances; S 85 deg 41 min 13 sec W, 646.0 feet; N 56 deg 21 min 54 sec W, 207.47 feet; N 47 deg 33 min 56 sec W, 694.83 feet; N 34 deg 06 min 24 sec W, 151.08 feet; N 26 deg 53 min 20 sec W, 466.26 feet; N 52 deg 38 min 06 sec W, 339.68 feet; N 42 deg 34 min 55 sec W, 252.43 feet; N 01 deg 13 min 24 sec W, 480.06 feet; N 27 deg 08 min 44 sec W, 507.83 feet; N 40 deg 23 min 41 sec W, 149.56 feet; N 51 deg 23 min 48 sec W, 345.79 feet; N 23 deg 19 min 53 sec W, 395.07 feet; N 37 deg 44 min 40 sec W, 257.41 feet; N 28 deg 48 min 41 sec W, 243.17 feet; N 37 deg 23 min 56 sec W, 352.12 feet; N 30 deg 48 min 55 sec W, 161.10 feet; N 39 deg 42 min 13 sec W, 197.01 feet; N 10 deg 59 min 39 sec W, 172.41 feet; N 52 deg 15 min 24 sec W, 147.90 feet; N 33 deg 11 min 10 sec W, 209.27 feet; N 03 deg 05 min 49 sec E, 539.61 feet; N 25 deg 23 min 41 sec W, 100.04 feet; N 24 deg 35 min 45 sec E, 195.62 feet; N 00 deg 17 min 48 sec E, 381.30 feet; N 11 deg 10 min 44 sec E, 172.99 feet; N 15 deg 23 min 59 sec W, 172.61 feet; N 20 deg 03 min 49 sec E, 232.83 feet; N 03 deg 20 min 02 sec E, 384.39 feet; N 04 deg 19 min 36 sec E, 343.03 feet; N 14 deg 00 min 22 sec W, 48.01 feet; N 14 deg 54 min 04 sec E, 129.74 feet; N 01 deg 24 min 18 sec W, 414.92 feet; N 05 deg 29 min 58 sec E, 327.87 feet; N 10 deg 28 min 09 sec E, 348.62 feet; N 00 deg 52 min 15 sec E, 540.49 feet; N 03 deg 13 min 05 sec E, 216.36 feet; N 18 deg 07 min 11 sec W, 74.18 feet; N 07 deg 16 min 45 sec W, 149.87 feet; N 45 deg 06 min 27 sec E, 186.92 feet; thence run southeasterly and northeasterly with the following courses and distances: S 89 deg 20 min 33 sec E, 87.30 feet; S 50 deg 56 min 43 sec E, 272.92 feet; S 58 deg 57 min 31 sec E, 263.75 feet; S 48 deg 26 min 58 sec E, 96.92 feet; S 46 deg 55 min 34 sec E, 699.34 feet; S 54 deg 15 min 55 sec E, 111.83 feet; S 67 deg 10 min 36 sec E, 548.32 feet; S 68 deg 50 min 10 sec E, 630.30 feet; S 77 deg 49 min 59 sec E, 359.72 feet; N 65 deg 40 min 56 sec E, 163.54 feet; N 74 deg 13 min 35 sec E, 111.16 feet; N 62 deg 27 min 15 sec E, 371.84 feet; S 84 deg 29 min 15 sec E, 97.38 feet; N 74 deg 08 min 06 sec E, 128.51 feet; N 38 deg 16 min 04 sec E, 231.97 feet; N 46 deg 39 min 54 sec E, 255.07 feet; N 03 deg 41 min 59 sec E, 318.18 feet to an Iron Rod; thence run Northwesterly with the following courses and distances: N 81 deg 11 min 33 sec W, 378.23 feet to an Iron Rod; N 59 deg 01 min 15 sec W, 4055.64 feet to an Iron Rod; N 14 deg 26 min 08 sec W, 1865.38 feet to an Iron Rod; N 80 deg 56 min 02 sec E, 729.18 feet to an Iron Rod; N 64 deg 50 min 44 sec W, 348.26 feet to an Iron Rod; N 45 deg 00 min 00 sec W, 110.0 feet to an Iron Rod; WEST 1360.0 feet to an Iron Rod on the West line of Section 19, Township 6 South, Range 25 East; thence run S 00 deg 46 min 03 sec W, along said West line and along the West line of Section 30, a distance of 8099.43 feet to a concrete monument at the Southwest corner

of said Section 30; thence run S 00 deg 00 min 45 sec E, along the West line of Section 31, a distance of 5334.22 feet to a concrete monument at the Southwest corner of Section 31 and the Northwest corner of said Section 6; thence run S 00 deg 33 min 05 sec W, along the West line of said Section 6, a distance of 5347.35 feet to the Point of Beginning.

The above described lands containing 1353.10 acres more or less.

***Phase II Lands:***
A Tract of land situated in Sections 29, 30, 31, 32, 33, Township 6 South, Range 25 East; Clay County, Florida; Said tract designated as Phase II on a Boundary Survey by Mark E. Hardenbrook, Florida Professional Surveyor and Mapper No. 5500, Dated March 5, 2010 with a File Number of H-07-213-GCMB and being more particularly described as follows:

Commence at a Concrete Monument with a Brass Plate at the Southwest corner of Section 6, Township 7 South, Range 25 East and run S 88 deg 27 min 05 sec E, along the south line of said Section 6, a distance of 5223.40 feet to a concrete monument at the southwest corner of Section 5; thence run N 89 deg 24 min 25 sec E, along  the south line of said Section 5, a distance of 483.49 feet to an Iron Rod in the centerline of Union Camp Grade, a private road; thence run northerly, along said centerline with the following courses and distances: N 04 deg 56 min 59 sec W, 727.94 feet; N 10 deg 07 min 26 sec W, 107.64 feet; N 24 deg 33 min 38 sec W, 162.63 feet; N 42 deg 27 min 18 sec W, 118.46 feet; N 55 deg 03 min 49 sec W, 299.40 feet; N 45 deg 51 min 11 sec W, 136.17 feet; N 29 deg 49 min 31 sec W, 158.67 feet; N 19 deg 09 min 22 sec W, 168.51 feet; N 09 deg 49 min 50 sec W, 443.90 feet; N 02 deg 36 min 27 sec W, 176.13 feet; N 03 deg 00 min 18 sec E, 3501.60 feet to an Iron Rod in the centerline intersection of Hercules Grade, a private road and the Point of Beginning; thence run westerly and northwesterly with the following courses and distances; S 85 deg 41 min 13 sec W, 646.0 feet; N 56 deg 21 min 54 sec W, 207.47 feet; N 47 deg 33 min 56 sec W, 694.83 feet; N 34 deg 06 min 24 sec W, 151.08 feet; N 26 deg 53 min 20 sec W, 466.26 feet; N 52 deg 38 min 06 sec W, 339.68 feet; N 42 deg 34 min 55 sec W, 252.43 feet; N 01 deg 13 min 24 sec W, 480.06 feet; N 27 deg 08 min 44 sec W, 507.83 feet; N 40 deg 23 min 41 sec W, 149.56 feet; N 51 deg 23 min 48 sec W, 345.79 feet; N 23 deg 19 min 53 sec W, 395.07 feet; N 37 deg 44 min 40 sec W, 257.41 feet; N 28 deg 48 min 41 sec W, 243.17 feet; N 37 deg 23 min 56 sec W, 352.12 feet; N 30 deg 48 min 55 sec W, 161.10 feet; N 39 deg 42 min 13 sec W, 197.01 feet; N 10 deg 59 min 39 sec W, 172.41 feet; N 52 deg 15 min 24 sec W, 147.90 feet; N 33 deg 11 min 10 sec W, 209.27 feet; N 03 deg 05 min 49 sec E, 539.61 feet; N 25 deg 23 min 41 sec W, 100.04 feet; N 24 deg 35 min 45 sec E, 195.62 feet; N 00 deg 17 min 48 sec E, 381.30 feet; N 11 deg 10 min 44 sec E, 172.99 feet; N 15 deg 23 min 59 sec W, 172.61 feet; N 20 deg 03 min 49 sec E, 232.83 feet; N 03 deg 20 min 02 sec E, 384.39 feet; N 04 deg 19 min 36 sec E, 343.03 feet; N 14 deg 00 min 22 sec W, 48.01 feet; N 14 deg 54 min 04 sec E, 129.74 feet; N 01 deg 24 min 18 sec W, 414.92 feet; N 05 deg 29 min 58 sec E, 327.87 feet; N 10 deg 28 min 09 sec E, 348.62 feet; N 00 deg 52 min 15 sec E, 540.49 feet; N 03 deg 13 min 05 sec E, 216.36 feet; N 18 deg 07 min 11 sec W, 74.18 feet; N 07 deg 16 min 45 sec W, 149.87 feet; N 45 deg 06 min 27 sec E, 186.92 feet; thence run southeasterly and northeasterly with the following courses and distances: S 89 deg 20 min 33 sec E, 87.30 feet; S 50 deg 56 min 43 sec E, 272.92 feet; S 58 deg 57 min 31 sec E, 263.75 feet; S 48 deg 26 min 58 sec E, 96.92 feet; S 46 deg 55 min 34 sec E, 699.34 feet; S 54 deg 15 min 55 sec E, 111.83 feet; S 67 deg 10 min 36 sec E, 548.32 feet; S 68 deg 50 min 10 sec E, 630.30 feet; S 77 deg 49 min 59 sec E, 359.72 feet; N 65 deg 40 min 56 sec E, 163.54 feet; N 74 deg 13 min 35 sec E, 111.16 feet; N 62 deg 27 min 15 sec E, 371.84 feet; S 84 deg 29 min 15 sec E, 97.38 feet; N 74 deg 08 min 06 sec E, 128.51 feet; N 38 deg 16 min 04 sec E, 231.97 feet; N 46 deg 39 min 54 sec E, 255.07 feet; N 03 deg 41 min 59 sec E, 318.18 feet to an Iron Rod hereinafter referred to a "Point A"; thence return to the above described Point of Beginning and run Northeasterly along the centerline of said Hercules Grade, a private road, with the following courses and distances: N 85 deg 24 min 39 sec E, 2550.57 feet; N 84 deg 48 min 57 sec E, 932.70 feet; N 36 deg 25 min 05 sec E, 503.96 feet; N 43 deg 27 min 26 sec E, 1271.04 feet; N 50 deg 08 min 54 sec E, 404.03 feet; N 61 deg 00 min 40 sec E, 882.58 feet; N 68 deg 17 min 32 sec E, 118.56 feet, N 60 deg 05 min 26 sec E, 203.47 feet; N 64 deg 19 min 42

sec E, 571.69 feet to an Iron Rod; thence leave said centerline and run northwesterly with the following courses and distances: N 26 deg 52 min 47 sec W, 3425.38 feet to an Iron Rod; N 49 deg 46 min 51 sec W, 4596.54 feet to an Iron Rod; N 81 deg 11 min 33 sec W, 1073.22 feet to an Iron Rod at the above referenced "Point A" and to Close.

The above described lands containing 1466.01 acres more or less.

### Phase III Lands:

A Tract of land situated in Sections 31, 32, 33, Township 6 South, Range 25 East and in Section 4, 5, 6, Township 7 South, Range 25 East; Clay County, Florida; Said tract designated as Phase III on a Boundary Survey by Mark E. Hardenbrook, Florida Professional Surveyor and Mapper No. 5500, Dated March 5, 2010 with a File Number of H-07-213-GCMB and being more particularly described as follows:

Commence at a Concrete Monument with a Brass Plate at the Southwest corner of Section 6, Township 7 South, Range 25 East and run S 88 deg 27 min 05 sec E, along the south line of said Section 6, a distance of 5223.40 feet to a concrete monument at the southwest corner of Section 5; thence run N 89 deg 24 min 25 sec E, along the south line of said Section 5, a distance of 483.49 feet to an Iron Rod in the centerline of Union Camp Grade, a private road and the Point of Beginning; thence run northerly, along said centerline with the following courses and distances: N 04 deg 56 min 59 sec W, 727.94 feet; N 10 deg 07 min 26 sec W, 107.64 feet; N 24 deg 33 min 38 sec W, 162.63 feet; N 42 deg 27 min 18 sec W, 118.46 feet; N 55 deg 03 min 49 sec W, 299.40 feet; N 45 deg 51 min 11 sec W, 136.17 feet; N 29 deg 49 min 31 sec W, 158.67 feet; N 19 deg 09 min 22 sec W, 168.51 feet; N 09 deg 49 min 50 sec W, 443.90 feet; N 02 deg 36 min 27 sec W, 176.13 feet; N 03 deg 00 min 18 sec E, 3501.60 feet to an Iron Rod in the centerline intersection of Hercules Grade, a private road; thence run Northeasterly along said centerline with the following courses and distances: N 85 deg 24 min 39 sec E, 2550.57 feet; N 84 deg 48 min 57 sec E, 932.70 feet; N 36 deg 25 min 05 sec E, 503.96 feet; N 43 deg 27 min 26 sec E, 1271.04 feet; N 50 deg 08 min 54 sec E, 404.03 feet; N 61 deg 00 min 40 sec E, 882.58 feet; N 68 deg 17 min 32 sec E, 118.56 feet, N 60 deg 05 min 26 sec E, 203.47 feet; N 64 deg 19 min 52 sec E, 571.69 feet to an Iron Rod hereinafter referred to a "Point B"; thence return to the above described point of beginning and run N 89 deg 24 min 25 sec E, along the south line, of said Section 5, a distance of 4810.61 feet to a concrete monument at the southwest corner of Section 4; thence run N 89 deg 42 min 50 sec E, along the south line of said Section 4, a distance of 2638.99 feet to a concrete monument; thence run N 89 deg 41 min 34 sec E, along said south line, 2023.87 feet to a concrete monument at the southwest corner of lands described in Official Records Book 1249 on Page 365 of the public records of said county; thence run along the boundary of said lands with the following courses and distances: N 00 deg 33 min 28 sec W, 662.66 feet to a concrete monument; N 89 deg 48 min 50 sec E, 169.40 feet to a concrete monument; N 00 deg 45 min 00 sec W, 663.70 feet to a concrete monument; N 89 deg 38 min 59 sec E, 502.61 feet to a concrete monument on the East line of said Section 4 and the northeast corner of the aforesaid lands; thence run N 00 deg 46 min 59 sec W, along said East line, 1226.39 feet to an Iron Rod; thence leave said East line and run S 89 deg 36 min 23 sec W, 2760.91 feet to an Iron Rod; thence run N 00 deg 04 min 10 sec E, 2889.05 feet to an Iron Rod; thence run S 89 deg 38 min 01 sec E, 1064.55 feet to an Iron Rod; thence run Northwesterly with the following courses and distances: N 45 deg 24 min 04 sec W, 2597.75 feet to an Iron Rod; N 30 deg 07 min 11 sec W, 1293.20 feet to an Iron Rod at the above referenced "Point B" and to Close.

The above described lands containing 1382.11 acres more or less.

## Attachment 3

### Legal Description of the lands comprising the **Access Easement**

A Strip of land situated in Section 8, Township 7 South, Range 25 East; Clay County, Florida; Said Strip Lying 20.0 feet left (east) of and 20.0 feet right (west) of the following described centerline:

Commence at a concrete monument at the Northwest corner of Section 8 and run N 89 deg 24 min 25 sec E, along the North line of said Section 8, a distance of 483.49 feet to an Iron Rod at the intersection north line with the centerline of an existing private grade and the Point of Beginning. thence run in a general southeasterly direction, along said centerline with the following courses and distances: S 02 deg 48 min 58 sec E, 558.45 feet to a point of non-tangent curve having an arc length of 218.35 feet, a radius of 575.70 feet and a chord bearing and distance of S 15 deg 42 min 31 sec E, 217.04 feet to a point of compound curve with a non-tangent curve having an arc length of 583.58 feet, a radius of 3721.18 feet and a chord bearing and distance of S 28 deg 32 min 41 sec E, 582.98 feet; thence S 34 deg 10 min 08 sec E, 776.35 feet to a point of non-tangent curve having an arc length of 129.45 feet, a radius of 278.56 feet and a chord bearing and distance of S 21 deg 28 min 28 sec E, 128.28 feet; thence run S 11 deg 15 min 20 sec E, 737 feet more or less to the northerly maintained right of way line of Sharron Road, a county right of way and the terminus of said 40.0' Easement Centerline.

Depiction of the Access Easement on the current trail road.



**Attachment 4**

**Conditions of Use by Hunters to Access the Conservation Easement Areas**

1.    The persons permitted to utilize the Access Easement as Permittees for hunting purposes under this Agreement for hunters to use the New Roadway are limited to (i) employees and direct, indirect or beneficial owners of Grantee, (ii) contractors retained by Grantee for hunting management services, and (iii) following construction of the New Roadway, the members of the hunt club and their guests as permitted by Grantee. (the "*Permittee's*").

(a)    To exercise such rights of access, (i) each member of the hunt club must be in good standing, (ii) each member of the hunt club must have his/her name registered with Grantee as may be specified in the hunting leases, and (iii) there must be insurance in place as required in the hunting lease.

(b)    Grantee shall have the right to control and, if desired, terminate the right of the hunt club or its members use the Access Easement pursuant to the terms and conditions of the hunting lease.

2.    Use and Acceptance of Property.

(a)    Grantee shall use Grantor's Property and the Access Easement for the Permitted Use in a manner which shall reasonably minimize interference with Grantor's use of the Grantor's Property and its business operations at the Grantor's Property, and otherwise comply with the terms of this Agreement.

(b)    All gates to trail roads shall be locked by Grantee or the Permittee's unless Grantee, a Permittee or a representative of either is present at the gate.

(c)    While utilizing the Access Easement no burning or activities creating a significant risk of fire shall be conducted by Permittees.

(d)    Grantee shall promptly cause to be repaired any road fence, gate, bridge or other improvement damaged by reason of the activities of Grantee or Permittees hereunder.

(e)    All personal property brought onto Grantor's Property and all use of the Access Easement shall be at Grantee's and the Permittees' sole risk and Grantee and Permittees exculpate Grantor from any liability for loss or damage to such personal property.

(f)    Grantee and each Permittee accept the condition of the roadways constituting the Access Easement "AS IS" and assume all risks associated with such conditions.

3.    Grantee Compliance.

(a)    Prior to and as a condition to exercising rights hereunder, Grantee shall deliver to Grantor proof of insurance required by this Agreement.

(b)      Grantee shall not cause or allow any third party lien or claim to encumber the Grantor's Property and shall promptly discharge of record any such lien or claim at Grantee's sole cost and expense.

(c)      Each of Grantor and Grantee may revoke the rights of any hunt club member for failure to maintain gates locked or for violations of one or more such hunt club member's obligations hereunder.

## Exhibit B

Hercules Grade Access License

[see attached]

Prepared by:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456

### Hercules Grade Access License

This Access License ("*Agreement*"), dated as of September ___, 2020 (the "*Effective Date*"), is by and between **JAX-PALATKA FARMS LLC**, a Delaware limited liability company (the "*Grantor*") and **REINHOLD CORPORATION**, a Florida corporation ("*Grantee*").

WHEREAS, Grantor is the fee owner of the property in Sections 33 and 34, T6S, R25E on which the road segment described in Exhibit "A" (the "*Access Roadway*") are located, Grantor having acquired such lands from Grantee. The Access Roadway is part of larger tracts that have been acquired by Grantor from Grantee ("*Property*").

WHEREAS, Grantee leases/licenses for hunting purposes certain lands subject to the Conservation Easements recorded at OR 3578, p. 1369 (the "*Phase I Lands*") and at OR 3369, page 1342, public records, Clay County, FL (the "*Phase II Lands*") (collectively the "*Conservation Lands*") and to the Phase III Lands (as hereinafter defined) to one or more hunt clubs. Grantee has also committed to place a conservation easement on additional lands (the "*Phase III Lands*"), which, upon removal of such commitment, Grantee has agreed to sell to Grantor.

WHEREAS, one or more of such hunt clubs require access over the road described in Exhibit "A" in order to access the Phase I Lands, Phase II Lands and/or the Phase III Lands.

WHEREAS, Grantor is willing to permit Grantee, Grantee's invitees and contractors providing hunting management services, and the members of the hunt clubs requiring access to the Phase I Lands, Phase II Lands, and/or Phase III Lands to use the Access Roadway solely for the Permitted Use (as hereinafter defined) on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Access; Term.

(a)    Subject to the provisions of this Agreement, Grantor hereby grants to Grantee, Grantee's permitted successors and assigns, and the Permittees (as hereinafter defined) permission to utilize on a non-exclusive basis the Access Roadway from time to time for the sole purpose of exercising hunting and fishing rights pursuant to a then valid hunting/fishing license/lease between Grantee and the hunt club on the

Conservation Lands and Phase III Lands, and, in the case of Grantee, and its invitees and contractors, for monitoring such use of the Access Roadway and for any hunting management activities (the "*Permitted Use*").

(b)    The persons permitted to utilize the Access Roadway under this Agreement are limited to (x) the members of the hunt club and their guests as permitted by Grantee (the "*Permittees*") and (y) Grantor, and Grantor's invitees and contractors for hunting management purposes.  To exercise such rights of access, (i) each member of the hunt club must be in good standing, (ii) each member must have his/her name registered with Grantor's Representative and (iii) there must be insurance in place as set forth in Section 4 herein.  Grantor's Representative is currently Cooper Murphy acting pursuant to the Property Management Agreement between Grantor and Grantee.

(c)    Grantee shall have the right at all times to control the Permittees' access to, over, and upon the Access Roadway, and, if desired, terminate the right of the Permittees to use, access, or travers over or upon the Access Roadway pursuant to the terms of the hunting lease.

(d)    This License shall terminate upon (i) completion of a new trail road near the Westerly boundary of Section 7, T7S, R25E running north from Sharron Road to the Northerly boundary of Section 7, accompanied by any required consent of the St. Johns River Water Management District, the Army Corp of Engineers, if applicable, and any permits associated therewith, for Grantee to utilize the Southernmost East-West trail road in Phase I of the Mitigation Bank, and (ii) recordation by Redshirt Farms, LLC of an easement of record establishing such access allowing for the hunters across such new trail road.

(e)    Unless otherwise agreed by Grantor, there shall be no more than two hunt club with no more than 30 members total permitted to utilize the Access Roadway hereunder.

2.    Use and Acceptance of Property.

(a)    Grantee shall use the Access Roadway for the Permitted Use in a manner which shall reasonably minimize interference with Grantor's use of the Access Roadway, Grantor's Property, and Grantor's business operations at the Grantor's Property, and otherwise comply with the terms of this Agreement.

(b)    All gates to trail roads shall be locked by Grantee or the Permittees unless Grantee, a Permittee, or a representative of either is present at the gate.

(c)    While utilizing the Access Roadway, no burning or activities creating a significant risk of fire shall be conducted by Grantee or the Permittees.

(d)    Grantee shall enforce the covenants in its hunting leases to use commercially reasonable efforts cause to be repaired any road, fence, gate, bridge or other improvement damaged by reason of the acts, omissions or activities of Permittees hereunder or the Permittees' use of the Access Roadway.  Grantee shall promptly repair any road, fence, gate, bridge or other improvement damaged by Grantee.

2

(e)    All personal property brought onto Grantor's Property and all use of the Access Roadway shall be at Grantee's and the Permittees' sole risk and Grantee exculpates Grantor from any liability for loss or damage to such personal property.

(f)    Grantee and each Permittee accepts the condition of the Access Roadway "AS IS" and assumes all risks associated with such conditions.

3.    <u>Grantee Compliance</u>.

(a)    Prior to exercising rights hereunder, Grantee shall deliver to Grantor proof of insurance required by this Agreement.

(b)    Grantee shall not cause or allow any third party lien or claim to encumber the Grantor's Property and shall promptly discharge of record any such lien or claim at Grantee's sole cost and expense.

(c)    Each of Grantor and Grantee may revoke the rights of any member of a hunt club for failure to maintain gates locked or for violations of one or more of any member of a hunt club's obligations hereunder.

4.    <u>Insurance</u>. Grantee shall maintain insurance, or cause the Permittees to maintain insurance, covering Grantee and the activities of the Permittees on the Property in the following minimum amounts:

A.    Commercial General Liability with limits of not less than $1,000,000.00 combined single limit bodily injury & property damage each occurrence, $2,000,000.00 general aggregate and $2,000,000.00 products/completed operations aggregate including coverage for: premises and operations, products and completed operations, contractual liability insuring the obligations assumed by contractors of Grantee in this Agreement, independent contractors, personal & advertising injury.

B.    Commercial Automobile Liability covering owned, hired and non-owned vehicles with limits of not less than $1,000,000.00 combined single limit bodily injury and property damage each occurrence.

C.    Follow Form Excess liability (umbrella) insurance for bodily injury and property damage over primary employer's liability, commercial general liability, and commercial automobile liability with limits in the amount of $1,000,000.00 each occurrence and aggregate;

D.    Workers' compensation insurance covering all employees of the Grantee or its assignees who are engaged in any work duties involving use of the Access Roadways in an amount required by applicable laws. Employer's Liability coverage of not less than:

i.    Bodily Injury by Accident (Each Accident) $1,000,000.00

ii.    Bodily Injury by Disease (Policy Limit) $1,000,000.00

iii.   Bodily Injury by Disease (Each Employee) $1,000,000.00

E.    Liability insurance for hunting activities in amounts of not less than $1,000,000 per occurrence or $2,000,000 in the aggregate

The insurance described above shall be obtained without liability on the part of Grantor for premiums. The insurance described in items (A), (B), (C) and (E) above shall name Grantor as an additional insured. Each of the above policies will be primary and non-contributory with respect to any policies carried by any additional insured. Any coverage carried by Grantor shall be excess insurance. Such insurance shall be placed with reputable insurance companies licensed or authorized to do business in the state of Florida and have a minimum Best's rating of A-/VIII.

Waiver of Subrogation. Each insurance policy maintained by Grantee hereunder or by Grantor with respect to the Property shall contain a waiver of subrogation clause, so that no insurers shall have any claim over or against Grantor or Grantee, as the case may be, by way of subrogation or otherwise, with respect to any claims that are insured under such policy. All insurance relating to the Property shall be only for the benefit of the party securing said insurance and all others named as insureds. Notwithstanding any contrary provisions of this Agreement, Grantor and Grantee hereby release each other from and waive all rights of recovery and claims under or through subrogation or otherwise for any and all losses and damages to property to the extent caused by a peril insured or insurable under the policies of insurance required to be maintained under this Agreement by the waiving party and agree that no insurer shall have a right to recover any amounts paid with respect to any claim against Grantor or Grantee by subrogation, assignment or otherwise.

5.    **Indemnification of Grantor**. To the extent of insurance coverage required to be carried hereunder or, if greater, the actual insurance carried by Grantee, Grantee shall indemnify and hold harmless Grantor from and against any and all liability, claims, actual damages, demands, fines, penalties, costs and expenditures (including reasonable attorneys' fees and costs of litigation defense and/or settlement) ("Damages") caused by the negligent acts or omissions of Grantee, any of its agents, employees, contractors, licensees, or invitees retained by Grantee and acting under Grantee's direction, or the Permittees. The foregoing indemnification shall not apply to the extent such Damages are found to be caused by the gross negligence or willful misconduct of Grantor or any of its agents, employees, contractors, licensees, or invitees (other than Grantee) retained by Grantor and acting under Grantor's direction. All indemnification obligations contained in this paragraph shall survive the expiration or sooner termination of this Agreement.

The gross negligence or willful misconduct of Reinhold Corporation acting as the Manager under the Property Management Agreement between Grantee and Grantor shall not be imputed to Grantor.

6.    **Default.** In the event of a breach by either party, or its employee, agent, tenant, invitee, or contractor of any of the terms, covenants, restrictions or conditions of this Agreement, the non-breaching

4

party shall be entitled forthwith to full and adequate relief by injunction and/or all such other available legal and equitable remedies from the consequences of such breach, including payment of any amounts due and/or specific performance. In no event shall either party be liable to the other party for any speculative or punitive damages arising from this Agreement.

7.    **Notices**. Any notice which must or may be given to a party hereunder or any successor or assign of any party under the provisions of this Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed as follows:

| If to Grantee: | Reinhold Corporation |
| | Attn: George M. Egan |
| | 1845 Town Center Blvd., Ste. 105 |
| | Fleming Island, Florida 32003 |
| | Phone: (904) 269-5857 |
| | Email: GEgan@reinholdcorporation.com |

With a copy to:    Driver, McAfee, Hawthorne & Diebenow, PLLC
One Independent Drive, Suite 1200
Jacksonville, Florida 32202
Attn.: Matthew S. McAfee, Esq.
Phone: (904) 301-1269
Email: mmcafee@drivermcafee.com

If to Grantor:    JAX-PALATKA FARMS LLC
Attn: Rick Feaser
9 West 57th Street, Suite 5000
New York, NY 10019-2701
Fax: (212) 826-1265
E-mail: richie@ruanecuniff.com

5

With copies to:          Mr. Dennis Carey
(none if blank)          977 Stagecoach Road
                         Oglethorpe, GA 31068
                         Fax: (478) 472-7098
                         email: pinetimber@windstream.net

                         and to

                         Rogers Towers, P.A.
                         Attn: John T. Sefton, Esq.
                         1301 Riverplace Boulevard, Suite 1500
                         Jacksonville, Florida 32207
                         Fax: (904) 396-0663
                         E-mail: jsefton@RTLAW.com

Any party may change its address for notices by serving on the other party a notice that provides the new address.

8.      **Headings**. The headings of the sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

9.      **Counterparts**. To facilitate execution, this Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

10.     **Assignment**. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Grantor as owner of the Property. Grantee party may not assign or transfer its rights and duties under this Agreement without Grantor's prior written consent, which consent may be granted or withheld in Grantor's sole discretion. Notwithstanding the foregoing, either party may assign its rights under this Agreement to an entity controlling, controlled by or under common control with such party without the consent to the other party, provided that (i) the assignor remains liable for obligations arising from events theretofore occurring, (ii) the assignee has and retains sufficient net worth to perform its obligations hereunder and (iii) such control relationship is continuing thereafter. Upon the failure to of such control relationship to continue, the assignor shall thereupon become fully liable for the obligations of the assignee and any successor assignee.

11.     **Written Approval**. Unless otherwise specified in this Agreement, all approvals and consents hereunder must be requested in writing by the party seeking such approval or consent to the other party, and all approvals or consents shall not be effective unless in writing. Additionally, the parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed.

6

12.    **Non-Waiver**.  A failure of a party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein.  In no way whatsoever shall a waiver of any term, provision or condition of this Agreement be valid unless in writing, signed by the waiving party, and only to the extent expressly set forth in such writing.

13.    **No Joint Venture or Partnership**.  None of the terms or provisions of this Agreement shall be deemed to create a partnership between or among the parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise.  Each party shall be considered a separate entity and no party shall have the right to act as an agent for the other party unless expressly authorized to do so herein or by separate instrument signed by the party to be charged.

14.    **Entire Agreement; Amendment**.  This Agreement and any exhibits hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the parties, whether written or oral, with respect to the subject matter hereof.  To be effective, any modification and/or amendment to this Agreement must be in writing and executed by the parties.

15.    **Applicable Law**.  This Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws.  Venue for any dispute between the parties with regard to this Agreement and the subject matter hereof shall lie only in Clay County, Florida.

16.    **Joint Preparation**.  The parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.

17.    **Jury Waiver**.  EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT (INCLUDING ENFORCEMENT, INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT) OR PERFORMANCE UNDER THIS AGREEMENT.  EACH PARTY ACKNOWLEDGES THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

18.    **Attorneys' Fees**.  If any legal or equitable action is commenced by either party against the other party to enforce or interpret any provision of this Agreement or with regard to the subject matter hereof, the party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing party its reasonable attorneys' fees and costs incurred by the prevailing party, in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

19.    **Severability**.  If any clause or provision of this Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement shall not be affected thereby. It is the express intention of the parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

20.    **Time is of the Essence**. Time is of the essence of this Agreement.

21.    **Limitation on Damages**.  Neither party shall be liable to the other for any consequential, speculative or punitive damages incurred due to the fault of the other or their employees, consultants, agents, contractors or subcontractors, regardless of the nature of the fault or whether such liability arises in breach of contract or warranty, tort, statute, or any other cause of action. Consequential damages include, but are not limited to, loss of use, lost business opportunities, damage to representation and loss of profit, and all such claims are hereby waived and released.

22.    **Estoppel Letters**.  Within fifteen (15) business days after written request, each Party, or their respective successors and assigns, agrees to execute a commercially reasonable form of estoppel from time to time as requested by any of the other Party subject to this Agreement stating that the requesting Party and its property comply with matters set forth in this Agreement and whether any sums are due such Party from the requesting Party.

23.    **Force Majeure**.  In the event that either Party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of causes beyond the control of the Party whose performance is delayed, such as weather, acts of God, strikes, lock-outs, labor troubles, failure of power, restrictive governmental laws or regulations, inability to obtain permits due to delays of governmental authorities beyond typical approval timelines (not caused by any action or inaction of Jax-Palatka), riots, insurrection, public demonstrations or protests, war, epidemics, pandemics, disease outbreaks, quarantines or other health crises or public health events or other reasons of a like nature without limiting the same, then the delayed Party shall deliver prompt written notice (not to exceed seven (7) days) of such event to the other Party hereto and performance of such act shall be excused for the period of delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay (collectively, "**Force Majeure**"). Notwithstanding anything in this Section 26 to the contrary, none of the following shall constitute or be considered a Force Majeure event:  (i) the financial inability of a Party to perform any obligation under this Agreement; (ii) the failure of a Party to apply for a required permit or approval or to provide in a timely manner all information required to obtain a required permit or approval that is necessary to meet the requirements of this Agreement; and (iii) any event for which a delayed Party is claiming a Force Majeure event but for which such Party fails to timely provide the notice thereof as described above.

[THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK]


[SIGNATURE PAGE FOLLOWS]

WHEREFORE, the parties hereto have executed this Access License as of the date first above written.

Executed in the presence of:

**Grantor:**

JAX-PALTKA FARMS LLC,
a Delaware limited liability company

_____
Name: _____

By: _____
Name: _____
Title: _____

_____
Name: _____

**ACKNOWLEDGEMENT**

State of _____; County of _____

The foregoing instrument was acknowledged this _____ day of _____, 2020, by _____ as the _____ of **JAX-PALATKA FARMS LLC,** a Delaware limited liability company, on behalf of said company.  Such person physically appeared before me and *(notary must check applicable box)*

☐     Is/are personally known to me

☐     Produced a current _____ driver's license as identification

☐     Produced _____ as identification

{Notary Seal must be affixed}

_____

*PRINTED NAME OF NOTARY:*

....................................................

9

Executed in the presence of:                    **Grantee**:

                                                Reinhold Corporation
                                                a Florida corporation

_____                By:    _____
Name: _____                Name:  George M. Egan
                                                Title:   President

_____
Name: _____


## ACKNOWLEDGEMENT

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐     Is/are personally known to me

☐     Produced a current Florida driver's license as identification

☐     Produced _____ as identification

{Notary Seal must be affixed}

                                        _____
                                        *printed name of notary:* ....................................................................

10

## EXHIBIT A

A non-exclusive easement for ingress and egress 15 feet on each side of the centerline of each the following trail road:  BEGIN at the intersection of Saunders Road with Hercules Grade Road in the N 1/2 of the NE 1/4 of Section 34, T6S, R25E; thence, run in a general Westerly and Southwesterly direction along said Hercules Grade Road to its point of intersection with the West Section line of said Section 34; thence continue in a general Westerly and Southwesterly direction along said Hercules Grade Road through the N 1/2 of Section 33, T6S, R25E to the point of intersection of the centerline of said Hercules Grade Road with the Easternmost point of those lands in the NW 1/4 of Section 33, T6S, R25E owned by Reinhold Corporation that are subject to the Conservation Easement recorded at OR 3578, p. 1369, public records, Clay County, FL (said Easternmost point lying in the SW 1/4 of the NW 1/4 of said Section 33 and having been marked by an Iron Rod as indicated in survey prepared by Mark E. Hardenbrook, Florida Professional Surveyor and Mapper No. 5500, dated March 5, 2010 with a File Number of H-07-213-GCMB and on Exhibit A of OR 3578, p. 1369).

11

## Exhibit C

### Gary Road Traffic Signal Agreement

[see attached]

## Agreement Regarding Gary Road Intersection and Traffic Signal

This Agreement Regarding Gary Road Intersection and Traffic Signal (the "Agreement") is made this ___ day of _____, 2020, by and between **REINHOLD CORPORATION** ("Reinhold") and **JAX-PALATKA FARMS LLC** ("JPF").

RECITALS:

(A)    Pursuant to a Purchase and Sale Agreement dated April 24, 2020 (the "PSA"), Reinhold as "Seller" is selling to JPF as "Purchaser" (or, as to 322 acres, providing an option to purchase) approximately 13,000 acres located South and West of the intersection of SR 16 and new SR 23, all in Clay County, FL.

(B)    The Florida Department of Transportation ("FDOT") is constructing a new expressway known as SR 23 that will cross SR 16. FDOT is building a diverging diamond interchange ("DDI") at the intersection of SR 16 and SR 23.

(C)    The property in the Southwest Quadrant of the SR 23 and SR 16 intersection has contemporaneously sold to JPF by Reinhold, such property bounded on the West at SR 16 by Gary Road. Reinhold is the owner of the remaining Quadrants of the SR 16 / SR 23 intersection. JPF is agreeing to fund the re-location of portions of Gary Road South of SR 16 as provided in the PSA and in the "Gary Road Development Agreement."

(D)    Both Reinhold and JPF desire that the intersection at Gary Road and S.R. 16 has a traffic signal providing for left turns in all directions through the intersection. In particular:

  i.  The value of each party's holdings will be increased substantially by the traffic signal.

  ii.  Traffic from Tracts conveyed to JPF lying to the South, in particular lands in portions of Sections 13, 24, 25, and 26 T6S, R25E and in a portion of Section 19 in T6S, R26E, travelling North will depend upon a left turn signal on North-bound Gary Road in order to access conveniently West-bound S.R. 16.

  iii.  Traffic from tracts retained by Reinhold in lands North of S.R. 16 traveling South on Gary Road will depend upon a left turn signal on South-bound Gary Road to access conveniently East-bound S.R. 16.

(E)    The parties acknowledge that expansion of traffic stacking capability between the Westerly end of the DDI and Gary Road and other lane enhancements may be required in order to persuade FDOT to allow a fully operational traffic signal at Gary Road and SR 16.

(F)    The parties desire to execute this Agreement to commit mutually to using commercially reasonable efforts to obtain the installation of a traffic signal with left turn capabilities in all directions (a "Full-Service Traffic Signal") at the intersection of SR 16 and Gary Road and to address cost-sharing with respect to such Full-Service Traffic Signal.

NOW THEREFORE, in consideration of the mutual obligations contained herein, the parties covenant and agree as follows:

1.    Efforts to Install Full Service Traffic Signal. Reinhold and JPF each commit to utilize their commercially reasonable efforts to persuade state, county and other officials to install a Full Service Traffic Signal at the intersection of SR 16 and Gary Road at the appropriate time of development of either parcel. Each agrees not to re-locate the Gary Road intersection with SR 16 as shown on the plans attached to the PSA without the consent of the other, provided that nothing herein shall prevent a widening of Gary Road.

2.    Agreement to Contribute Right-of-Way.

a. Each of Reinhold and JPF, upon satisfaction of the "Donation Conditions" described below, shall dedicate without charge if required by FDOT's traffic engineer, additional right away contiguous to the present ROW of SR 16 from such party's existing lands (or from lands that may hereafter be acquired by it or its affiliates) fronting on SR 16 as is necessary to obtain a Full Service Traffic Signal at the intersection of SR 16 and Gary Road.

b. The "Donation Conditions" are:

i.    The written request of Reinhold to JPF or of JPF to Reinhold;

ii.    The determination by FDOT's traffic engineering firm that the right-of-way is necessary for FDOT to approve a Full-Service Traffic Signal on SR 16 at Gary Road; and

iii.    A determination from FDOT that they will not condemn or pay for the right of way required for the Full Service Traffic Signal.

c. This Agreement shall remain confidential between the parties and shall not be disclosed to state, county or government officials, including, without limitation, the FDOT or Clay County, Florida.

3.    Agreement to True Up Valuation of Donated Right of Way. In the event that either Reinhold or JPF is required by this Agreement to donate more land (the "Excess Land") than the other party (the "Excess Contributor") in order to obtain the Full Service Traffic Signal, the other party (the "Payor") agrees to pay the Excess Contributor one-half of the value of the Excess Land (the "True Up Payment"). If the parties cannot agree on the value of the Excess Land, the parties shall pick a mutually acceptable appraiser with sufficient market experience in Clay County, Florida right of way valuations to appraise the value of the Excess Land. The parties shall equally share the cost of the appraisal. The Payor shall pay the Excess Contributor the True Up Payment within thirty (30) days of the date of the "True Up Payment Notice" (as hereinafter defined).

Upon receipt of the appraisal, the Excess Contributor shall send the Payor a notice of the True Up Payment accompanied by the appraisal supporting such amount (hereinafter referred to as the "Traffic Signal Completion Notice") that are subject to reimbursement. Such reimbursement of the True Up Payment, together with accrued interest thereon, shall be due

3271792_6

within thirty (30) days after receipt of the True Up Payment Notice. If such reimbursement is not received within such thirty (30) day period, then the Excess Contributor shall be entitled to recover such amount from the Payor, together with interest thereon at the prime rate of interest as quoted in the Wall Street Journal plus four percent (4%) (not to exceed the maximum rate of interest allowed by law) and all costs and reasonable attorney's fees incurred in collection thereof.

4.       Agreement to Contribute to Traffic Signal Design, Permitting and Installation. The party that designs, permits and constructs the Full-Service Traffic Signal for purposes of this Section 4 shall be referred to as the "First Party". The party that reimburses the First Party pursuant to this Section 4 shall be referred to as the "Second Party". In consideration for the First Party constructing the Full-Service Traffic Signal, the Second Party agrees that it shall reimburse the First Party for one-half of the total costs to design, permit and construct the Full-Service Traffic Signal, including, without limitations, the support structures related thereto (herein after referred to as the "Traffic Signal Costs") within thirty (30) days of the date of the "Traffic Signal Completion Notice" (as hereinafter defined).

The Traffic Signal Costs shall include associated permitting, design and survey costs. Upon completion of the Traffic Signal, as certified by an engineer acceptable to Reinhold and JPF, the First Party shall send the Second Party a notice of the total Traffic Signal Costs accompanied by sufficient invoices and paid receipts to substantiate and confirm such costs (hereinafter referred to as the "Traffic Signal Completion Notice") that are subject to reimbursement.

Such reimbursement of the Traffic Signal Costs, together with accrued interest thereon, if any, shall be due within thirty (30) days after receipt of the Traffic Signal Completion Notice. If such reimbursement is not received within such thirty (30) day period, then the First Party shall be entitled to recover such amount from the Second Party, together with interest thereon at the prime rate of interest as quoted in the Wall Street Journal plus four percent (4%) (not to exceed the maximum rate of interest allowed by law) and all costs and reasonable attorney's fees incurred in collection thereof.

5.       Miscellaneous. This instrument shall inure to the benefit of and be binding upon the heirs, personal representatives, and permitted successors and assigns of the parties. There are no third party beneficiaries to this Agreement. Paragraph headings are for convenience only and shall not be used to construe or interpret this Agreement. This Agreement shall be governed by and interpreted, construed and enforced in accordance with the internal laws of Florida without regard to principles of conflicts of law. This agreement may be specifically enforced. In any litigation arising out of this Agreement, the prevailing party shall be entitled to recover its costs and attorneys' fees. In the event that any of the covenants, agreements, terms or provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms or provisions contained herein shall be in no way affected, prejudiced or disturbed thereby.

6.       Term. This Agreement shall remain in effect until the earlier of (a) twenty (20) years following the date hereof or (b) the date on which the Full-Service Traffic Signal has been installed and the True Up Payment and reimbursement for the Traffic Signal Costs have been paid as provided herein.

3271792_6

7.     Notices. Any notice which must or may be given to Reinhold, JPF or any successor or assign of any of the foregoing, under the provisions of this Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission to Reinhold or JPF (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed, with regard to Reinhold and JPF, as follows:

3271792_6

If to Reinhold:    Reinhold Corporation
Attn: George M. Egan
1845 Town Center Blvd., Ste. 105
Fleming Island, Florida 32003
Phone: (904) 269-5857
Email: GEgan@reinholdcorporation.com

With a copy to:    Driver, McAfee, Hawthorne & Diebenow, PLLC
One Independent Drive, Suite 1200
Jacksonville, Florida 32202
Attn.: Matthew S. McAfee, Esq.
Phone: (904) 301-1269
Email: mmcafee@drivermcafee.com

If to JPF:    JAX-PALATKA FARMS LLC
Attn: Rick Feaser
9 West 57th Street, Suite 5000
New York, NY 10019-2701
Fax: (212) 826-1265
E-mail: richie@ruanecuniff.com

With copies to:    Mr. Dennis Carey
(none if blank)    977 Stagecoach Road
Oglethorpe, GA 31068
Fax: (478) 472-7098
email: pinetimber@windstream.net

and to

Rogers Towers, P.A.
Attn: John T. Sefton, Esq.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, Florida 32207
Fax: (904) 396-0663
E-mail: jsefton@RTLAW.com

Any party may change its address for notices by serving on the other party a notice that provides the new address.

8.    Headings. The headings of the sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

9.    Counterparts. To facilitate execution, this Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

3271792_6

10. Assignment. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns; provided however, neither Party may assign or transfer its rights and duties under this Agreement without the other Party's prior written consent, which consent may be granted or withheld in such other Party's sole discretion. Notwithstanding the foregoing, either Party may assign its rights under this Agreement to an entity (x) that purchases the property owned by either Reinhold or JPF that would benefit from the Full-Service Traffic Signal, or (y) controlling, controlled by or under common control with such Party without the consent to the other Party, provided that with respect to a transfer pursuant to (y) above, (i) the assignor remains liable for obligations arising from events theretofore occurring, (ii) the assignee has and retains sufficient net worth to perform its obligations hereunder and (iii) such control relationship is continuing thereafter. Upon the failure to of such control relationship to continue, the assignor shall thereupon become fully liable for the obligations of the assignee and any successor assignees.

11. Written Approval. Unless otherwise specified in this Agreement, all approvals and consents hereunder must be requested in writing by the party seeking such approval or consent to the other party, and all approvals or consents shall not be effective unless in writing. Additionally, the parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed.

12. Non-Waiver. A failure of a party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. In no way whatsoever shall a waiver of any term, provision or condition of this Agreement be valid unless in writing, signed by the waiving party, and only to the extent expressly set forth in such writing.

13. No Joint Venture or Partnership. None of the terms or provisions of this Agreement shall be deemed to create a partnership between or among the parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each party shall be considered a separate entity and no party shall have the right to act as an agent for the other party unless expressly authorized to do so herein or by separate instrument signed by the party to be charged.

14. Entire Agreement; Amendment. This Agreement and any exhibits hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the parties, whether written or oral, with respect to the subject matter hereof. To be effective, any modification and/or amendment to this Agreement must be in writing and executed by the parties.

15. Applicable Law. This Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws. Venue for any dispute between the parties with regard to this Agreement and the subject matter hereof shall lie only in Clay County, Florida.

3271792_6

16. <u>Joint Preparation</u>. The parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.

17. <u>Jury Waiver</u>. EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT (INCLUDING INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT) OR PERFORMANCE UNDER THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

18. <u>Attorneys' Fees</u>. If any legal or equitable action is commenced by either party against the other party to enforce or interpret any provision of this Agreement or with regard to the subject matter hereof, the party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing party its reasonable attorneys' fees and costs incurred by the prevailing party, in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

19. <u>Severability</u>. If any clause or provision of this Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement shall not be affected thereby. It is the express intention of the parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

20. <u>Time is of the Essence</u>. Time is of the essence of this Agreement.

21. <u>Limitation on Damages</u>. Neither party shall be liable to the other for any consequential, speculative or punitive damages incurred due to the fault of the other or their employees, consultants, agents, contractors or subcontractors, regardless of the nature of the fault or whether such liability arises in breach of contract or warranty, tort, statute, or any other cause of action. Consequential damages include, but are not limited to, loss of use, lost business opportunities, damage to representation and loss of profit, and all such claims are hereby waived and released.

3271792_6

*Signature Page to*
*"Agreement Regarding Gary Road Intersection and Traffic Signal"*

WHEREFORE the parties have set their hands and seals as of this ____ day of _____, 2020.

Executed in the presence of:                    **Reinhold:**

                                                Reinhold Corporation,
                                                a Florida corporation

_____                By: _____
Name: _____                Name: _____
                                                Title: _____


_____
Name: _____


Executed in the presence of:                    **JPF:**

                                                JAX-PALTKA FARMS LLC,
                                                a Delaware limited liability company

_____                By: _____
Name: _____                Name: _____
                                                Title: _____


_____
Name: _____


3271792_6

**Exhibit D**

Purchase Price Allocations and Map

[see attached]

## CALCULATION of ACRES and PURCHASE PRICE FOR FIRST CLOSING

|  | Acres | Price per Acre | Total Value |
|---|---|---|---|
| Gross Deal | 13,431.00 | $3,164 | $42,500,000 |
| less: |  |  |  |
| Mit Bank | 1,382.11 | 2,750 | 3,800,803 |
| Iluka Hold Back | 314.39 | 2,750 | 864,573 |
| Mineral rights (400 acres) | --- | 1,000 | 400,000 |
| Storm Water Pond | 26.01 | 2,750 | 71,528 |
| Quiet Title Action (estimated) | 251.00 | 2,750 | 690,250 |
| Roads (close approximation) |  |  |  |
| Long Branch City - Inside Penny Farms | 32.00 | 2,750 | 88,000 |
| Long Branch City - Outside of Penny Farms | 19.00 | 2,750 | 52,250 |
| Saunders Road | 31.00 | 2,750 | 85,250 |
| FIRST CLOSING - ACRES AND CONSIDERATION | 11,375.49 | $3,204 | $36,447,348 |

## ALLOCATION of PURCHASE PRICE by PARCEL:

|  | Acres | Price per Acre | Total Value |
|---|---|---|---|
| Penney Farms | 312.00 | $9,000 | $2,808,000 |
| SR 16 | 273.00 | 6,500 | 1,774,500 |
| Interchange | 30.01 | 300,000 | 9,003,000 |
| Remainder - Timber Acreage | 10,760.48 | 2,125 | 22,861,848 |
| FIRST CLOSING - ALLOCATION | 11,375.49 | $3,204 | $36,447,348 |

**Reinhold Corporation**
**South of SR 16**

**Exhibit E**

Deed of Rights of Reversion

[see attached]

Prepared by and return to:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456

Tax Parcel No: Portion of 34-06-25-010552-000-00

## DEED for RIGHTS OF REVERSION
(Saunders Road)

THIS DEED is made this __ day of _____ , 202__, between

### REINHOLD CORPORATION, a Florida corporation,

whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003 ("**Grantor**"), Grantor being the successor by merger to **Reinhold Corporation**, a Delaware corporation, which was formerly known as **Foremost Properties Inc.** (prior to December 11, 1957) **Clay County Development Company** (prior to February 28, 1962) and **Shadowlawn Farms Inc.** (prior to December 5, 1966), and

### JAX-PALATKA FARMS LLC, a Delaware limited liability company,

whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893 ("**Grantee**").

### WITNESSETH:

That Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained and sold to Grantee and Grantee's successors and assigns forever, Grantor's rights of reversion in that certain deed dated May 26, 1939, recorded July 19, 1939 at **Deed Book 37, page 478**, public records, Clay County, Florida, to the extent that the roadway subject to such rights of reversion abuts property of Grantee acquired from Grantor in in the deed of even date recorded at OR ____, page _____, conveying lands in **Sections 22, 27, 34, 35 and 36 in T6S, R25E** and **Sections 2 and 3, T7S, R25E**.

To have and to hold the same unto Grantee and its successors and assigns.

This conveyance is made without warranties of title except that Grantor covenants with Grantee that Grantor has not previously conveyed such rights of reversion, if any, to any other

------------------------------------------------------------------------------------------------

Note to Clerk: Please index under each of the four names **Reinhold Corporation, Clay County Development Company, Shadowlawn Farms Inc.** and **Foremost Properties Inc.** for Grantor

party, except (i) to the extent of any conveyance made by Grantor of State Road 315, or (ii) as may have occurred by operation of law.

3280695_1

*Signature Page to Deed from Reinhold Corporation to JAX-PALATKA FARMS LLC*
*(Rights of Reversion for Saunders Road)*

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal the day and year first above written.

Signed, sealed and delivered
In the presence of:

**GRANTOR**

**REINHOLD CORPORATION**, a Florida corporation

_____
*Typed or printed name:* .......................

_____
*Typed or printed name:* .......................

By: _____
George M. Egan, as its President

*{Corporate Seal}*

State of Florida; County of _____

The foregoing instrument was acknowledged this _____ day of _____ _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation. Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current Florida driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

_____
*printed name of notary:* ................................................

3280695_1

**Exhibit 8.1**

Special Warranty Deeds

[see attached]

Prepared by:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL  32207
RT Matter No. 803456
and
Matt McAfee
Driver, McAfee, Hawthorne & Diebenow
One Independent Dr., STE 1200
Jacksonville, FL 32202


Tax Parcel No: 20-06-25-010594-000-00


## SPECIAL WARRANTY DEED
### (Timber Tract)

THIS SPECIAL WARRANTY DEED is made this __ day of _____ , 202__, between

### REINHOLD CORPORATION, a Florida corporation,

whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL  32003 ("**Grantor**"), Grantor being the successor by merger to **Reinhold Corporation**, a Delaware corporation, which was formerly known as **Foremost Properties Inc.** (prior to December 11, 1957) **Clay County Development Company** (prior to February 28, 1962) and **Shadowlawn Farms Inc.** (prior to December 5, 1966), and

### JAX-PALATKA FARMS LLC, a Delaware limited liability company,

whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL  32256-2893 ("**Grantee**").

### WITNESSETH:

That Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained and sold to Grantee and Grantee's successors and assigns forever, the following described land located in Clay County, Florida, to-wit:

See Exhibit A attached hereto and made a part hereof (the "**Property**").

Notwithstanding the foregoing, Grantor retains the following mineral rights in and to:

------------------------------------------------------------------------------------------------

Note to Clerk:  Please index under each of the four names **Reinhold Corporation, Clay County Development Company, Shadowlawn Farms Inc. Foremost Properties Inc.** for Grantor

(a)    SW 1/4 of NE 1/4, SE 1/4 of NW 1/4, NE 1/4 of SW 1/4, NW 1/4 of SE 1/4, E 1/2 of SE 1/4 of SW 1/4, SW 1/4 of SE 1/4 of SW 1/4, S. 24, T.6S., R.25E; and SW 1/4 of NW 1/4 and NW 1/4 of SW 1/4, S. 19, T.6S., R.26E;

(b)    NW 1/4 of SE 1/4 of SW 1/4 of S. 24, T.6S., R.25E; and

(c)    W 1/2 of NE 1/4 and SE 1/4 of NE 1/4 of S. 4, T.7S., R.25E (collectively, the "**Mineral Rights**").

For the avoidance of doubt, the Property conveyed by this Deed shall not include the Mineral Rights on lands described in paragraphs (a), (b), and (c) above.

Subject to

(i)    covenants, restrictions and easements of record, and any encroachments, overlaps and easements that would be disclosed by an accurate survey of the Property, provided that nothing herein shall be deemed to reimpose the same, and to taxes for 2020 and subsequent years,

(ii)    Hunting Leases/Licenses and Timber Cutting Agreements not containing an option to purchase and all of which terminate on or before April 30, 2022;

(iii)    and to the "Environmental Use Restriction" set forth below.

To have and to hold the same unto Grantee in fee simple.

Environmental Use Restriction

By the acceptance of this Deed, Grantee on behalf of itself, and its successors and assigns, covenants with Grantor that:

A.  Until the earlier of (i) September __, 2055, or (ii) that date on which the Greens Creek Mitigation Bank no longer has credits or is no longer actively pursuing the sale of mitigation bank credits, the Property shall not be permitted to be utilized as a wetland mitigation bank or a gopher tortoise mitigation bank which offers credits for sale to unaffiliated third parties of Grantee, its successors and assigns. As used herein, an "unaffiliated third party" is a party with less than 70 percent common beneficial ownership with Grantee, its successors and assigns.

B.  Nothing in this Environmental Use Restriction shall preclude development of the Property for commercial, residential or any other use except for those uses specifically prohibited in the prior paragraph (A).

C.  Nothing in this Environmental Use Restriction shall preclude Grantee, its successors and assigns from (i) subjecting portions of the Property to conservation easements to obtain wetland credits required to permit development on other portions of the Acquisition Lands (as hereinafter defined); (ii) the creation of banks for endangered species that provide credits to permit development on the Acquisition Lands,

3254974_5

provided, however, that none of such credits shall be sold to unaffiliated third parties as hereinbefore defined for offsite use; or (iii) the creation of wetland mitigation or gopher tortoise credits for the use of Grantee or any affiliate of Grantee with at least 70 percent common beneficial ownership with Grantee, its successors or assigns.

D. For clarity, the "**Acquisition Lands**" are those lands owned on January 1, 2020 by Grantor that lie South of State Road 16 in Townships T6S, R25E, T7S, R25E and T6S, R26E, but excluding (i) the cell tower area on the westerly end of Parcel #21742-000-00 lying in Section 17, T6S, R25E, (ii) those portions of the Greens Creek Mitigation Bank other than Parcels 19-06-25-010531-001-00 and 30-06-25-010548-000-00, and (iii) any property lying north or east of new State Road 23.

The foregoing Environmental Use Restriction shall touch and concern and run with the Property; however, there are no third party beneficiaries to the foregoing Environmental Use Restriction and the enforcement of such Restriction is limited to a single party, being either Grantor and its successors or, if Grantor assigns such rights, to a single assignee of Grantor so designated by written notice recorded in the Official Public Records of Clay County, FL.

And Grantor does hereby covenant with Grantee that, except as noted above, at the time of the delivery of this deed the Property was free from all encumbrances made by Grantor, and that Grantor will warrant and defend the lands against the lawful claims and demands of all persons claiming by, through or under Grantor, but against none other.

3254974_5

*Signature Page to Deed from Reinhold Corporation to JAX-PALATKA FARMS LLC*
*(Parcels other than commercial tract)*

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal the day and year first above written.

Signed, sealed and delivered
In the presence of:

**GRANTOR**

**REINHOLD CORPORATION**, a Florida corporation

_____
*Typed or printed name:* .......................

_____
*Typed or printed name:* .......................

By: _____
George M. Egan, as its President

*{Corporate Seal}*

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____ _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation. Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current Florida driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

_____
*printed name of notary:* ..................................................

3254974_5

## Exhibit A

### The Property

ALL OF THE FOLLOWING LANDS LYING IN TOWNSHIP 6 SOUTH, RANGE 25 EAST, CLAY COUNTY FLORIDA:

SECTION 13: ALL, less and except those lands conveyed to State of Florida Department of Transportation described in Official Records Book 3504, Page 933 and Official Records Book 4088, Page 1182, Public Records of Clay County, Florida.
And less and except that part lying Easterly of Parcel No. 179 Part "A" described in Special Warranty Deed conveyed to the State of Florida Department of Transportation recorded in Official Records Book 4088, Page 1182, Public Records of Clay County, Florida.


SECTION 18: S 1/2. Said lands being a portion of The Florida Farms and Industries Company's Subdivision according to the plats thereof recorded in Plat Book 2, Page 28, and Plat Book 2 Page 33.
Less and except those lands conveyed to State of Florida Department of Transportation recorded in Deed Book 91, Page 19, and those lands conveyed to State of Florida Department of Transportation recorded in Official Records Book 62, Page 575, Public Records of Clay County, Florida.

SECTION 19: All. The E 1/2 of said lands being a portion of The Florida Farms and Industries Company's Subdivision according to the plats thereof recorded in Plat Book 2, Page 28 and Plat Book 2, Page 33.

Less and except any part in those lands described in Conservation Easement recorded in Official Records Book 3369, Page 1342, Public Records of Clay County, Florida.

SECTION 21: S 1/2.

SECTION 22: W 1/2 of SW 1/4.

SECTION 24: ALL.

SECTION 25: ALL, less and except those lands conveyed to IR RE Holdings, LLC recorded in Official Records Book 3793, Page 1223, Public Records of Clay County, Florida.

SECTION 26: ALL, less and except those land conveyed to IR RE Holdings, LLC recorded in Official Records Book 3793, Page 1223, Public Records of Clay County, Florida.

3254974_5

SECTION 27:  S 1/2; W 1/2 of NW 1/4; SE 1/4 of NW 1/4; S 1/2 of NE 1/4 of NW 1/4; S 1/2 of NE 1/4; and S 1/2 of NW 1/4 of NE 1/4. Less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County, Florida.

SECTION 28:  ALL, less and except those lands described in Conservation Easement recorded in Official Records Book 3578, Page 1369, Public Records of Clay County, Florida.

SECTION 29:  ALL, less and except those lands described in Conservation Easements recorded in Official Records Book 3369, Page 1342 and Official Records Book 3578, Page 1369, Public Records of Clay County, Florida.

SECTION 30:  NE 1/4, less and except those lands described in Conservation Easements recorded in Official Records Book 3369, Page 1342 and Official Records Book 3578, Page 1369, Public Records of Clay County, Florida.

SECTION 31:  SE 1/4 of SE 1/4, less and except those lands described in Conservation Easements recorded in Official Records Book 3369, Page 1342 and Official Records Book 3578, Page 1369, Public Records of Clay County, Florida.

SECTION 32:  ALL, less and except those lands described in Conservation Easement recorded in Official Records Book 3369, Page 1342 and Official Records Book 3578, Page 1369, Public Records of Clay County, Florida.

SECTION 33:  ALL, less and except those lands described in Conservation Easement recorded in Official Records Book 3578, Page 1369, Public Records of Clay County, Florida.

SECTION 34:  ALL, less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County, Florida.

SECTION 35:  ALL, less and except those lands conveyed to Clay County in Deed Book 37, Page 478, and conveyed to IR RE Holdings, LLC in Official Records Book 3793, Page 1223, Public Records of Clay County, Florida.

SECTION 36:  ALL, less and except those lands conveyed to State of Florida Department of Transportation in Official Records Book 93, Page 120, and conveyed to IR RE Holdings, LLC in Official Records Book 3793, Page 1223, Public Records of Clay County, Florida.


ALL OF THE FOLLOWING LANDS LYING IN TOWNSHIP 7 SOUTH, RANGE 25 EAST, CLAY COUNTY, FLORIDA:

SECTION 1:  ALL, less and except those lands conveyed to State of Florida Department of Transportation in Official Records Book 93, Page 120, and conveyed to IR RE Holdings, LLC in Official Records Book 3793, Page 1223, Public Records of Clay County, Florida.


3254974_5

SECTION 2:  W 1/2; NE 1/4 of NE 1/4; W 1/2 of SE 1/4; and SE 1/4 of SE 1/4; less and except those lands conveyed to Clay County in Deed Book 37, Page 478, and conveyed to Board of County Commissioners of Clay County in Deed Book 37, Page 484, and conveyed to State of Florida Department of Transportation in Official Records Book 93, Page 120, and conveyed to IR RE Holdings, LLC in Official Records Book 3793, Page 1223, Public Records of Clay County, Florida.

SECTION 3:  N 1/2; S 1/2 of S 1/2 of NE 1/4 of SE 1/4; S 1/2 of S 1/2 of NE 1/4 of NE 1/4 of SW 1/4; S 1/2 of SE 1/4 of NW 1/4 of NE 1/4 of SW 1/4; E 1/2 of SW 1/4 of NE 1/4 of SW 1/4; SE 1/4 of NE 1/4 of SW 1/4; and SE 1/4 of SW 1/4.

Less and except those lands conveyed to Clay County in Deed Book 37, Page 478, and conveyed to Board of County Commissioners of Clay County in Deed Book 37, Page 484, Public Records of Clay County, Florida.

Section 4:  ALL, less and except the SE 1/4 of SE 1/4 of SE 1/4 and the E 3/4 of NE 1/4 of SE 1/4 of SE 1/4.

SECTION 5:  ALL, less and except those lands described in Conservation Easement recorded in Official Records Book 3369, Page 1342, Public Records of Clay County, Florida.

SECTION 6:  E 1/4, less and except those lands described in Conservation Easement recorded in Official Records Book 3369, Page 1342, Public Records of Clay County, Florida.


ALL OF THE FOLLOWING LANDS LYING IN TOWNSHIP 6 SOUTH, RANGE 26 EAST, CLAY COUNTY FLORIDA:

SECTION 18:  That part of the SW 1/4 lying Westerly of Parcel 179 Part "A" described in Special Warranty Deed conveyed to the State of Florida Department of Transportation recorded in Official Records Book 4088, Page 1182, Public Records of Clay County, Florida.

SECTION 19:  W 1/2, less and except those lands conveyed to the State of Florida Department of Transportation recorded in Official Records Book 4088, Page 1182.
And less and except those lands lying Easterly of Parcel 179 Part "A" described in Special Warranty Deed to the State of Florida Department of Transportation recorded in Official Records Book 4088, Page 1182, Public Records of Clay County, Florida.
And less and except that part conveyed to the State Road Department of Florida recorded in Deed Book 93, Page 138, Public Records of Clay County, Florida.

SECTION 30:  N 1/2 of NW 1/4; SW 1/4 of NW 1/4; W 1/2 of SE 1/4 of NW 1/4; W 1/2 of SW 1/4; less and except those lands conveyed in Official Records Book 628, Pages 38, 39, 40, 41, 42, 43 and 44, and conveyed to State of Florida Department of Transportation in Deed Book 93, Page 138 and Official Records Book 93, Page 120, Public Records of Clay County, Florida.


3254974_5

SECTION 31:  NW 1/4; and N 1/2 of SW 1/4; less and except those lands conveyed to State of Florida Department of Transportation in Official Records Book 93, Page 120, and conveyed to IR RE Holdings, LLC in Official Records Book 3793, Page 1223, Public Records of Clay County, Florida.

All of the following lands lying in Plat "A" of The Florida Farms and Industries Company's Property as per plat thereof recorded in Plat Book 2, Page 27, Public Records of Clay County, Florida, said lands being in Sections 17 and 20, Township 6 South, Range 25 East

BLOCK 28:  Lots 1 through 8, inclusive.
Less and except those lands conveyed to State of Florida Department of Transportation in Official Records Book 62, Page 575, Public Records of Clay County, Florida.

BLOCK 29:  Lots 1 through 10, inclusive.

BLOCK 30:  Lots 5 through 9, inclusive.

BLOCK 38:  Lots 9 through 16, inclusive.

BLOCK 39:  Lots 1 through 18, inclusive.

BLOCK 40:  Lots 1 through 6, inclusive.

All of the following lands lying in Section 3 of Plat "A" of Florida Farms and Industries Company's Property in Clay County, Florida, as per the plat thereof recorded in Plat Book 2, Page 29, Public Records of Clay County, Florida, said lands being in Sections 15, 16, 21, 22 and 27, Township 6 South, Range 25 East:

Block 30:  Lots 1, 2, 3, the West 795 feet of Lots 4 and 10.

Block 31:  Lots 1, 2, 3, 6, 7, 8, and the East 145 feet of Lots 4 and 10.

Block 32:  Lots 2 through 13, inclusive, less and except from Lot 13 those lands conveyed to Jerry W. Smith and Joyce R. Smith, his wife in Official Records Book 672, Page 19 and Official Records Book 1046, Page 460, Public Records of Clay County, Florida.

And less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County.

Block 33:  Lots 1, 2, 3, 4, 13, 14, 15 and 16, and the South Half (S 1/2) of Lots 7 and 8.

3254974_5

And less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County, Florida.

Block 34: Lots 11 and 12.

Block 35: Lots 1 through 16, inclusive.

Less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County, Florida.

Block 36: Lots 5, 6, 11 and 12.

Less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County, Florida.

Block 37: Lots 5, 6, 9, 10, 11 and 12.

Block 38: Lots 5, 6, 7 and 8.

Block 56: Lots 8 and 9.

Less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County, Florida.

Block 57: Lots 9 and 10.

Block 68: Lots 11 through 20, inclusive.

All of the following parcels lying in Plat "A" of The Florida Farms and Industries Company's Property as per plat thereof recorded in Plat Book 2, Page 27, The Florida Farms & Industries Company's Subdivision of Section 18; The E 1/2 of Sec. 19, T.6S., R 25 E,; And that part of Sec. 13, T.6S., R.25E. lying East of Black Creek, in Clay County, FLA., as per the plat thereof recorded in Plat Book 2, Page 28, and in Section 3 of Plat "A" of Florida Farms and Industries Company's Property in Clay County, Florida, as per the plat thereof recorded in Plat Book 2, Page 29, Public Records of Clay County, Florida, respectively:

Adams Road as shown on the said plats of Plat Book 2, Page 27, Plat Book 2, Page 28, and Plat Book 2, page 29. Less and except any part lying in Saunders Road and less any part conveyed to Clay County in Deed Book 37, Page 478. And less and except that part lying in the North 30 feet of the NW 1/4 of NE 1/4 of Section 21, Township 6 South, Range 25 East, Clay County, Florida.

3254974_5

That part of Melontown Avenue (n/k/a Kentucky Avenue), lying between Blocks 28 and 29, and lying between Blocks 39 and 40, as shown on said Plat Book 2, Page 27.

Cleveland Avenue, as shown on said Plat Book 2, Page 27.

Prospect Avenue, as shown on said Plat Book 2, Page 28.

McDuffie Avenue, as shown on said Plat Book 2, Page 28.

That part of Pierce Avenue lying between Lots 11 and 12, Block 34, Lots 11 and 12, Block 68, and Lots 1, 2, 3, and 4, Block 33, and lying between Blocks 35 and 68, and lying between Blocks 56 and 57, as shown on said Plat Book 2, Page 29.

That part of Dunlap Avenue lying between Lots 1, 2 and 3, Block 30 and Lots 6, 7 and 8, Block 31, and lying between Blocks 37 and 38, as shown on said Plat Book 2, Page 29.

That part of Young Avenue lying between Blocks 31 and 32, and lying between Lots 5 and 6, Block 37, and Lots 11 and 12, Block 36, as shown on said Plat Book 2, Page 29.

Bennett Road, as shown on said Plat Book 2, Page 29. Less and except any part lying in Saunders Road and less any part conveyed to Clay County in Deed Book 37, Page 478.

That part of Ohio Avenue lying West of Lots 11 through 16, inclusive, Block 35, and lying West of Block 56, of said Plat Book 2, Page 29.


All of the following lands lying in Long Branch City, as per the plat thereof recorded in Plat Book 2, Page 26, Public Records of Clay County, Florida:

Blocks 56 through 62, inclusive: All.

Block 89: The East 138 feet.

Blocks 92 and 93: All.

Blocks 113, 114 and 115: All.

Block 117: All.

Block 128: All.

Less and except those lands described in Deed Book 67, Page 383 and being more particularly described as follows: The Westerly 553 feet of Block One Hundred Twenty-eight (128) in Long Branch City, Plat recorded in Plat Book 2, Page 26.


3254974_5

Blocks 129 and 130: All.

And all that part of the Florida Farms Industries Company's railroad right of way lying between the east line of Melontown Avenue (now Kentucky Avenue) and the west line of Hal Avenue (now Clark Avenue); and that part of said railroad right of way lying between a point 553 feet east of the east line of Osceola Avenue (now Studio Avenue) and the west line of Taterville Avenue (now Saunders Road); all according to the plat of Long Branch City, recorded in Plat Book 2, Page 26. And that part of said railroad right of way lying between Lot 5 and Lot 6, Block 28 of Plat "A" of The Florida Farms and Industries Company's Property as per plat thereof recorded in Plat Book 2, Page 27. And that part of said railroad right of way lying in Blocks 28, 42 and 43, Section 18, Township 6 South, Range 25 East, as shown on plat of The Florida Farms & Industries Company's Subdivision, recorded in Plat Book 2, Page 28, Public Records of Clay County, Florida.

LESS AND EXCEPT from all of the above described lands, any part lying in the right of way of the following roads:  State Road 16, State Road 23, County Road 315 a/k/a Springbank Road, Saunders Road, and Hogarth Road. And less and except any part lying in a public, maintained road.

AND LESS AND EXCEPT FROM ALL OF THE ABOVE:

NORTHERLY COMMERCIAL PARCEL:
A parcel of land situated in the Northwest 1/4 of Section 13, Township 6 South, Range 25 East, Clay County, Florida: Said parcel being more particularly described as follows:
Commence at the Southeast corner of the Northeast 1/4 of said Section 13 and run South 89°17'30" West, along the Southerly line of said Northeast 1/4, a distance of 1,942.83 feet to the centerline of construction of State Road No. 23 (as per Florida Department of Transportation Right of Way Map Section 71493, F.P. No. 4229382 & 4229383), and a curve to the right, having a radius of 11,459.00 feet; thence along said centerline of construction of State Road No. 23, and the arc of said curve, through an angle of 13°58'58", an arc distance of 2,796.54 feet, and a chord bearing and distance of North 36°17'37" West, 2,789.61 feet; thence South 60°41'52" West, a distance of 461.50 feet to the most Northerly corner of lands described as Parcel 808 Part W in Official Records Book 4088, Page 1253 of the Public Records of said county and the Point of Beginning; thence South 45°53'41" West, along the Northerly line of the aforesaid lands, 487.91 feet; thence South 44°06'19" East, along the Westerly line of aforesaid lands 501.97 feet: thence leave said Westerly line and run South 89°59'52" West, 1309.30 feet to a point on the West line of said Section 13; thence North 00°13'40" East, along the West line of Section 13, a distance of 1190.86 feet to the Southwest corner of lands described as Parcel 179 Part T in said Official Records Book 4088, Page 1253 of said Public Records; thence along the South line of the aforesaid lands and along the Southwesterly line of lands described as Parcel 179 Part A in said Official Records Book 4088, Page 1253 of said Public Records, running in a general Easterly/Southeasterly direction with the following four (4) courses and distances: (1) North

3254974_5

89°07'27" East, 529.19 feet: (2) South 75°03'38" East, 414.57 feet: (3) South 43°28'35" East, 441.99 feet: (4) South 45°11'41" East, 101.12 feet to the Point of Beginning.

AND LESS AND EXCEPT FROM ALL OF THE ABOVE:

PHASE III:
A Tract of land situated in Sections 31, 32, 33, Township 6 South, Range 25 East and in Section 4, 5, 6, Township 7 South, Range 25 East; Clay County, Florida; Said tract designated as Phase III on a Boundary Survey by Mark E. Hardenbrook, Florida Professional Surveyor and Mapper No. 5500, Dated March 5, 2010 with a File Number of H-07-213-GCMB and being more particularly described as follows:

Commence at a Concrete Monument with a Brass Plate at the Southwest corner of Section 6, Township 7 South, Range 25 East and run S 88 deg 27 min 05 sec E, along the south line of said Section 6, a distance of 5223.40 feet to a concrete monument at the southwest corner of Section 5; thence run N 89 deg 24 min 25 sec E, along the south line of said Section 5, a distance of 483.49 feet to an Iron Rod in the centerline of Union Camp Grade, a private road and the Point of Beginning; thence run northerly, along said centerline with the following courses and distances: N 04 deg 56 min 59 sec W, 727.94 feet; N 10 deg 07 min 26 sec W, 107.64 feet; N 24 deg 33 min 38 sec W, 162.63 feet; N 42 deg 27 min 18 sec W, 118.46 feet; N 55 deg 03 min 49 sec W, 299.40 feet; N 45 deg 51 min 11 sec W, 136.17 feet; N 29 deg 49 min 31 sec W, 158.67 feet; N 19 deg 09 min 22 sec W, 168.51 feet; N 09 deg 49 min 50 sec W, 443.90 feet; N 02 deg 36 min 27 sec W, 176.13 feet; N 03 deg 00 min 18 sec E, 3501.60 feet to an Iron Rod in the centerline intersection of Hercules Grade, a private road; thence run Northeasterly along said centerline with the following courses and distances: N 85 deg 24 min 39 sec E, 2550.57 feet; N 84 deg 48 min 57 sec E, 932.70 feet; N 36 deg 25 min 05 sec E, 503.96 feet; N 43 deg 27 min 26 sec E, 1271.04 feet; N 50 deg 08 min 54 sec E, 404.03 feet; N 61 deg 00 min 40 sec E, 882.58 feet; N 68 deg 17 min 32 sec E, 118.56 feet, N 60 deg 05 min 26 sec E, 203.47 feet; N 64 deg 19 min 52 sec E, 571.69 feet to an Iron Rod hereinafter referred to a "Point B"; thence return to the above described point of beginning and run N 89 deg 24 min 25 sec E, along the south line, of said Section 5, a distance of 4810.61 feet to a concrete monument at the southwest corner of Section 4; thence run N 89 deg 42 min 50 sec E, along the south line of said Section 4, a distance of 2638.99 feet to a concrete monument; thence run N 89 deg 41 min 34 sec E, along said south line, 2023.87 feet to a concrete monument at the southwest corner of lands described in Official Records Book 1249 on Page 365 of the public records of said county; thence run along the boundary of said lands with the following courses and distances: N 00 deg 33 min 28 sec W, 662.66 feet to a concrete monument; N 89 deg 48 min 50 sec E, 169.40 feet to a concrete monument; N 00 deg 45 min 00 sec W, 663.70 feet to a concrete monument; N 89 deg 38 min 59 sec E, 502.61 feet to a concrete monument on the East line of said Section 4 and the northeast corner of the aforesaid lands; thence run N 00 deg 46 min 59 sec W, along said East line, 1226.39 feet to an Iron Rod; thence leave said East line and run S 89 deg 36 min 23 sec W, 2760.91 feet to an Iron Rod; thence run N 00 deg 04 min 10 sec E, 2889.05 feet to an Iron Rod; thence run S 89 deg 38 min 01 sec E, 1064.55 feet to an Iron Rod; thence run Northwesterly with the following courses and distances: N 45 deg 24 min 04 sec W, 2597.75 feet to an Iron Rod; N

3254974_5

30 deg 07 min 11 sec W, 1293.20 feet to an Iron Rod at the above referenced "Point B" and to Close.


AND LESS AND EXCEPT FROM ALL OF THE ABOVE:

POND E

A Parcel of Land Situated in the Southeast 1/4 of Section 13, Township 6 South, Range 25 East, Clay County, Florida: Said Parcel Being More Particularly Described As Follows: Commence At The Southeast Corner Of Said Section 13 And Run North 00°24'45" West, Along The East Line Of Said Southeast 1/4 Of Said Section 13, A Distance Of 592.39 Feet To Southwesterly Line Of Lands Described As Parcel 179 Part A In Official Records Book 4088, Page 1253 Of Said Public Records And The Westerly Limited Access Right Of Way Of State Road No. 23 (As Per Florida Department Of Transportation Right Of Way Map Section 71493, F.P. No. 4229382 & 4229383); Thence Run North 47°43'10" West, Along Said Westerly Line, 426.98 Feet To The Point Of Beginning: Thence Continue North 47°43'10" West, Along Said Westerly Line, 1350.0 Feet; Thence Leave Said Right Of Way Line and Run With Following Five (5) Courses And Distances: (1) South 42°16'50" West, 190.0 Feet: (2) South 16°15'36" West, 400.0 Feet: (3) South 08°51'33" East, 781.84 Feet: (4) South 47°43'10" East, 565.72 Feet: (5) North 42°16'50" East, 1040.0 Feet To The Point Of Beginning.


AND LESS AND EXCEPT FROM ALL OF THE ABOVE:

**PARCEL S - B** (South of Springbank) (Iluka Buffer)

A Tract of land situated in Section 36, Township 6 South, Range 25 East and Section 1, Township 7 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows:

Commence at a concrete monument at the Southeast corner of Section 1 and run S 89 deg 22 min 52 sec W, along the south line of said Section 1, a distance of 2455.89 feet to the Point of Beginning. thence continue S 89 deg 22 min 52 sec W, along said south line 1531.81 feet to the southwest corner of the E 3/4 of said Section 1; thence run N 00 deg 30 min 56 sec W, along the West Line of said E 3/4, a distance of 3827.88 feet to the southerly line of County Road No. 315 (also known as Springbank Road), an 80' Right of Way; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 1472.38 feet and an arc length of 682.87 feet and a chord bearing and distance of N 38 deg 58 min 45 sec E, 676.76 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 576+58.56 as shown on Right of Way Survey; thence run N 25 deg 41 min 34 sec E, along said right of way, 1990.18 feet to a point of curvature lying 40 feet right of and perpendicular to centerline Station 596+48.74 as shown on said Survey; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 5689.58 feet and an arc length of 702.43 feet and a chord bearing and distance of N 29 deg 13 min 46 sec E, 701.98 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 603+55.41 as shown on said Survey; thence run N 32 deg 45 min 24 sec E, along said right of way,

3254974_5

993.06 feet to its intersection with the westerly line of lands designated and described as Parcel S in Official Records Book 3793 on Page 1223 of the public records of said County; thence run along said westerly line in a general southerly direction with the following courses and distances: S 64 deg 29 min 34 sec E, 1007.11 feet to an Iron Rod; S 23 deg 41 min 54 sec E, 186.42 feet to an Iron Rod; S 09 deg 52 min 12 sec E, 604.22 feet to an Iron Rod; thence run S 66 deg 01 min 14 sec W, 2127.06 feet; S 17 deg 47 min 27 sec E, 294.25 feet to an Iron Rod; S 33 deg 17 min 39 sec E, 295.31 feet to an Iron Rod; S 26 deg 03 min 36 sec E, 965.86 feet to an Iron Rod; S 12 deg 33 min 24 sec E, 498.03 feet to an Iron Rod; S 23 deg 03 min 14 sec E, 675.57 feet to an Iron Rod; S 30 deg 05 min 37 sec E, 398.79 feet to an Iron Rod; S 06 deg 04 min 52 sec E, 308.39 feet to an Iron Rod; S 03 deg 01 min 28 sec W, 1069.06 feet to an Iron Rod; S 86 deg 00 min 15 sec W, 1159.45 feet to an Iron Rod; S 58 deg 46 min 21 sec W, 342.05 feet to an Iron Rod; S 24 deg 48 min 24 sec E, 1139.82 feet to a concrete monument on the south line of said Section 1 and the Point of Beginning

AND LESS AND EXCEPT FROM ALL OF THE ABOVE:

**PARCEL N - B** (North of Springbank – Revised) (Iluka Buffer)
A Tract of land situated in Sections 25 & 36, Township 6 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows: Commence at a concrete monument at the Southeast corner of Section 1, Township 7 South, Range 25 East and run N 00 deg 12 min 51 sec W, along the East line of said Section 1, a distance of 5300.10 feet to a concrete monument at the northeast corner thereof; thence run N 41 deg 27 min 22 sec W, 2952.52 feet to an Iron Rod on the Northwesterly right of way line of County Road 315, (also known as Springbank Road), an 80' Right of Way and the southerly most corner of lands designated and described as Parcel N in Official Records Book 3793 on Page 1223 of the public records of said County; thence run N 32 deg 45 min 24 sec E, along said right of way line, 2766.69 feet to an Iron Rod at the intersection of said right of way with the easterly line of the aforesaid lands and the Point of Beginning; thence run along said easterly line with the following Five (5) courses and distances: N 55 deg 31 min 08 sec W, 810.24 feet to an Iron Rod; N 22 deg 26 min 22 sec E, 1594.41 feet; N 73 deg 02 min 10 sec E, 337.55 feet; N 01 deg 03 min 39 sec E, 713.07 feet; N 27 deg 32 min 40 sec W, 509.62 feet; thence leave said easterly line and run in a general southeasterly direction with the following Three (3) courses and distances: S 40 deg 08 min 06 sec E, 240.85 feet; S 45 deg 25 min 52 sec E, 215.13 feet; S 64 deg 36 min 48 sec E, 74.48 feet to a point on the east line of said Section 25; thence run S 00 deg 19 min 25 sec E, along said east line, 2012.82 feet to the Northeast corner of said Section 36; thence run S 00 deg 18 min 55 sec E, along the east line of said Section 36, a distance of 148.93 feet to its intersection with said northwesterly right of way line; thence run S 32 deg 45 min 24 sec W, along said right of way line, 793.04 feet to the Point of Beginning.

3254974_5

Prepared by:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456
and
Matt McAfee
Driver, McAfee, Hawthorne & Diebenow
One Independent Dr., STE 1200
Jacksonville, FL 32202

Tax Parcel No: 17-06-25-021739-000-00

## SPECIAL WARRANTY DEED
### (Penney Farms Tract)

THIS SPECIAL WARRANTY DEED is made this __ day of _____, 202__, between

## REINHOLD CORPORATION, a Florida corporation,

whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003 ("**Grantor**"), Grantor being the successor by merger to **Reinhold Corporation**, a Delaware corporation, which was formerly known as **Foremost Properties Inc.** (prior to December 11, 1957) **Clay County Development Company** (prior to February 28, 1962) and **Shadowlawn Farms Inc.** (prior to December 5, 1966), and

## JAX-PALATKA FARMS LLC, a Delaware limited liability company,

whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893 ("**Grantee**").

### WITNESSETH:

That Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained and sold to Grantee and Grantee's successors and assigns forever, the following described land located in Clay County, Florida, to-wit:

See Exhibit A attached hereto and made a part hereof (the "**Property**").

Subject to

(i)      covenants, restrictions and easements of record, and any encroachments, overlaps and easements that would be disclosed by an accurate survey of the Property,

---

Note to Clerk: Please index under each of the four names **Reinhold Corporation, Clay County Development Company, Shadowlawn Farms Inc. Foremost Properties Inc.** for Grantor

provided that nothing herein shall be deemed to reimpose the same, and to taxes for 2020 and subsequent years,

(ii)     Hunting Leases/Licenses and Timber Cutting Agreements not containing an option to purchase and all of which terminate on or before April 30, 2022;

(iii)    and to the "Environmental Use Restriction" set forth below.

To have and to hold the same unto Grantee in fee simple.

Environmental Use Restriction

By the acceptance of this Deed, Grantee on behalf of itself, and its successors and assigns, covenants with Grantor that:

A.  Until the earlier of (i) September __, 2055, or (ii) that date on which the Greens Creek Mitigation Bank no longer has credits or is no longer actively pursuing the sale of mitigation bank credits, the Property shall not be permitted to be utilized as a wetland mitigation bank or a gopher tortoise mitigation bank which offers credits for sale to unaffiliated third parties of Grantee, its successors and assigns. As used herein, an "unaffiliated third party" is a party with less than 70 percent common beneficial ownership with Grantee, its successors and assigns.

B.  Nothing in this Environmental Use Restriction shall preclude development of the Property for commercial, residential or any other use except for those uses specifically prohibited in the prior paragraph (A).

C.  Nothing in this Environmental Use Restriction shall preclude Grantee, its successors and assigns from (i) subjecting portions of the Property to conservation easements to obtain wetland credits required to permit development on other portions of the Acquisition Lands (as hereinafter defined); (ii) the creation of banks for endangered species that provide credits to permit development on the Acquisition Lands, provided, however, that none of such credits shall be sold to unaffiliated third parties as hereinbefore defined for offsite use; or (iii) the creation of wetland mitigation or gopher tortoise credits for the use of Grantee or any affiliate of Grantee with at least 70 percent common beneficial ownership with Grantee, its successors or assigns.

D.  For clarity, the "**Acquisition Lands**" are those lands owned on January 1, 2020 by Grantor that lie South of State Road 16 in Townships T6S, R25E, T7S, R25E and T6S, R26E, but excluding (i) the cell tower area on the westerly end of Parcel #21742-000-00 lying in Section 17, T6S, R25E, (ii) those portions of the Greens Creek Mitigation Bank other than Parcels 19-06-25-010531-001-00 and 30-06-25-010548-000-00, and (iii) any property lying north or east of new State Road 23.

The foregoing Environmental Use Restriction shall touch and concern and run with the Property; however, there are no third party beneficiaries to the foregoing Environmental Use Restriction and the enforcement of such Restriction is limited to a single party, being either Grantor and its

successors or, if Grantor assigns such rights, to a single assignee of Grantor so designated by written notice recorded in the Official Public Records of Clay County, FL.

And Grantor does hereby covenant with Grantee that, except as noted above, at the time of the delivery of this deed the Property was free from all encumbrances made by Grantor, and that Grantor will warrant and defend the lands against the lawful claims and demands of all persons claiming by, through or under Grantor, but against none other.

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal the day and year first above written.

Signed, sealed and delivered
In the presence of:

**GRANTOR**

**REINHOLD CORPORATION**, a Florida corporation

_____
Typed or printed name:  ... ... ... ... ... ... ...

_____
Typed or printed name:  ... ... ... ... ... ... ...

By: _____
       George M. Egan, as its President

*{Corporate Seal}*

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____ _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current Florida driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

_____
*printed name of notary:*  ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...

**Exhibit A**

The Property

All of the following lands lying in Long Branch City, as per the plat thereof recorded in Plat Book 2, Page 26, Public Records of Clay County, Florida:

Blocks 1 through 6, inclusive: All.

Less and Except those lands conveyed to State of Florida Department of Transportation in Official Records Book 62, Page 575, Public Records of Clay County, Florida.

Block 7: Lots 1 and 4, and the W 1/2 of Lots 2 and 5, and The North one-half (1/2) of Dwight Street from the west boundary of Schumaker Ave. to the southerly prolongation of the east line of the West 1/2 of Lot 5, Block 7, and that part of Schumaker Ave. from the northerly line of Dwight Street to the southerly line of State Road 13, as vacated by Ordinance Number 76-1 recorded in Official Records Book 383, Page 119.

Less and except those lands conveyed to the State of Florida Department of Transportation in Official Records Book 62, Page 575, Public Records of Clay County, Florida.

Block 8: Lots 1, 2 and 3, less and except the South 30 feet of said lots.

Block 9: Lots 1,2 and 3.

Blocks 12 through 17, inclusive: All.

Blocks 23 and 24: All.

Block 25: Lots 1, 2, 3 and 4.

Block 26: Los 1, 4, 5 and 6.

Blocks 27 and 28: All.

Block 29: Lots 4, 5 and 6.

Block 30: Lot 8.

Block 34: All.

Block 36: Lots 1 and 2.

Block 37: Lots 4, 5 and 6.

Blocks 38 and 39: All.

Block 40: All.

Less and except those lands described as follows: Parcel of land within the confines of Block Forty (40) described as follows: Beginning at the Southeast corner of Lot Six (6) in Block Forty (40), thence North along Hall Avenue a distance of sixty-four (64) feet, thence west on a line parallel to Tallahassee Street a distance of one hundred forty-nine (149) feet, thence south on a line parallel to Hall Avenue a distance of sixty-four (64) feet to the north side of Tallahassee Street, thence east along Tallahassee Street one hundred forty-nine (149) feet to the point of beginning.

And less and except those lands conveyed to Edward L. Pierce in Official Records Book 40, Page 180, Public Records of Clay County, Florida.

Block 45: All.

Block 48: Lots 4, 5 and 6.

Block 49: All.

Block 50: Lots 1, 2, 3, 5, 6 and 7.

Block 85: Lots 3, 4, 5, 6, 7 and 8.

Less and except those lands described as follows: That part of Lot Seven (7) in Block Eighty-five (85) beginning one hundred twelve and one-half (112 1/2) feet from the northeast corner of said lot, thence running west parallel with Penney Road one hundred eighty-seven and one-half (187 1/2) feet, thence south two hundred ninety (290) feet, thence east one hundred eighty-seven and one-half (187 1/2) feet, thence north two hundred ninety (290) feet to the point of beginning, of Long Branch City, according to Plat thereof recorded in Plat Book 2, Page 26 of the Public Records of Clay County, Florida.
And less and except those lands described as follows: The East one hundred eighty-seven and five-tenths (187.5) feet of the West two hundred eighty-one and seventy-five hundredths (281.75) feet of the North half (1/2) of Lot Seven (7), Block Eighty-five (85), Long Branch City, according to plat thereof recorded in Plat Book 2, Page 26, Public Records of Clay County, Florida.

Block 86: All.

Block 87: Lots 2, 3, 4, 5, 7, 8, 9 and 10.

Block 88: All.

Block 90: All.

Less and except those lands described in Deed Book 101, Page 493, and more particularly described as follows: Beginning at a point 200 feet South from the Northwest corner of Lot 1, Block 90, Long Branch City, as shown on map or plat recorded in Plat Book 2, Page 26, of the Public Records of Clay County, Florida, in the office of the Clerk of the Circuit Court; thence East 103 feet 4 inches; thence South 414 feet; thence West 103 feet 4 inches; thence North 414 feet to the point of beginning.

And less and except those lands conveyed to State of Florida Department of Transportation in Official Records Book 62, Page 575, Public Records of Clay County, Florida.

Block 91: All.

Less and except those lands conveyed to State of Florida Department of Transportation in Official Records Book 62, Page 575, Public Records of Clay County, Florida.

Blocks 94 and 95: All.

Block 96: All.

Less and Except those lands conveyed to Town of Penney Farms in Official Records Book 345, Page 538, Public Records of Clay County, Florida.

Block 98: All.

Less and except those lands conveyed to Town of Penney Farms in Official Records Book 770, Page 549 and Official Records Book 1372, Page 2253, Public Records of Clay County, Florida.

And less and except that part of Block 98, Long Branch City, Clay County, Florida according to Plat Book 2, Page 26, lying East of those lands as described in Official Records Book 1406, Page 2030 of Public Records of Clay County, Florida. Said part being further described as follows: For a point of reference commence at the Northeast corner of said lands described in Official Records Book 1406, Page 2030. Thence North 89° 10' 26" East along the South Right of Way of Caroline Street (Harriman Street per plat), the same being the North line of said Block 98, a distance of 143.00 feet to the Point of Beginning; thence continue along said South Right of Way line of Caroline Street, North 89° 10'26" East, a distance of 100.00 feet; thence South 00° 49' 34" East, a distance of 100.00 feet; thence South 89° 10' 26" West a distance of 100.00 feet; thence North 00° 49' 34" West a distance of 100.00 feet to the Point of Beginning.

Block 109: All.

Less and except those lands described in Deed Book 64, Page 418 and being more particularly described as follows: The West five hundred fifty-three (553) feet of Block 109, Long Branch City as shown on Plat recorded in Plat Book 2, Page 26, of the Public Records of Clay County, Florida.

Blocks 110, 111 and 112: All.

And all that part of the Florida Farms Industries Company's railroad right of way lying north of the main track through Blocks 85, 86, 87 and 88; all according to the plat of Long Branch City, recorded in Plat Book 2, Page 26.

All of the following lands lying in Section 3 of Plat "A" of Florida Farms and Industries Company's Property in Clay County, Florida, as per the plat thereof recorded in Plat Book 2, Page 29, Public Records of Clay County, Florida:
Block 33:  The North Half (N 1/2) of Lots 7 and 8, less and except from Lot 7 those lands conveyed to Henry B. Colby in Official Records Book 69, Page 633, Public Records of Clay County, Florida.
Less and except those lands conveyed to Clay County in Deed Book 37, Page 478, Public Records of Clay County, Florida.

LESS AND EXCEPT from all of the above described lands, any part lying in the right of way of State Road 16 and Saunders Road, and any part lying in a public, maintained road.

Prepared by:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456
and
Matt McAfee
Driver, McAfee, Hawthorne & Diebenow
One Independent Dr., STE 1200
Jacksonville, FL 32202

Tax Parcel No: Portion of 18-06-25-010530-000-00

## SPECIAL WARRANTY DEED
### (SR 16 Tract)

THIS SPECIAL WARRANTY DEED is made this __ day of _____ , 202__, between

### REINHOLD CORPORATION, a Florida corporation,

whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003 ("**Grantor**"), Grantor being the successor by merger to **Reinhold Corporation**, a Delaware corporation, which was formerly known as **Foremost Properties Inc.** (prior to December 11, 1957) **Clay County Development Company** (prior to February 28, 1962) and **Shadowlawn Farms Inc.** (prior to December 5, 1966), and

### JAX-PALATKA FARMS LLC, a Delaware limited liability company,

whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893 ("**Grantee**").

### WITNESSETH:

That Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained and sold to Grantee and Grantee's successors and assigns forever, the following described land located in Clay County, Florida, to-wit:

See Exhibit A attached hereto and made a part hereof (the "**Property**").

Subject to

(i)      covenants, restrictions and easements of record, and any encroachments, overlaps and easements that would be disclosed by an accurate survey of the Property,

--------------------------------------------------------------------------------

Note to Clerk: Please index under each of the four names **Reinhold Corporation, Clay County Development Company, Shadowlawn Farms Inc. Foremost Properties Inc.** for Grantor

provided that nothing herein shall be deemed to reimpose the same, and to taxes for 2020 and subsequent years,

(ii)    Hunting Leases/Licenses and Timber Cutting Agreements not containing an option to purchase and all of which terminate on or before April 30, 2022;

(iii)    and to the "Environmental Use Restriction" set forth below.

To have and to hold the same unto Grantee in fee simple.

Environmental Use Restriction

By the acceptance of this Deed, Grantee on behalf of itself, and its successors and assigns, covenants with Grantor that:

A.  Until the earlier of (i) September __, 2055, or (ii) that date on which the Greens Creek Mitigation Bank no longer has credits or is no longer actively pursuing the sale of mitigation bank credits, the Property shall not be permitted to be utilized as a wetland mitigation bank or a gopher tortoise mitigation bank which offers credits for sale to unaffiliated third parties of Grantee, its successors and assigns. As used herein, an "unaffiliated third party" is a party with less than 70 percent common beneficial ownership with Grantee, its successors and assigns.

B.  Nothing in this Environmental Use Restriction shall preclude development of the Property for commercial, residential or any other use except for those uses specifically prohibited in the prior paragraph (A).

C.  Nothing in this Environmental Use Restriction shall preclude Grantee, its successors and assigns from (i) subjecting portions of the Property to conservation easements to obtain wetland credits required to permit development on other portions of the Acquisition Lands (as hereinafter defined); (ii) the creation of banks for endangered species that provide credits to permit development on the Acquisition Lands, provided, however, that none of such credits shall be sold to unaffiliated third parties as hereinbefore defined for offsite use; or (iii) the creation of wetland mitigation or gopher tortoise credits for the use of Grantee or any affiliate of Grantee with at least 70 percent common beneficial ownership with Grantee, its successors or assigns.

D.  For clarity, the "**Acquisition Lands**" are those lands owned on January 1, 2020 by Grantor that lie South of State Road 16 in Townships T6S, R25E, T7S, R25E and T6S, R26E, but excluding (i) the cell tower area on the westerly end of Parcel #21742-000-00 lying in Section 17, T6S, R25E, (ii) those portions of the Greens Creek Mitigation Bank other than Parcels 19-06-25-010531-001-00 and 30-06-25-010548-000-00, and (iii) any property lying north or east of new State Road 23.

The foregoing Environmental Use Restriction shall touch and concern and run with the Property; however, there are no third party beneficiaries to the foregoing Environmental Use Restriction and the enforcement of such Restriction is limited to a single party, being either Grantor and its

successors or, if Grantor assigns such rights, to a single assignee of Grantor so designated by written notice recorded in the Official Public Records of Clay County, FL.

And Grantor does hereby covenant with Grantee that, except as noted above, at the time of the delivery of this deed the Property was free from all encumbrances made by Grantor, and that Grantor will warrant and defend the lands against the lawful claims and demands of all persons claiming by, through or under Grantor, but against none other.

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal the day and year first above written.

Signed, sealed and delivered
In the presence of:

**GRANTOR**

**REINHOLD CORPORATION**, a Florida corporation

_____
*Typed or printed name:* .........................

_____
*Typed or printed name:* .........................

By: _____
George M. Egan, as its President

*{Corporate Seal}*

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____ _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current Florida driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

_____
*printed name of notary:* ...............................................................

## Exhibit A

### The Property

ALL OF THE FOLLOWING LANDS LYING IN TOWNSHIP 6 SOUTH, RANGE 25 EAST, CLAY COUNTY FLORIDA:

SECTION 18: That portion of the North Half (N 1/2) lying South of the right-of-way of State Road No. 16. Said lands being a portion of The Florida Farms and Industries Company's Subdivision according to the plats thereof recorded in Plat Book 2, Page 28, and Plat Book 2, page 33.

Prepared by:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456
and
Matt McAfee
Driver, McAfee, Hawthorne & Diebenow
One Independent Dr., STE 1200
Jacksonville, FL 32202


Tax Parcel No: Portion of 13-06-25-010434-000-00


## SPECIAL WARRANTY DEED
(Parcel West of Interchange fronting on S.R. 16 & Gary Road)

THIS SPECIAL WARRANTY DEED is made this __ day of September, 2020, between

**REINHOLD CORPORATION**, a Florida corporation,

whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003 ("**Grantor**"), Grantor which was formerly known as **Foremost Properties Inc.** (prior to December 11, 1957) and

**JAX-PALATKA FARMS LLC**, a Delaware limited liability company,

whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893 ("**Grantee**").

### WITNESSETH:

That Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained and sold to Grantee and Grantee's successors and assigns forever, the following described land located in Clay County, Florida, to-wit:

See Exhibit A attached hereto and made a part hereof (the "**Property**").

Subject to

(i)      covenants, restrictions and easements of record, and any encroachments, overlaps and easements that would be disclosed by an accurate survey of the Property, provided that nothing herein shall be deemed to reimpose the same, and to taxes for 2020 and subsequent years,

(ii)  Hunting Leases/Licenses not containing an option to purchase and all of which terminate on or before January 31, 2022;

(iii)  and to the "Development Restrictions" and the "Environmental Use Restriction" set forth below.

To have and to hold the same unto Grantee in fee simple.

Development Restrictions

By the acceptance of this Deed, Grantee on behalf of itself, and its successors and assigns covenants with Grantor that

A.  Until September ___, 2027 (i) no portion of the Property shall be re-zoned or subject to any change in land use, nor shall any re-zoning or land use modification application be filed, by Grantee, its successors or assigns and (ii) Grantee and its successors and assigns shall not acquire development rights or development entitlements for the Property.

B.  Until September ___, 2030, (i) no portion of the Property shall be sold, ground leased or leased, excluding, however, (1) any judicial sale to enforce a mortgage held by an institutional lender, a deed in lieu of foreclosure to an institutional lender, or a sale by such lender acquiring the Property or portions thereof in foreclosure or by deed in lieu of foreclosure, and (2) any transfer for right-of-way use for roads, public utilities or cable, including antennae.

C.  Nothing in these Development Restrictions shall prevent the construction of roads or other horizontal infrastructure constructed for the benefit of other lands that are purchased or contemplated to be purchased by Grantee from Grantor (the "Acquisition Lands") if such improvements as completed are to serve parcels in the Acquisition Lands; and provided further, that in such event nothing shall prevent Grantee from upsizing the capacity or size of such horizontal infrastructure to also serve the Property.

D.  For clarity, the "Acquisition Lands" are those lands owned on January 1, 2020 by Grantor that lie South of State Road 16 in Townships T6S, R25E, T7S, R25E and T6S, R26E, but excluding (i) the Property, (ii) the cell tower area on the westerly end of Parcel #21742-000-00 lying in Section 17, T6S, R25E, (iii) those portions of the Green River Mitigation Bank other than Parcels 19-06-25-010531-001-00 and 30-06-25-010548-000-00, and (iv) any property lying north or east of new State Road 23.

Environmental Use Restriction

By the acceptance of this Deed, Grantee on behalf of itself, and its successors and assigns, covenants with Grantor that:

3208696_8

A. Until the earlier of (i) September ___, 2055, or (ii) that date on which the Green Creek Mitigation Bank no longer has credits or is no longer actively selling mitigation bank credits, the Property shall not be permitted to be utilized as a wetland mitigation bank or a gopher tortoise mitigation bank which offers credits for sale to unaffiliated third parties of Grantee, its successors and assigns. As used herein, an "unaffiliated third party" is a party with less than 70 percent common beneficial ownership with Grantee, its successors and assigns.

B. Nothing in this Environmental Use Restriction shall preclude the subsequent development of the Property for commercial, residential or any other use except for those uses specifically prohibited in the prior paragraph (A).

C. Nothing in this Environmental Use Restriction shall preclude Grantee, its successors and assigns from (i) subjecting portions of the Property to conservation easements to obtain wetland credits required to permit development on other portions of the Acquisition Lands or the Property; (ii) the creation of banks for endangered species that provide credits to permit development on the Acquisition Lands or the Property, provided, however, that none of such credits shall be sold to unaffiliated third parties as hereinbefore defined for offsite use; or (iii) the creation of wetland mitigation or gopher tortoise credits for the use of Grantee or any affiliate of Grantee with at least 70 percent common beneficial ownership with Grantee, its successors or assigns.

The foregoing Development Restrictions and Environmental Use Restriction shall touch and concern and run with the Property; however, there are no third party beneficiaries to the foregoing Development Restrictions and the Environmental Use Restriction and the enforcement of such Restrictions is limited to a single party, being either Grantor and its successors or, if Grantor assigns such rights, to a single assignee of Grantor so designated by written notice recorded in the Official Public Records of Clay County, FL.

And Grantor does hereby covenant with Grantee that, except as noted above, at the time of the delivery of this deed the Property is free from all encumbrances made by Grantor, and that Grantor will warrant and defend the lands against the lawful claims and demands of all persons claiming by, through or under Grantor, but against none other.

3208696_8

*Signature Page to Deed from Reinhold Corporation to JAX-PALATKA FARMS LLC*

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal the day and year first above written.

Signed, sealed and delivered
In the presence of:

**GRANTOR**

**REINHOLD CORPORATION**, a Florida corporation

_____
*Typed or printed name:* ... ... ... ... ... ... ... ...

By: _____

_____
*Typed or printed name:* ... ... ... ... ... ... ... ...

George M. Egan, as its President

*{Corporate Seal}*

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____ _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐      Is/are personally known to me

☐      Produced a current Florida driver's license as identification

☐      Produced _____ as identification

*{Notary Seal must be affixed}*

_____

*printed name of notary:* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...

3208696_8

**Exhibit A**

**The Property**

A Parcel of Land Situated in the Northwest 1/4 of Section 13, Township 6 South, Range 25 East, Clay County, Florida: Said Parcel Being More Particularly Described As Follows:

Commence At The Southeast Corner Of The Northeast 1/4 Of Said Section 13 And Run South 89°17'30" West, Along The Southerly Line Of Said Northeast 1/4, A Distance Of 1,942.83 Feet To The Centerline Of Construction Of State Road No. 23 (As Per Florida Department Of Transportation Right Of Way Map Section 71493, F.P. No. 4229382 & 4229383), And A Curve To The Right, Having A Radius Of 11,459.00 Feet; Thence Along Said Centerline Of Construction Of State Road No. 23, And The Arc Of Said Curve, Through An Angle Of 13°58'58", An Arc Distance Of 2,796.54 Feet, And A Chord Bearing And Distance Of North 36°17'37" West, 2,789.61 Feet; Thence South 60°41'52" West, A Distance Of 461.50 Feet To The Most Northerly Corner of Lands Described As Parcel 808 Part W In Official Records Book 4088, Page 1253 Of The Public Records Of Said County And The Point Of Beginning; Thence South 45°53'41" West, Along The Northerly Line Of The Aforesaid Lands, 487.91 Feet; Thence South 44°06'19" East, Along The Westerly Line Of Aforesaid Lands 501.97 Feet: Thence Leave Said Westerly Line And Run South 89°59'52" West, 1309.30 Feet To A Point On The West Line Of Said Section 13; Thence North 00°13'40" East, Along The West Line Of Section 13, A Distance Of 1190.86 Feet To The Southwest Corner of Lands Described As Parcel 179 Part T In Said Official Records Book 4088, Page 1253 Of Said Public Records; Thence Along The South Line of the Aforesaid Lands And Along The Southwesterly Line of Lands Described As Parcel 179 Part A In Said Official Records Book 4088, Page 1253 Of Said Public Records, Running In A General Easterly/Southeasterly Direction With The Following Four (4) Courses And Distances: (1) North 89°07'27" East, 529.19 Feet: (2) South 75°03'38" East, 414.57 Feet: (3) South 43°28'35" East, 441.99 Feet: (4) South 45°11'41" East, 101.12 Feet To The Point Of Beginning.

Containing 30.01 Acres, More Or Less.

3208696_8

**Exhibit 9.1**

Clay Pit License Agreement

[see attached]

## CLAY PIT LICENSE AGREEMENT

This Clay Pit License Agreement ("*Agreement*"), dated as of _____, 2020 (the "*Effective Date*"), is by and between **JAX-PALATKA FARMS LLC**, a Delaware limited liability company (the "*Grantor*") and **REINHOLD CORPORATION**, a Florida corporation ("*Grantee*").

WHEREAS, Grantor is the fee owner of the property described and depicted as Parcel 1 on Exhibit A attached hereto (the "*Grantor Property*");

WHEREAS, Grantee has requested the use the portion of the Grantor's Property located to the south of State Road 16 and as more specifically depicted as "Clay Pit" on Exhibit A (the "*Access Area*") for the purpose of removing up to thirty (30) truckloads of clay (being generally between fourteen (14) and sixteen (16) cubic yards per truckload) for each twelve month period during the Term (as defined below) from the Clay Pit to use on property owned by Grantee (the "*Permitted Use*");

WHEREAS, Grantor is willing to permit Grantee to use the Access Area solely for the Permitted Use on the terms and conditions set forth in this Agreement; and

WHEREAS, Grantor and Grantee acknowledge and agree that the Clay Pit is not permitted at the present time, as Grantee (as the prior owner) has been previously advised by its consultant that activities thereon did not warrant a permit.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Access; Term.

(a)    Subject to the provisions of this Agreement, Grantor hereby grants Grantee, its successors and assigns and its contractors, agents and employees, permission to enter the Access Area from time to time for a period of five (5) years from the Effective Date (the "*Term*") and use the Access Area solely for the Permitted Use.  Access for workmen shall occur only during daylight hours without the consent of Grantor's Representative (as hereinafter defined), which shall not be unreasonably withheld.

(b)    Grantor grants to Grantee, its successors and assigns and its contractors, agents and employees, a non-exclusive easement and right to enter upon Grantor's Property over the roads described in Exhibit "B" with tools, wagons, carts, trucks, men and equipment and all other conveyances that are necessary for the Permitted Use, together with the right to operate on such roads and roadways upon, over and across Grantor's Property, when such roads and roadways are necessary for ingress to, egress from and access to the Access Area.

(c)    Grantor shall determine from time to time if the Clay Pit should be permitted due to excavation occurring on or after the date of this Agreement.  In the event of such a determination, Grantor shall be responsible for such permitting, at its sole cost and expense.

DRAFT of August 13

2.     Purpose of Access and Vacating the Grantor's Properties.

(a)     Grantee shall use Grantor's Property and the Access Area for the Permitted Use in a manner which shall minimize interference with Grantor's use of the Grantor's Property and its business operations at the Grantor's Property, and otherwise in accordance with this Agreement.

(b)     Grantee shall notify Grantor's designated representative for access ("Grantor's Representative"), who shall be Cooper Murphy so long as the Management Agreement is in effect, at least 24 hours in advance of any entry to Grantor's. All gates to trail roads shall be locked unless Grantee or a representative of Grantee is present at the gate.

(c)     All personal property brought onto Grantor's Property for the Permitted Use shall be at Grantee's sole risk and Grantee exculpates Grantor from any liability for loss or damage to such personal property.

(d)     In conducting its activities related to the Permitted Use, Grantee shall adhere and shall use commercially reasonable efforts to cause its contractors, agents and employees to adhere, to all regulations and laws and all commercial standards for the removal of clay. Grantor and Grantee agree to work together in sloping and other requirements for reclamation of the Clay Pit.

(e)     Grantee shall promptly notify Grantor of and shall remediate any petroleum or chemical spills or toxic or hazardous waste from Grantee's equipment related to the Permitted Use to the extent required by applicable law.

(f)     On or before the end of the Term, Grantee shall:

(i)     remove any and all of its property used in connection with this Agreement from Grantor's Property, including without limitation, Grantee's equipment used in connection with this Agreement; and

(ii)     otherwise comply with its obligations under this Agreement, including, without limitation, Section 3 hereof.

3.     Grantee Compliance.

(a)     Prior to entering onto the Access Area, Grantee shall deliver to Grantor proof of insurance required by this Agreement.

(b)     To the extent that Grantee damages the Access Area, Grantee shall repair the Access Area to substantially its prior condition, including any damage to the access roads and associated improvements, such as fences, gates, culverts and bridges.

2

3273849_8

(c)    Grantee shall not cause or allow any third party lien or claim to encumber the Grantor's Property related to the Permitted Use and shall immediately discharge of record any such lien or claim at Grantee's sole cost and expense.

4.    Insurance. Grantee or its assignee agrees to maintain insurance in the following minimum amounts:

A.    Commercial General Liability with limits of not less than $1,000,000.00 combined single limit bodily injury & property damage each occurrence, $2,000,000.00 general aggregate and $2,000,000.00 products/completed operations aggregate including coverage for: premises and operations, products and completed operations, contractual liability insuring the obligations assumed by contractors of Grantee in this Agreement, independent contractors, personal & advertising injury.

B.    Commercial Automobile Liability covering owned, hired and non-owned vehicles with limits of not less than $1,000,000.00 combined single limit bodily injury and property damage each occurrence.

C.    Follow Form Excess liability (umbrella) insurance for bodily injury and property damage over primary employer's liability, commercial general liability, and commercial automobile liability with limits in the amount of $1,000,000.00 each occurrence and aggregate;

D.    Workers' compensation insurance covering all employees of the Grantee or its assignees who are engaged in any work under on the Access Area in an amount required by applicable laws. Employer's Liability coverage of not less than:

    i.    Bodily Injury by Accident (Each Accident) $1,000,000.00

    ii.    Bodily Injury by Disease (Policy Limit) $1,000,000.00

    iii.    Bodily Injury by Disease (Each Employee) $1,000,000.00

The insurance described above shall be obtained without liability on the part of Grantor for premiums. The insurance described in items (A), (B), and (C) above shall name Grantor as an additional insured. Each of the above policies will be primary and non-contributory with respect to any policies carried by any additional insured. Any coverage carried by Grantor shall be excess insurance. Such insurance shall be placed with reputable insurance companies licensed or authorized to do business in the state of Florida and have a minimum Best's rating of A-/VIII.

5.    Indemnification of Grantor.  To the extent of insurance coverage required to be carried hereunder or, if greater, the actual insurance carried by Grantee, Grantee agrees to indemnify and hold harmless Grantor from and against any and all liability, claims, actual damages, demands, fines, penalties, costs and expenditures (including reasonable attorneys' fees and costs of litigation defense and/or settlement) ("Damages") caused by the negligent acts or omissions of Grantee or any of its agents, employees,

3

3273849_8

contractors, licensees, or invitees retained by Grantee and acting under Grantee's direction. The foregoing indemnification shall not apply to the extent such Damages are found to be caused by the gross negligence or willful misconduct of Grantor or any of its agents, employees, contractors, licensees, or invitees (other than Grantee) retained by Grantor and acting under Grantor's direction. All indemnification obligations contained in this paragraph shall survive the expiration or sooner termination of this Agreement

The gross negligence or willful misconduct of Reinhold Corporation acting as the Manager under the Property Management Agreement between Grantee and Grantor shall not be imputed to Grantor.

Grantee accepts the condition of the Access Area and roads "AS IS" and assumes all risks associated with such conditions.

6.    Default. In the event of a breach by either party, or its employee, agent, tenant, invitee, or contractor of any of the terms, covenants, restrictions or conditions of this Agreement, the non-breaching party shall be entitled forthwith to full and adequate relief by injunction and/or all such other available legal and equitable remedies from the consequences of such breach, including payment of any amounts due and/or specific performance. In no event shall either party be liable to the other party for any consequential, speculative or punitive damages arising from this Agreement.

7.    Notices. Any notice which must or may be given to a party hereunder or any successor or assign of any party under the provisions of this Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed as follows:

If to Grantee:    Reinhold Corporation
Attn: George M. Egan
1845 Town Center Blvd., Ste. 105
Fleming Island, Florida 32003
Phone: (904) 269-5857
Email: GEgan@reinholdcorporation.com

4

3273849_8

| | |
|---|---|
| With a copy to: | Driver, McAfee, Hawthorne & Diebenow, PLLC<br>One Independent Drive, Suite 1200<br>Jacksonville, Florida 32202<br>Attn.: Matthew S. McAfee, Esq.<br>Phone: (904) 301-1269<br>Email: mmcafee@drivermcafee.com |
| If to Grantor: | JAX-PALATKA FARMS LLC<br>Attn: Rick Feaser<br>9 West 57th Street, Suite 5000<br>New York, NY 10019-2701<br>Fax: (212) 826-1265<br>E-mail: richie@ruanecuniff.com |
| With copies to:<br>(none if blank) | Mr. Dennis Carey<br>977 Stagecoach Road<br>Oglethorpe, GA 31068<br>Fax: (478) 472-7098<br>email: pinetimber@windstream.net<br><br>and to<br><br>Rogers Towers, P.A.<br>Attn: John T. Sefton, Esq.<br>1301 Riverplace Boulevard, Suite 1500<br>Jacksonville, Florida 32207<br>Fax: (904) 396-0663<br>E-mail: jsefton@RTLAW.com |

Any party may change its address for notices by serving on the other party a notice that provides the new address.

8.    Headings. The headings of the sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

9.    Counterparts. To facilitate execution, this Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

10.    Assignment. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Grantor as owner of the Property. Grantee party may not assign or transfer its rights and duties under this Agreement without Grantor's prior written consent, which consent may be

5

3273849_8

granted or withheld in Grantor's sole discretion. Notwithstanding the foregoing, either party may assign its rights under this Agreement to an entity controlling, controlled by or under common control with such party without the consent to the other party.

11.    Written Approval. Unless otherwise specified in this Agreement, all approvals and consents hereunder must be requested in writing by the party seeking such approval or consent to the other party, and all approvals or consents shall not be effective unless in writing. Additionally, the parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed.

12.    Non-Waiver. A failure of a party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. In no way whatsoever shall a waiver of any term, provision or condition of this Agreement be valid unless in writing, signed by the waiving party, and only to the extent expressly set forth in such writing.

13.    No Joint Venture or Partnership. None of the terms or provisions of this Agreement shall be deemed to create a partnership between or among the parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each party shall be considered a separate entity and no party shall have the right to act as an agent for the other party unless expressly authorized to do so herein or by separate instrument signed by the party to be charged.

14.    Entire Agreement; Amendment. This Agreement and any exhibits hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the parties, whether written or oral, with respect to the subject matter hereof. To be effective, any modification and/or amendment to this Agreement must be in writing and executed by the parties.

15.    Applicable Law. This Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws. Venue for any dispute between the parties with regard to this Agreement and the subject matter hereof shall lie only in Clay County, Florida.

16.    Joint Preparation. The parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.

17.    Jury Waiver. EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT (INCLUDING INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT) OR PERFORMANCE UNDER THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

3273849_8

18.     Attorneys' Fees. If any legal or equitable action is commenced by either party against the other party to enforce or interpret any provision of this Agreement or with regard to the subject matter hereof, the party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing party its reasonable attorneys' fees and costs incurred by the prevailing party, in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

19.     Severability. If any clause or provision of this Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement shall not be affected thereby. It is the express intention of the parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

[SIGNATURE PAGE FOLLOWS]

7

3273849_8

IN WITNESS WHEREOF, the parties hereto have executed this Clay Pit License Agreement as of the date first above written.

GRANTOR:

**JAX-PALATKA FARMS LLC,** a Delaware limited liability company

By_____
Name:
Title:

GRANTEE:

**REINHOLD CORPORATION,** a Florida corporation

By_____
Name:
Title:

8

3273849_8

## EXHIBIT A

### DEPICTION OF ACCESS AREA



Clay Pit
Access License

Exhibit A

09-03-2020

9

3273849_8

<u>EXHIBIT "B"</u>

ROADS PERMITTED TO BE UTILIZED (OTHER THAN PUBLIC ROADS)

Trail road running from Southerly end of public portion of Kentucky Avenue to East-West Road running from Clay Pit to the East.

Trail Road running Easterly from Clay Pit to Road described above and then to Palmetto Avenue and then north on any non-public portion of Palmetto Avenue.

3273849_8

## Exhibit 9.2

## Temporary Timber Cut Easement

[see attached]

Prepared by and return to:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456

## Temporary License to Cut Timber

THIS Temporary License to Cut Timber ("**License Agreement**") is made this ____ day of _____, 2020, between REINHOLD CORPORATION, a Florida corporation ("**Reinhold**"), whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003, and JAX-PALATKA FARMS LLC, a Florida limited liability company ("**JAX**"), whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893.

RECITALS:

(A) Reinhold has this date sold and deeded the lands depicted on Exhibit A attached (the "**Timber Parcel**") to JAX, all pursuant to the terms of a Purchase and Sale Agreement dated as of April 24, 2020 (the "**Agreement**").

(B) As part of the sale, Reinhold retained the right (i) to cut and remove certain stands of merchantable pine timber on the Timber Parcel as depicted on Exhibit A and more particularly defined in the Logging Contracts (collectively, the "**Stands**"), and collect compensation therefrom up to $750,000.00; (ii) pay JAX any gross revenues (including advances paid under the Logging Contracts) received therefrom in excess of $750,000.00; and (iii) to rake, bed and herbicide the Timber Parcel with respect to the Stands.

(C) Reinhold has sold the Stands to (i) Great South Timber & Lumber, LLC, (ii) Gator Timber & Land, L.L.C., and (iii) Alford Timber (each individually, a "**Logger**" and collectively, the "**Loggers**") pursuant to certain Timber Cutting Agreement Contracts (the "**Logging Contracts**"). Reinhold has furnished a true and correct copy of each of the Logging Contracts and all amendments thereto to JAX.

(D) This instrument is executed to grant Reinhold and the Loggers rights to access the Stands over, upon, and through the Timber Parcel and to cut and remove the merchantable pine timber from the Stands.

NOW THEREFORE, in consideration of the mutual covenants made herein, Reinhold and JAX hereby covenant and agree as follows:

1. License to Cut and Remove Timber. JAX hereby grants to Reinhold and the Loggers a temporary license to cut and remove standing pine timber from the Stands depicted and/or described in Exhibit A. This License Agreement shall expire on or before July 8, 2021, unless the Logging Contracts are extended pursuant to the *force majeure* provision in one of the Logging Contracts, in which case this License Agreement shall be extended (as to the Stands covered by that Logging Contract), but in no event shall this License Agreement be extended to a date later than January 8, 2022.

2. License for Ingress and Egress. Most of the Stands lie adjacent to roads that are public by County maintenance. To the extent the Stands do not front on a public road, JAX hereby grants to Reinhold and to the Loggers a temporary, non-exclusive license for ingress and egress over the trail roads that run from the nearest of such County-maintained roads to the Stands to be cut solely for the

1

Temporary License to Cut Timber (00326632-7xAF098).DOCX

purposes of accessing and harvesting the Stands and performing its obligations hereunder and under the Logging Contracts. In the case of the Southernmost Stands, JAX also grants to Reinhold and to the Loggers a temporary, non-exclusive license for ingress and egress over the trail roads between such Stands solely for the purposes of accessing and harvesting the Stands and performing its obligations hereunder and under the Logging Contracts.

3. Conditions and Restrictions on Use. Reinhold shall use commercially reasonable efforts to cause all timber harvest operation and activities on the Timber Parcel by Reinhold and the Loggers to be performed in compliance with the most current publication of Florida's Department of Agriculture and Consumer Service's Silviculture Best Management Practices ("**BMPs**"). Reinhold acknowledges that the existing trail roads, existing improvements, and drainage and storm-water conveyance features and systems on the Timber Parcel and adjacent property of JAX (collectively, the "**Infrastructure**") and the continued functioning thereof are material to the value of the Timber Parcel. Reinhold shall, and shall use commercially reasonable efforts to cause the Loggers to, not damage the Infrastructure (normal wear and tear excepted). At Reinhold's or at the Loggers' expense, Reinhold shall (or use commercially reasonable efforts to cause the Loggers to) repair and restore the Infrastructure, or any portion thereof, damaged or destroyed in connection with Reinhold's or the Loggers' presence on the Timber Parcel or activities thereon (normal wear and tear excepted). Reinhold shall comply (and shall use commercially reasonable efforts to cause the Loggers to comply) with all applicable laws, rules, and regulations, including all environmental laws, rules, and regulations, of all governmental and quasi-governmental authorities having jurisdiction over the Timber Parcel, use thereof, or activities thereon, including all BMPs. Reinhold shall not cause, commit, or permit any waste on the Timber Parcel, shall not remove soil, import soil or alter the existing surface elevation of the Timber Parcel, or perform any excavation work for fill dirt without first obtaining JAX's prior written consent, and shall not start any fire, including, but not limited to, warming fires and/or trash barrel burning, or initiate any burn (control burn or otherwise) or permit any of the foregoing on the Timber Parcel.

4. Standards. Reinhold shall use Reinhold's commercially reasonable efforts to cause the timber in the Stands to be clear cut and removed in accordance with BMPs by July 8, 2021, subject to the force majeure provisions of the respective Logging Contracts, which may extend the date of expiration or termination of this license to a date on or before January 8, 2022, as applicable. Reinhold shall enforce the terms of the Logging Contracts for the benefit of JAX. Reinhold and each Logger shall maintain the policies of insurance specified and listed in the Logging Contracts.

5. Indemnification of JAX. To the extent of insurance coverage required to be carried hereunder or, if greater, the actual insurance carried by Reinhold, Reinhold shall indemnify and hold harmless JAX from and against any and all liability, claims, actual damages, demands, fines, penalties, costs and expenditures (including reasonable attorneys' fees and costs of litigation defense and/or settlement) ("Damages") caused by the negligent acts or omissions of Reinhold or any of its agents, employees, contractors, licensees, or invitees retained by Reinhold and acting under Reinhold's direction. The foregoing indemnification shall not apply to the extent such Damages are found to be caused by the gross negligence or willful misconduct of JAX or any of its agents, employees, contractors, licensees, or invitees (other than Reinhold) retained by JAX and acting under JAX's direction. All indemnification obligations contained in this paragraph shall survive the expiration or sooner termination of this License Agreement

The gross negligence or willful misconduct of Reinhold Corporation acting as the Manager under the Property Management Agreement between Reinhold and JAX shall not be imputed to JAX.

6. <u>Termination of License to Cut and Remove Timber</u>. This License Agreement (and all licenses granted hereunder) shall terminate on July 8, 2021, which date may be extended in accordance with the force majeure provisions of the Logging Contracts; provided, however, that no such extension(s) shall extend the term of this License Agreement (or any license(s) granted hereunder) or any Logging Contract beyond January 8, 2022.

7. <u>Completion of Site Prep following Timber Harvest</u>. Reinhold shall, at Reinhold's expense, complete the site preparation following the timber harvest using BMPs, including raking, bedding and herbicide application by October 31, 2021, following completion of the timber harvest from the Stands. If requested by JAX, Reinhold shall double bed; provided, however, that if double bedding on the Stands exceeds Reinhold's customary timber management practices, JAX shall pay the increased costs.

8. <u>Accounting</u>. Reinhold shall monitor the Loggers' harvesting activities to ensure the Loggers comply with the terms of this License Agreement (and all licenses granted hereunder), terms of the Logging Contracts. Reinhold shall furnish to JAX (in hard copy or electronic form) accountings from each Logger, including, where requested, load tickets by email to Pinetimber@windstream.net, within one calendar week of receipt. Once collections from the timber harvest have exceeded $750,000 in the aggregate, Reinhold shall remit proceeds in excess of $750,000 payable to JAX within five business days in care of:

> Dennis Carey, Pine Timber Co.
> 977 Stagecoach Road
> Oglethorpe, GA 31068
> Phone: (478) 957-6879; Email: pinetimber@windstream.net

or to such other bank account as may be requested in writing by JAX.

9. <u>Intentionally deleted</u>.

10. <u>No Encumbrances</u>. From and after the date hereof, Reinhold expressly covenants and agrees that the Timber Parcel shall not be subject to any encumbrance by any mortgage, lien, financial instrument, or other agreement outside of or in addition to this License Agreement, nor shall the Timber Parcel be liable to satisfy any indebtedness that may result from Reinhold's or the Loggers' operation or activities.

11. <u>Notices</u>. Any notice which must or may be given to Reinhold, JAX, or any successor or assign of any of the foregoing, under the provisions of this License Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission to Reinhold or JAX (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed, with regard to the parties, as follows:

Temporary License to Cut Timber (00326632-7xAF098).DOCX

| | |
|---|---|
| If to Reinhold: | Reinhold Corporation<br>Attn: George M. Egan<br>1845 Town Center Blvd., Ste. 105<br>Fleming Island, Florida 32003<br>Phone: (904) 269-5857<br>Email: GEgan@reinholdcorporation.com |
| With a copy to: | Driver, McAfee, Hawthorne & Diebenow, PLLC<br>One Independent Drive, Suite 1200<br>Jacksonville, Florida 32202<br>Attn.: Matthew S. McAfee, Esq.<br>Phone: (904) 301-1269<br>Email: mmcafee@drivermcafee.com |
| If to JAX: | JAX-PALATKA FARMS LLC<br>Attn: Rick Feaser<br>9 West 57th Street, Suite 5000<br>New York, NY 10019-2701<br>Fax: (212) 826-1265<br>E-mail: richie@ruanecuniff.com |
| With copies to:<br>(none if blank) | Mr. Dennis Carey<br>977 Stagecoach Road<br>Oglethorpe, GA 31068<br>Fax: (478) 472-7098<br>email: pinetimber@windstream.net<br><br>and to<br><br>Rogers Towers, P.A.<br>Attn: John T. Sefton, Esq.<br>1301 Riverplace Boulevard, Suite 1500<br>Jacksonville, Florida 32207<br>Fax: (904) 396-0663<br>E-mail: jsefton@RTLAW.com |

Any party may change its address for notices by serving on the other party a notice that provides the new address.

12. Headings. The headings of the sections of this License Agreement are for convenience only and in no way limit or affect the terms or conditions of this License Agreement.

13. Counterparts. To facilitate execution, this License Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

14. Assignment. This License Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided however, neither party may assign or transfer its rights and duties under this License Agreement without the other party's prior written consent, which consent may be granted or withheld in such other party's sole discretion. Notwithstanding the foregoing, either party may assign its rights under this License

Temporary License to Cut Timber (00326632-7xAF098).DOCX

Agreement to an entity controlling, controlled by or under common control with such party without the consent to the other party and Reinhold may assign its rights hereunder to the Loggers, as necessary to comply with and perform under the Logging Contracts.

15. <u>Written Approval</u>.  Unless otherwise specified in this License Agreement, all approvals and consents hereunder must be requested in writing by the party seeking such approval or consent to the other party, and all approvals or consents shall not be effective unless in writing.  Additionally, the parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed.

16. <u>Non-Waiver</u>.  A failure of a party to enforce at any time any term, provision or condition of this License Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein.  In no way whatsoever shall a waiver of any term, provision or condition of this License Agreement be valid unless in writing, signed by the waiving party, and only to the extent expressly set forth in such writing.

17. <u>No Joint Venture or Partnership</u>.  None of the terms or provisions of this License Agreement shall be deemed to create a partnership between or among the parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise.  Each party shall be considered a separate entity and no party shall have the right to act as an agent for the other party unless expressly authorized to do so herein or by separate instrument signed by the party to be charged.

18. <u>Entire Agreement; Amendment</u>.  This License Agreement and any exhibits hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the parties, whether written or oral, with respect to the subject matter hereof.  To be effective, any modification and/or amendment to this License Agreement must be in writing and executed by the parties.

19. <u>Applicable Law</u>.  This License Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws.  Venue for any dispute between the parties with regard to this License Agreement and the subject matter hereof shall lie only in Clay County, Florida.

20. <u>Joint Preparation</u>.  The parties to this License Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this License Agreement shall not be more strictly construed against any one of the parties hereto.

21. <u>Jury Waiver</u>.  EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS LICENSE AGREEMENT (INCLUDING INTERPRETATION OR CONSTRUCTION OF THIS LICENSE AGREEMENT) OR PERFORMANCE UNDER THIS LICENSE AGREEMENT.  EACH PARTY ACKNOWLEDGES THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

22. <u>Attorneys' Fees</u>.  If any legal or equitable action is commenced by either party against the other party to enforce or interpret any provision of this License Agreement or with regard to the subject matter hereof, the party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing party its reasonable attorneys' fees and costs incurred by the prevailing party,

Temporary License to Cut Timber (00326632-7xAF098).DOCX

in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

23. <u>Severability</u>.  If any clause or provision of this License Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this License Agreement shall not be affected thereby. It is the express intention of the parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

24. <u>Time is of the Essence</u>.  Time is of the essence of this License Agreement.

25. <u>Limitation on Damages</u>.  Neither party shall be liable to the other for any consequential, speculative or punitive damages incurred due to the fault of the other or their employees, consultants, agents, contractors or subcontractors, regardless of the nature of the fault or whether such liability arises in breach of contract or warranty, tort, statute, or any other cause of action. Consequential damages include, but are not limited to, loss of use, lost business opportunities, damage to representation and loss of profit, and all such claims are hereby waived and released.

26. <u>No Recording</u>. Neither this License Agreement, nor any memorandum or document related hereto may be recorded in any official public record.

Wherefore the parties have set their hands and seals as of the day and year first above written.

IN WITNESS WHEREOF, Reinhold and JAX have executed this License Agreement on the date hereinabove written.

*[End of page – signatures on following pages.]*

Temporary License to Cut Timber (00326632-7xAF098).DOCX

*Signature Page of Reinhold Corporation on*
*Temporary License to Cut Timber*

Executed in the presence of:                    **Reinhold**:

                                                Reinhold Corporation
                                                a Florida corporation

_____                     By:     _____
Name: _____                      Name:  George M. Egan
                                                 Title:  President


_____
Name: _____


## ACKNOWLEDGEMENT

State of Florida; County of _____

The foregoing instrument was acknowledged this _____ day of _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation. Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐      Is/are personally known to me

☐      Produced a current Florida driver's license as identification

☐      Produced _____ as identification


{Notary Seal must be affixed}

                                    _____
                                    *printed name of notary:* .................................................................

*Signature Page of JAX-PALATKA FARMS LLC on*
*Temporary License to Cut Timber*

Executed in the presence of:                    **JAX:**

                                                **JAX-PALATKA FARMS LLC,**
                                                a Delaware limited liability company

_____                By: _____
Name: _____                Name: _____
                                                Title: _____


_____
Name: _____


## ACKNOWLEDGEMENT


State of _____; County of _____


The foregoing instrument was acknowledged this _____ day of _____, 2020,        by
_____ as the _____ of **JAX-PALATKA FARMS LLC,** a
Delaware limited liability company, on behalf of said company. Such person <u>physically appeared</u> before
me and *(notary must check applicable box)*

☐        Is/are personally known to me

☐        Produced a current _____ driver's license as identification

☐        Produced _____ as identification


{Notary Seal must be affixed}

                              _____

                              *printed name of notary:* ...........................................................

## Exhibit A

### Depiction of the Property and the Stands



4000          0          4000          8000 US Feet

08-25-2020

9

Temporary License to Cut Timber (00326632-7xAF098).DOCX

## Exhibit 9.3

### Stormwater Pond Access License and Short Form for Stormwater Pond Contract

[see attached]

Prepared by and return to:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456

### License Agreement for Inspection and Monitoring of
### Storm Water Pond Excavation

This LICENSE AGREEMENT is made by and between **JAX-PALATKA FARMS LLC**, a Delaware limited liability company ("Licensor"), whose address is whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893, and **REINHOLD CORPORATION.**, a Florida ("Licensee"), whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003.

RECITALS:

(A)    Licensor has this date acquired lands from Licensee and anticipates acquiring additional tracts from Licensee within the next three years, all pursuant to a Purchase and Sale Agreement (as modified or amended, the "PSA") for lands in Clay County, Florida dated April 24, 2020 (as it may be amended from time to time).

(B)    Under the terms of the section 9.3 of the PSA Licensor has agreed to allow access to Licensee to inspect and monitor the excavation of dirt from an area to be constructed as a storm water retention pond, which pond area is shown on Exhibit "A" and consists of approximately 26 acres (the "Storm Water Pond Parcel").

(C)    This Agreement sets forth the terms of the access to be provided.

NOW THEREFORE, in consideration of Ten Dollars and No 00/100 ($10.00), the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee covenant and agree as follows:

1.    Permit for Ingress and Egress and License.

(a)    Licensor grants to the Licensee a license and easement for vehicular use of the trail roads on the Property identified on Exhibit "B" attached (the "Trail Roads") for the sole and limited purpose of inspection and monitoring excavation of the Storm Water Pond Parcel.

1

(b)    Licensor may revoke Licensee's access for a material breach of this License Agreement only if the Licensee fails to cure such material breach within thirty (30) days after receipt of written notice from the Licensor setting forth the nature of such material breach; provided, however, if such failure cannot reasonably be cured by Licensee within such thirty (30) day period, Licensee shall be afforded a reasonable period of time to cure such failure provided Licensee diligently and continuously pursues such cure to completion, but in no event shall such reasonable period of time exceed sixty (60) days from the receipt of the original written notice from Licensor.

(c)    It is understood that **no vehicles** removing material from the Storm Water Pond Parcel may utilize this License or the Trail Roads covered hereby.

(d)    The term of this License Agreement shall be until Licensee conveys the Storm Water Pond Parcel to Licensor, at which point this License Agreement shall terminate without any further action required by Licensee or Licensor.

2.    Intentionally deleted.

3.    Gates and Restrictions on Access. Use and access of the rights granted to Licensee hereunder is subject to the following restrictions:

(a)    For safety purposes during any hunting season, ingress and egress shall be coordinated by the Licensee with any hunt club having a recreational license encompassing any lands including or adjacent to the relevant Trail Road(s) to be accessed.   Licensor, upon reasonable request, shall provide any such party with the current contact information in Licensor's possession for the holder(s) of a hunting license from Licensor on any such lands of Licensor.

(b)    Each person in accessing a Trail Road bordering a public road pursuant to this License shall keep the gate locked. Each such person shall provide Licensor with a list of persons authorized by the Licensee to access the Trail Road. Should a significant incident of vandalism, suspected arson, trespass, personal injury or theft occur on lands of Licensor within a five mile radius, Licensee agrees to comply with additional security measures that Licensor may reasonably impose.

(c)    Intentionally deleted.

(d)    Intentionally deleted.

4.    Road Location.

(a)    Neither Licensor nor Licensee shall be required to improve the Trail Roads to any higher standard than their current condition.

3255866_3

(b)    Licensor may relocate any Trail Road provided that Licensor supplies a right of way with the width and construction equivalent to the road replaced terminating at or near its former points of connection and routed over a right of way no more than 5% longer than the original road length as shown on Exhibit "B." Alternatively, subject to the prior written consent of Licensee or its agent, Licensor may relocate all or any portion of a trail road to another area on the relevant property provided that (A) either (i) Licensee will have reasonable access to the pre-existing road network, or (ii) if Licensee will not have reasonable access to the pre-existing road network, Licensor shall construct now road(s) as reasonably required to give Licensee functionally equivalent access to Licensee's adjacent properties (if any) prior to relocating the trail road or any applicable portion thereof; and (B) such new roadway area shall have widths and construction equivalent to those being replaced. Licensor may, at its option, convey any roadway to a government entity for road and utility purposes. If Licensor elects to do so, Licensee agrees to join in such conveyance and termination, at no additional charge or consideration, so as to release its rights with respect to the relevant roadway, provided that the roadway as dedicated maintains access to Licensee's and its affiliates lands, if any, as they exist presently.

5.    <u>Insurance Requirements</u>. Licensee or its assignee agrees to maintain insurance coverage in the following minimum amounts:

A.    Commercial General Liability with limits of not less than $1,000,000.00 combined single limit bodily injury & property damage each occurrence, $2,000,000.00 general aggregate and $2,000,000.00 products/completed operations aggregate including coverage for: premises and operations, products and completed operations, contractual liability insuring the obligations assumed by contractors of Licensee in this License Agreement, independent contractors, personal & advertising injury.

B.    Commercial Automobile Liability covering owned, hired and non-owned vehicles with limits of not less than $1,000,000.00 combined single limit bodily injury and property damage each occurrence.

C.    Follow Form Excess liability (umbrella) insurance for bodily injury and property damage over primary employer's liability, commercial general liability, and commercial automobile liability with limits in the amount of $1,000,000.00 each occurrence and aggregate;

D.    Workers' compensation insurance covering all employees of Licensee or its assignees who are engaged in any work under on the Trial Roads in an amount required by applicable laws. Employer's Liability coverage of not less than:

i.    Bodily Injury by Accident (Each Accident) $1,000,000.00

3255866_3

ii.    Bodily Injury by Disease (Policy Limit) $1,000,000.00

iii.    Bodily Injury by Disease (Each Employee) $1,000,000.00

The insurance described above shall be obtained without liability on the part of Licensor for premiums. The insurance described in items (A), (B), and (C) above shall name Licensor as an additional insured. Each of the above policies will be primary and non-contributory with respect to any policies carried by any additional insured. Any coverage carried by Licensor shall be excess insurance. Such insurance shall be placed with reputable insurance companies licensed or authorized to do business in the state of Florida and have a minimum Best's rating of A-/VIII.

6.    General.

(a)    Licensee agrees that, insofar as Licensor is concerned, Licensee for itself, its affiliates, their agents, employees, contractors, and guests, assumes all risks and hazards in connection with the use of the Trail Roads and all improvements situated thereon for any purpose.

(b)    Licensor shall have no obligation to maintain or repair the Trail Roads, adjacent lands or any part thereof or improvements situated thereon and shall have no liability for any injury resulting from Licensor's failure to maintain or repair any such lands or improvements.

(c)    To the extent of insurance coverage required to be carried hereunder or, if greater, the actual insurance carried by Licensee, Licensee agrees to indemnify and hold harmless Licensor from and against any and all liability, claims, actual damages, demands, fines, penalties, costs and expenditures (including reasonable attorneys' fees and costs of litigation defense and/or settlement) ("Damages") caused by the negligent acts or omissions of Licensee or any of its agents, employees, contractors, licensees, or invitees retained by Licensee and acting under Licensee's direction. The foregoing indemnification shall not apply to the extent such Damages are found to be caused by the gross negligence or willful misconduct of Licensor or any of its agents, employees, contractors, licensees, or invitees (other than Licensee) retained by Licensor and acting under Licensor's direction. All indemnification obligations contained in this paragraph shall survive the expiration or sooner termination of this Agreement

The gross negligence or willful misconduct of Reinhold Corporation acting as the Manager under the Property Management Agreement between Licensee and Licensor shall not be imputed to Licensor.

(d)    Intentionally deleted.

3255866_3

7.    Notices. Any notice which must or may be given to Licensee, Licensor or any successor or assign of any of the foregoing, under the provisions of this License Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission to Licensee or Licensor (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed, with regard to Licensee and Licensor, as follows:

| | |
|---|---|
| If to Licensee: | Reinhold Corporation<br>Attn: George M. Egan<br>1845 Town Center Blvd., Ste. 105<br>Fleming Island, Florida 32003<br>Phone: (904) 269-5857<br>Email: GEgan@reinholdcorporation.com |
| With a copy to: | Driver, McAfee, Hawthorne & Diebenow, PLLC<br>One Independent Drive, Suite 1200<br>Jacksonville, Florida 32202<br>Attn.: Matthew S. McAfee, Esq.<br>Phone: (904) 301-1269<br>Email: mmcafee@drivermcafee.com |
| If to Licensor: | JAX-PALATKA FARMS LLC<br>Attn: Rick Feaser<br>9 West 57th Street, Suite 5000<br>New York, NY 10019-2701<br>Fax: (212) 826-1265<br>E-mail: richie@ruanecuniff.com |

3255866_3

With copies to:

(none if blank)

Mr. Dennis Carey
977 Stagecoach Road
Oglethorpe, GA 31068
Fax: (478) 472-7098
email: pinetimber@windstream.net

and to

Rogers Towers, P.A.
Attn: John T. Sefton, Esq.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, Florida 32207
Fax: (904) 396-0663
E-mail: jsefton@RTLAW.com

Any party may change its address for notices by serving on the other party a notice that provides the new address.

8.      Headings.   The headings of the sections of this License Agreement are for convenience only and in no way limit or affect the terms or conditions of this License Agreement.

9.      Counterparts. To facilitate execution, this License Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

10.     Assignment. This License Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided however, neither party may assign or transfer its rights and duties under this License Agreement without the other party's prior written consent, which consent may be granted or withheld in such other party's sole discretion.  Notwithstanding the foregoing, either party may assign its rights under this License Agreement to an entity controlling, controlled by or under common control with such party without the consent to the other party.

11.     Written Approval.  Unless otherwise specified in this License Agreement, all approvals and consents hereunder must be requested in writing by the party seeking such approval or consent to the other party, and all approvals or consents shall not be effective unless in writing. Additionally, the parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed.

12.     Non-Waiver. A failure of a party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a

3255866_3

waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. In no way whatsoever shall a waiver of any term, provision or condition of this License Agreement be valid unless in writing, signed by the waiving party, and only to the extent expressly set forth in such writing.

13.    No Joint Venture or Partnership. None of the terms or provisions of this License Agreement shall be deemed to create a partnership between or among the parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each party shall be considered a separate entity and no party shall have the right to act as an agent for the other party unless expressly authorized to do so herein or by separate instrument signed by the party to be charged.

14.    Entire Agreement; Amendment. This License Agreement and any exhibits hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the parties, whether written or oral, with respect to the subject matter hereof. To be effective, any modification and/or amendment to this Agreement must be in writing and executed by the parties.

15.    Applicable Law. This License Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws. Venue for any dispute between the parties with regard to this License Agreement and the subject matter hereof shall lie only in Clay County, Florida.

16.    Joint Preparation. The parties to this License Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this License Agreement shall not be more strictly construed against any one of the parties hereto.

17.    Jury Waiver. EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS LICENSE AGREEMENT (INCLUDING INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT) OR PERFORMANCE UNDER THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

18.    Attorneys' Fees. If any legal or equitable action is commenced by either party against the other party to enforce or interpret any provision of this License Agreement or with regard to the subject matter hereof, the party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing party its reasonable attorneys' fees and costs incurred by the prevailing party, in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

19.    Severability. If any clause or provision of this License Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this License Agreement shall not be affected thereby. It is the express intention of the parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

3255866_3

20. _Time is of the Essence_. Time is of the essence of this License Agreement.

21. _Limitation on Damages_. Neither party shall be liable to the other for any consequential, speculative or punitive damages incurred due to the fault of the other or their employees, consultants, agents, contractors or subcontractors, regardless of the nature of the fault or whether such liability arises in breach of contract or warranty, tort, statute, or any other cause of action. Consequential damages include, but are not limited to, loss of use, lost business opportunities, damage to representation and loss of profit, and all such claims are hereby waived and released.

_(End of Page. Signature Pages Are Next)_

3255866_3

*Signature Page of Reinhold Corporation to*
*Right of Entry Permit and License Agreement for Monitoring of*
*Storm Water Pond Excavation*

Executed in the presence of:

**Licensee**:

Reinhold Corporation

a Florida corporation

By: _____

Name: George M. Egan

Title:   President

_____

Name: _____

_____

Name: _____

## ACKNOWLEDGEMENT

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐     Is/are personally known to me

☐     Produced a current Florida driver's license as identification

☐     Produced _____ as identification

{Notary Seal must be affixed}

_____

*printed name of notary:* ..............................................................

3255866_3

*Signature Page of JAX-PALATKA FARMS LLC to*
*Right of Entry Permit and License Agreement for Monitoring of*
*Storm Water Pond Excavation*

Executed in the presence of:

**Licensor:**

JAX-PALTKA FARMS LLC,

a Delaware limited liability company

_____
Name: _____

By: _____
Name: _____

Title: _____

_____
Name: _____

## ACKNOWLEDGEMENT

State of _____; County of _____

The foregoing instrument was acknowledged this _____ day of _____, 2020, by _____ as the _____ of **JAX-PALATKA FARMS LLC,** a Delaware limited liability company, on behalf of said company.  Such person physically appeared before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current _____ driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

_____

*printed name of notary:* ...........................................................................

3255866_3

**Exhibit "A"**

Description of Storm Water Pond Parcel

A Parcel of Land Situated in the Southeast 1/4 of Section 13, Township 6 South, Range 25 East, Clay County, Florida: Said Parcel Being More Particularly Described As Follows:

Commence At The Southeast Corner Of Said Section 13 And Run North 00°24'45" West, Along The East Line Of Said Southeast 1/4 Of Said Section 13, A Distance Of 592.39 Feet To Southwesterly Line Of Lands Described As Parcel 179 Part A In Official Records Book 4088, Page 1253 Of Said Public Records And The Westerly Limited Access Right Of Way Of State Road No. 23 (As Per Florida Department Of Transportation Right Of Way Map Section 71493, F.P. No. 4229382 & 4229383); Thence Run North 47°43'10" West, Along Said Westerly Line, 426.98 Feet To The Point Of Beginning: Thence Continue North 47°43'10" West, Along Said Westerly Line, 1350.0 Feet; Thence Leave Said Right Of Way Line and Run With Following Five (5) Courses And Distances: (1) South 42°16'50" West, 190.0 Feet: (2) South 16°15'36" West, 400.0 Feet: (3) South 08°51'33" East, 781.84 Feet: (4) South 47°43'10" East, 565.72 Feet: (5) North 42°16'50" East, 1040.0 Feet To The Point Of Beginning.

Containing 26.01 Acres, More Or Less.

License of Access to Monitor Storm Water Pond Parcel (00326633-7xAF098).DOCX
3255866_3

## Exhibit "B"

### Description of Trail Roads to be Accessed

**License to Access to
Monitor Stormwater Ponds**

Exhibit B





1500       0       1000 US Feet

**09-02-2020**

3255866_3

This instrument prepared by or under the supervision of
(and after recording should be returned to):

John T. Sefton, Suite 1500, 1301 Riverplace Blvd.
Jacksonville, FL  32207

A portion of Parcel I.D. No.: 13-06-25-010434-000-00

(Space Reserved for Clerk of Court)

## SHORT FORM OF CONTRACT FOR PURCHASE AND SALE

THIS SHORT FORM OF CONTRACT FOR PURCHASE AND SALE ("**Short Form of Agreement**") is executed this ____ day of _____, 20___ ("**Effective Date**"), by and between **Reinhold Corporation**, a Florida corporation ("**Seller**"), whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL  32003 and **JAX-PALATKA FARMS LLC**, a Florida limited liability company ("**Purchaser**"), whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL  32256-2893.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby covenant and agree as follows:

1.      **Purchase and Sale**.  Seller and Purchaser are the parties in and to an unrecorded Real Estate Purchase and Sale Agreement dated as of April 24, 2020 (as amended or modified, the "**Agreement**"), providing, among other things, for the sale by Seller and the purchase by Purchaser of certain real property located in Clay County, Florida more particularly described on Exhibit A attached hereto and made a part hereof ("**Property**"), consisting of 26 acres which are currently being excavated by Seller for a storm water retention pond, all upon terms as are set forth in the Agreement.  Seller agrees to sell and Purchaser agrees to purchase the Property in accordance with the terms of the Agreement.

2.      **Term**.  The sale of the Property is to be consummated on or before December 31, 2023.

3.      **Storm Water Pond**.  As provided in the Agreement, prior to the sale of the Property (a) Seller has the right to remove soil and dirt from the Property and (b) Seller shall construct a storm water pond on the Property in accordance with the terms and conditions of the Agreement.

4.      **Covenants Run with the Land**.  All of the terms, covenants and conditions contained in the Agreement and this Short Form of Agreement shall be deemed covenants running with the land for all purposes.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Short Form of Agreement on the date hereinabove written.

*[End of page – signatures on following pages.]*

3255915_4

*Signature Page of Reinhold Corporation on
Short Form of Contract for Purchase and Sale*

Executed in the presence of:

**Seller:**

Reinhold Corporation,
a Florida corporation

By: _____

Name: _____

Name: George M. Egan

Title:  President

_____

Name: _____

## ACKNOWLEDGEMENT

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____, 2020, by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current Florida driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

_____

*printed name of notary:* ..............................................................

3255915_4

*Signature Page of JAX-PALATKA FARMS LLC on*
*Short Form of Contract for Purchase and Sale*

Executed in the presence of:                    **Purchaser:**

                                                JAX-PALTKA FARMS LLC,
                                                a Delaware limited liability company

_____              By: _____
Name: _____              Name: _____
                                             Title: _____


_____
Name: _____


## ACKNOWLEDGEMENT

State of _____; County of _____


The foregoing instrument was acknowledged this _____ day of _____, 2020, by _____ as the _____ of **JAX-PALATKA FARMS LLC,** a Delaware limited liability company, on behalf of said company. Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current _____ driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

                              _____
                              *printed name of notary:* ...................................................


3255915_4

## Exhibit A

### To Short Form of Contract for Purchase and Sale

### Legal Description of the Property

A Parcel of Land Situated in the Southeast 1/4 of Section 13, Township 6 South, Range 25 East, Clay County, Florida: Said Parcel Being More Particularly Described As Follows:

Commence At The Southeast Corner Of Said Section 13 And Run North 00°24'45" West, Along The East Line Of Said Southeast 1/4 Of Said Section 13, A Distance Of 592.39 Feet To Southwesterly Line Of Lands Described As Parcel 179 Part A In Official Records Book 4088, Page 1253 Of Said Public Records And The Westerly Limited Access Right Of Way Of State Road No. 23 (As Per Florida Department Of Transportation Right Of Way Map Section 71493, F.P. No. 4229382 & 4229383); Thence Run North 47°43'10" West, Along Said Westerly Line, 426.98 Feet To The Point Of Beginning: Thence Continue North 47°43'10" West, Along Said Westerly Line, 1350.0 Feet; Thence Leave Said Right Of Way Line and Run With Following Five (5) Courses And Distances: (1) South 42°16'50" West, 190.0 Feet: (2) South 16°15'36" West, 400.0 Feet: (3) South 08°51'33" East, 781.84 Feet: (4) South 47°43'10" East, 565.72 Feet: (5) North 42°16'50" East, 1040.0 Feet To The Point Of Beginning.

Containing 26.01 Acres, More Or Less.

4

3255915_4

**Exhibit 9.4**

<u>Iluka Buffer Parcel Option and Recordable Short Form of Option</u>

[see attached]

## REAL ESTATE PURCHASE OPTION AGREEMENT
### (Iluka Buffer Parcel)

THIS REAL ESTATE PURCHASE OPTION AGREEMENT ("**Agreement**") is made this _____ day of _____, 2020, between REINHOLD CORPORATION, a Florida corporation ("**Seller**") and JAX-PALATKA FARMS LLC, a Florida limited liability company ("**Purchaser**").

RECITALS:

    (A) Seller and Purchaser have entered into a Purchase and Sale Agreement (as amended or modified, the "**PSA**") dated as of April 24, 2020, providing, among other things, for the purchase and sale of approximately 11,698 acres of land in Clay County, Florida;

    (B) As to slightly more than 314.39 acres of the lands to be sold, Section 9.4 of the PSA contemplates the execution of this Agreement upon Closing of the Base Parcel (as defined in the PSA).

THAT, FOR AND IN CONSIDERATION of the mutual covenants, promises, conditions, and undertakings set forth herein, the payment of the Option Payment (as defined below in Section 1.3), and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Seller and Purchaser covenant and agree as follows:

1.     **Option to Purchase**.

    1.1.     **Grant of Option**. Seller hereby grants to Purchaser the sole and exclusive right and option to purchase ("**Option**") from Seller, upon the terms and conditions hereafter set forth, that certain real property located in Clay County, Florida, which is more particularly described on Exhibit A attached hereto and by this reference made a part hereof ("**Land**"), together with the following property and rights (collectively, the "**Realty**"): together with all appurtenances, easements and privileges thereto belonging, including all right, title and interest of the Seller, if any, in and to all fences, gates, bridges, structures and other improvements thereon, and all Assumed Contracts as defined in the PSA, easements, rights, licenses and permits (including development rights and permits) appurtenant thereto, and any strips, gores, appurtenances, streets, alleys or ways adjoining the land and all timber, crops and other bio-mass growing on the Land. The Land and the Realty are collectively referred to hereinafter as the "**Property**". The Property is approximately 314.93 acres; however, the actual final acreage of the Property shall be determined by the Survey (as defined below in Section 14) in accordance with Section 14 below.

    1.2.     **Term of Option**. The term of the Option shall be for a period from the date hereof until the **earlier** of (i) **December 31, 2022**, or (ii) sixty (60) days after Purchaser closes on all or substantially all of the lands described in Exhibit "A" of the "Purchase Rights and Land Use Agreement" dated September 30, recorded October 5, 2015 at OR 3793, p. 1228, public records, Clay County, FL (such instrument being defined in the PSA as the "**Restriction Agreement**.") The term of the option (as it may be extended by written agreement of the parties) is referred to as the "**Option Term**").

    1.3.     **Option Payments**. As consideration for the granting of the Option, Purchaser has herewith delivered deliver to Seller a one-time payment in the amount of Fifty Thousand and No/100 Dollars ($50,000.00) ("**Option Payment**"). Unless expressly stated otherwise

1

herein, the Option Payment shall be non-refundable and shall be credited against the Purchase Price (as defined below in Section 2) if the Option is exercised and the Closing (as defined below in Section 3) is consummated hereunder.

1.4.    **Exercise of Option**.  Purchaser may elect to exercise the Option at any time prior to the expiration of the Option Term upon delivering written notice to Seller ("**Option Exercise Notice**") of Purchaser's intention to purchase the Property.  In the event the Option is not exercised prior to the expiration of the Option Term, this Agreement shall be of no further force or effect, Seller shall retain the Option Payment, and the parties hereto shall thereafter be relieved of all liability hereunder except for matters specifically provided to survive the termination of this Agreement.  Upon the exercise of the Option as herein provided, this Agreement shall constitute a binding agreement of sale and purchase.

1.5.    **Termination of Option**.  Upon any expiration or proper termination of the Option, Purchaser shall within ten (10) business days of Seller's written request record in the public records of Clay County, Florida a termination of this Agreement sufficient to cause the title insurance company to delete any reference to this Agreement in any future commitment to be issued by it.  This provision shall survive termination of this Agreement.

If Purchaser terminates this Option Agreement for any reason other than a Seller default, or if the Option Agreement otherwise expires, Purchaser shall furnish to Seller copies of any third party surveys, reports or other studies obtained by Purchaser, but excluding any of Purchaser's privileged work product.

1.6.    **Short Form of Option**.  As of the date hereof, the Parties shall execute the Short Form of Option attached hereto and incorporated herewith on Exhibit D.  Purchaser, at its sole cost, shall record the Short Form of Option.

2.    **Purchase Price**.  The purchase price is estimated to be approximately Eight Hundred Eighty-Five Thousand and No/100 Dollars ($885,000.00).  The actual purchase price for the Property shall be calculated based on the Survey (as defined below) of the Property in accordance with Section 12 below, and the resulting acreage for the Property will be utilized to calculate the purchase price for the Property by multiplying the number of acres of the Property by Two Thousand Seven Hundred Fifty and No/100 Dollars ($2,750.00) per acre ("**Purchase Price**").  If the Option is exercised, at Closing on the Property, the Purchase Price, plus or minus prorations and subject to such adjustments as provided in this Agreement, shall be paid and delivered by Purchaser in immediately available U.S. funds by wire transfer to

**Contact** _____ **at** _____ **when funds are transmitted.**

**PAYABLE TO: Rogers Towers, P.A.**

**BANK:**                _____
**BANK ADDRESS:**   _____
**ROUTING (ABA) NO.:** _____
**ACCOUNT NO.:**      _____
**SWIFT CODE:**       _____

2

Real Estate Purchase Option Agreement (Iluka Parcel) (00326631-7xAF098).DOC

REFERENCE:** _____

RT ESCROW FILE NO.: _____

NOTIFY _____ @ [email] [phone number]

Escrow Agent agrees to hold the Purchase Price in escrow in accordance with the terms of this Agreement.

3.      **Closing**. This transaction shall be closed and the deed, other closing instruments and possession shall be delivered to Purchaser on or before thirty (30) days following the date of the Option Exercise Notice ("**Closing**" or "**Closing Date**"), unless extended by other provisions of this Agreement. The precise time and place of Closing shall be determined by Purchaser in a location in Duval County, FL to be designated by Purchaser before the Closing Date or Purchaser shall have the right to effect the Closing via a "mail away" closing (i.e. in which funds are sent via wire transfer and closing documents are delivered via overnight delivery or courier delivery service to the Escrow Agent). The provisions of Article 10 of the PSA (conditions precedent) shall be applicable to Purchaser's obligation to close on the Property following Purchaser's exercise of the Option.

4.      **Documents for Closing**.

4.1.      At Closing, Seller shall execute and deliver to Purchaser the following closing documents:

(i)      a good and sufficient special warranty deed ("**Deed**") in form of Exhibit B attached hereto and by this reference made a part hereof, subject only to the Permitted Exceptions (as defined below in Section 5.1(e) of the PSA), in proper form for recording;

(ii)      Owner's Affidavit executed by Seller sufficient to permit the Title Company (as defined in the PSA) to remove exceptions for the "gap", mechanics liens, and parties in possession;

(iii)      Non-Foreign Affidavit executed by Seller stating that Seller is not a foreign person for purposes of the Internal Revenue Code;

(iv)      Closing Statement, setting forth credits and closing costs in connection with the transaction evidenced by this Agreement;

(v)      Partial Assignment and Assumption of the agreements described on Exhibit C attached hereto and by this reference made a part hereof;

(vi)      possession of the Property; and

(vii)      such other documents, if any, as Purchaser, Purchaser's lender, or the Title Company may reasonably request in order to effectuate the transaction contemplated by this Agreement.

4.2.      At Closing, Purchaser shall execute and deliver to Purchaser the following closing documents:

3

Real Estate Purchase Option Agreement (Iluka Parcel) (00326631-7xAF098).DOC

(i)     Closing Statement, setting forth credits and closing costs in connection with the transaction evidenced by this Agreement;

(ii)     Partial Assignment and Assumption of the agreements described on Exhibit C attached hereto and by this reference made a part hereof; and

(iii)     such other documents, if any, as Seller or the Title Company may reasonably request in order to effectuate the transaction contemplated by this Agreement

5.     **Expenses**.  Closing costs shall be allocated in the same manner as in the PSA.

6.     **Prorations**.  All lease/license revenues, utilities, real estate taxes and other charges and assessments affecting the Property shall be prorated in the manner set forth in the PSA.

7.     **Title**.  The provisions of Article 5 of the PSA are incorporated by reference to be applicable to this conveyance.  Once the option is exercised, the provisions of Section 5.3 shall be applicable hereto as if the Property subject to this Option were referenced and included in the phrase "Base Parcel, the Mitigation Bank Parcel and the Storm Water Pond Parcel."

8.     **Deliveries.**  In accordance with Section 4.3 of the PSA, Seller has previously made deliveries of Due Diligence Materials for the Property.

9.     **Risk of Loss**.  Risk of loss shall be as set forth in Sections 8.4 and 13.2 of the PSA, provided that, with respect to the limits of loss with respect to the Property subject to this Option, the limits shall be $25,000 and $75,000 rather than $100,000 and $500,000 as specified in Section 8.4 of the PSA.

10.     **Remedies.**  Remedies of each of Purchaser and Seller shall be as specified for them respectively under Article 14 of the PSA, inclusive of provisions pertaining to survival, except that where the term "Earnest Money" is utilized in Sections 14.1 and 14.2, the term "Option Payment" shall be substituted.

11.     **Condemnation; Brokerage, Survival**.  Provisions in the PSA with respect to condemnation, survival (including survival provisions on individual sections referred to herein) and brokerage are incorporated herein by reference.

12.     **Survey**.  Purchaser shall, at Purchaser's sole cost and expense, obtain a survey (the "**Survey**") of the Property as provided in Section 5.2 of the PSA.  The price shall be adjusted by the acreage as reflected in such survey to the nearest $1/100^{th}$ of an acre.

13.     **Inspection**.  Purchaser may continue to conduct periodic inspections of the Property prior to Closing on the Property provided that Purchaser complies with all provisions of Section 4.2 of the PSA with respect to such inspections.

14.     **Representations and Warranties and Covenants**. The representations  and warranties of Seller, subject to the terms, conditions and limitations set forth in the PSA (including provisions related to limitations and survival) shall be as set forth in Article 6 of the PSA, with respect to the Property.  The representations and warranties of Purchaser (including provisions related to limitations and survival) shall be as set forth in Article 7 of the PSA.

4

Real Estate Purchase Option Agreement (Iluka Parcel) (00326631-7xAF098).DOC

15.  **Covenants Pending Closing.** Seller shall adhere to the provisions of Section 8.3 of the PSA with respect to the Property prior to the Closing hereunder.

16.  **Miscellaneous.** The provisions of Article 15 of the PSA are incorporated herein by reference. Such provisions include the following required Radon disclosure:

> Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

17.  **Section 1031 Exchange.** Either party may consummate the purchase or sale (as applicable) of the Property as part of a so-called like kind exchange (an "**Exchange**") pursuant to § 1031 of the Internal Revenue Code (the "**Code**"), provided that: (a) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of an Exchange be a condition precedent or condition subsequent to the exchanging party's obligations under this Agreement, (b) the exchanging party shall effect its Exchange through an assignment of this Agreement, or its rights under this Agreement, to a qualified intermediary, (c) neither party shall be required to take an assignment of the purchase agreement for the relinquished or replacement property or be required to acquire or hold title to any real property for purposes of consummating an Exchange desired by the other party; and (d) the exchanging party shall pay any additional costs that would not otherwise have been incurred by the non-exchanging party had the exchanging party not consummated the transaction through an Exchange and indemnify the other party from and against all losses or damages sustained as a result of the Exchange. Neither party shall by this Agreement or acquiescence to an Exchange desired by the other party have its rights under this Agreement affected or diminished in any manner or be responsible for compliance with or be deemed to have warranted to the exchanging party that its Exchange in fact complies with § 1031 of the Code.

(Remainder of page intentionally left blank to allow for signatories)

5

Real Estate Purchase Option Agreement (Iluka Parcel) (00326631-7xAF098).DOC

*Signature Page of Seller to*
*Option for Iluka Buffer Parcel*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered, all of which has been done on the date shown below for each party.

**Seller:**

Reinhold Corporation, a Florida corporation

By: _____
Name:  George M. Egan
Title:    its President

Signed by Seller: _____, 2020

*Signature Page of Purchaser to*
*Option for Iluka Buffer Parcel*

**Purchaser**:

JAX-PALATKA FARMS LLC,
a Florida limited liability company

By: _____
Name: _____
Title: _____

Signed by Purchaser: _____, 2020

*Signature Page of Escrow Agent to*
*Option for Iluka Buffer Parcel*

AGREED TO AND ACCEPTED:

**Escrow Agent**:
Rogers Towers, P.A.

By: _____
Name: _____
Title: _____


Date: _____, 2020

## EXHIBIT A
## To Real Estate Purchase Option Agreement

### Legal Description of the Property

**PARCEL S - B (South of Springbank)**

A Tract of land situated in Section 36, Township 6 South, Range 25 East and Section 1, Township 7 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows: Commence at a concrete monument at the Southeast corner of Section 1 and run S 89 deg 22 min 52 sec W, along the south line of said Section 1, a distance of 2455.89 feet to the Point of Beginning. thence continue S 89 deg 22 min 52 sec W, along said south line 1531.81 feet to the southwest corner of the E 3/4 of said Section 1; thence run N 00 deg 30 min 56 sec W, along the West Line of said E 3/4, a distance of 3827.88 feet to the southerly line of County Road No. 315 (also known as Springbank Road), an 80' Right of Way; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 1472.38 feet and an arc length of 682.87 feet and a chord bearing and distance of N 38 deg 58 min 45 sec E, 676.76 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 576+58.56 as shown on Right of Way Survey; thence run N 25 deg 41 min 34 sec E, along said right of way, 1990.18 feet to a point of curvature lying 40 feet right of and perpendicular to centerline Station 596+48.74 as shown on said Survey; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 5689.58 feet and an arc length of 702.43 feet and a chord bearing and distance of N 29 deg 13 min 46 sec E, 701.98 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 603+55.41 as shown on said Survey; thence run N 32 deg 45 min 24 sec E, along said right of way, 993.06 feet to its intersection with the westerly line of lands designated and described as Parcel S in Official Records Book 3793 on Page 1223 of the public records of said County; thence run along said westerly line in a general southerly direction with the following courses and distances: S 64 deg 29 min 34 sec E, 1007.11 feet to an Iron Rod; S 23 deg 41 min 54 sec E, 186.42 feet to an Iron Rod; S 09 deg 52 min 12 sec E, 604.22 feet to an Iron Rod; thence run S 66 deg 01 min 14 sec W, 2127.06 feet; S 17 deg 47 min 27 sec E, 294.25 feet to an Iron Rod; S 33 deg 17 min 39 sec E, 295.31 feet to an Iron Rod; S 26 deg 03 min 36 sec E, 965.86 feet to an Iron Rod; S 12 deg 33 min 24 sec E, 498.03 feet to an Iron Rod; S 23 deg 03 min 14 sec E, 675.57 feet to an Iron Rod; S 30 deg 05 min 37 sec E, 398.79 feet to an Iron Rod; S 06 deg 04 min 52 sec E, 308.39 feet to an Iron Rod; S 03 deg 01 min 28 sec W, 1069.06 feet to an Iron Rod; S 86 deg 00 min 15 sec W, 1159.45 feet to an Iron Rod; S 58 deg 46 min 21 sec W, 342.05 feet to an Iron Rod; S 24 deg 48 min 24 sec E, 1139.82 feet to a concrete monument on the south line of said Section 1 and the Point of Beginning
Said Tract containing 278.87 Ac. more or less

**PARCEL N - B (North of Springbank – Revised)**

A Tract of land situated in Sections 25 & 36, Township 6 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows: Commence at a concrete monument at the Southeast corner of Section 1, Township 7 South, Range 25 East and run N 00 deg 12 min 51 sec W, along the East line of said Section 1, a distance of 5300.10 feet to a concrete monument at the northeast corner thereof;

**(Con't. on Page 2)**

**(Con't. from Page 1)**

thence run N 41 deg 27 min 22 sec W, 2952.52 feet to an Iron Rod on the Northwesterly right of way line of County Road 315, (also known as Springbank Road), an 80' Right of Way and the southerly most corner of lands designated and described as Parcel N in Official Records Book 3793 on Page 1223 of the public records of said County; thence run N 32 deg 45 min 24 sec E, along said right of way line, 2766.69 feet to an Iron Rod at the intersection of said right of way with the easterly line of the aforesaid lands and the Point of Beginning; thence run along said easterly line with the following Five (5) courses and distances: N 55 deg 31 min 08 sec W, 810.24 feet to an Iron Rod; N 22 deg 26 min 22 sec E, 1594.41 feet; N 73 deg 02 min 10 sec E, 337.55 feet; N 01 deg 03 min 39 sec E, 713.07 feet; N 27 deg 32 min 40 sec W, 509.62 feet; thence leave said easterly line and run in a general southeasterly direction with the following Three (3) courses and distances: S 40 deg 08 min 06 sec E, 240.85 feet; S 45 deg 25 min 52 sec E, 215.13 feet; S 64 deg 36 min 48 sec E, 74.48 feet to a point on the east line of said Section 25; thence run S 00 deg 19 min 25 sec E, along said east line, 2012.82 feet to the Northeast corner of said Section 36; thence run S 00 deg 18 min 55 sec E, along the east line of said Section 36, a distance of 148.93 feet to its intersection with said northwesterly right of way line; thence run S 32 deg 45 min 24 sec W, along said right of way line, 793.04 feet to the Point of Beginning.
Said Tract containing 35.52 Ac. more or less


**TOTAL AREA COVERED BY PARCELS S-B & N-B = 314.39 Ac.**

**EXHIBIT B**
**To Real Estate Purchase Option Agreement**

**Form Special Warranty Deed**

Prepared by:
John T. Sefton.
Rogers Towers, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, FL 32207
RT Matter No. 803456
and
Matt McAfee
Driver, McAfee, Hawthorne & Diebenow
One Independent Dr., STE 1200
Jacksonville, FL 32202

Tax Parcel No: _____

**SPECIAL WARRANTY DEED**

(Iluka Buffer Parcels)

    THIS SPECIAL WARRANTY DEED is made this __ day of _____, 202__, between

**REINHOLD CORPORATION**, a Florida corporation,

whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003 ("**Grantor**"), Grantor being the successor by merger to **Reinhold Corporation**, a Delaware corporation, which was formerly known as **Foremost Properties Inc.** (prior to December 11, 1957) **Clay County Development Company** (prior to February 28, 1962) and **Shadowlawn Farms Inc.** (prior to December 5, 1966), and

**JAX-PALATKA FARMS LLC**, a Delaware limited liability company,

whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893 ("**Grantee**").

**WITNESSETH:**

    That Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained and sold to Grantee and Grantee's successors and assigns forever, the following described land located in Clay County, Florida, to-wit:

See Exhibit A attached hereto and made a part hereof (the "**Property**").

Subject to

(i)    covenants, restrictions and easements of record, and any encroachments, overlaps and easements that would be disclosed by an accurate survey of the Property, provided that nothing herein shall be deemed to reimpose the same, and to taxes for 2020 and subsequent years,

(ii)    Hunting Leases/Licenses and Timber Cutting Agreements not containing an option to purchase and all of which terminate on or before April 30, 2022;

(iii)    and to the "Environmental Use Restriction" set forth below.

To have and to hold the same unto Grantee in fee simple.

Environmental Use Restriction

By the acceptance of this Deed, Grantee on behalf of itself, and its successors and assigns, covenants with Grantor that:

A.  Until the earlier of (i) September __, 2055, or (ii) that date on which the Greens Creek Mitigation Bank no longer has credits or is no longer actively pursuing the sale of mitigation bank credits, the Property shall not be permitted to be utilized as a wetland mitigation bank or a gopher tortoise mitigation bank which offers credits for sale to unaffiliated third parties of Grantee, its successors and assigns. As used herein, an "unaffiliated third party" is a party with less than 70 percent common beneficial ownership with Grantee, its successors and assigns.

B.  Nothing in this Environmental Use Restriction shall preclude development of the Property for commercial, residential or any other use except for those uses specifically prohibited in the prior paragraph (A).

C.  Nothing in this Environmental Use Restriction shall preclude Grantee, its successors and assigns from (i) subjecting portions of the Property to conservation easements to obtain wetland credits required to permit development on other portions of the Acquisition Lands (as hereinafter defined); (ii) the creation of banks for endangered species that provide credits to permit development on the Acquisition Lands, provided, however, that none of such credits shall be sold to unaffiliated third parties as hereinbefore defined for offsite use; or (iii) the creation of wetland mitigation or gopher tortoise credits for the use of Grantee or any affiliate of Grantee with at least 70 percent common beneficial ownership with Grantee, its successors or assigns.

D.  For clarity, the "**Acquisition Lands**" are those lands owned on January 1, 2020 by Grantor that lie South of State Road 16 in Townships T6S, R25E, T7S, R25E and T6S, R26E, but excluding (i) the cell tower area on the westerly end of Parcel #21742-000-00 lying in Section 17, T6S, R25E, (ii) those portions of the Greens Creek Mitigation Bank other than Parcels 19-06-25-010531-001-00 and 30-06-25-010548-000-00, and (iii) any property lying north or east of new State Road 23.

The foregoing Environmental Use Restriction shall touch and concern and run with the Property; however, there are no third party beneficiaries to the foregoing Environmental Use Restriction and the enforcement of such Restriction is limited to a single party, being either Grantor and its successors or, if Grantor assigns such rights, to a single assignee of Grantor so designated by written notice recorded in the Official Public Records of Clay County, FL.

And Grantor does hereby covenant with Grantee that, except as noted above, at the time of the delivery of this deed the Property was free from all encumbrances made by Grantor, and that Grantor will warrant and defend the lands against the lawful claims and demands of all persons claiming by, through or under Grantor, but against none other.

IN WITNESS WHEREOF, the Grantor has hereunto set his hand and seal the day and year first above written.

Signed, sealed and delivered

In the presence of:

**GRANTOR**

**REINHOLD CORPORATION**, a Florida corporation

By: _____

George M. Egan, as its President

*{Corporate Seal}*

_____

*Typed or printed name:* ...... ...... ...... ......

_____

*Typed or printed name:* ...... ...... ...... ......

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____, 20__,  by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person <u>physically appeared</u> before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current Florida driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

_____

*printed name of notary:* ...... ...... ...... ...... ...... ...... ...... ...... ...... ......

## Exhibit A

### The Property

**PARCEL S - B (South of Springbank)**
A Tract of land situated in Section 36, Township 6 South, Range 25 East and Section 1, Township 7 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows: Commence at a concrete monument at the Southeast corner of Section 1 and run S 89 deg 22 min 52 sec W, along the south line of said Section 1, a distance of 2455.89 feet to the Point of Beginning. thence continue S 89 deg 22 min 52 sec W, along said south line 1531.81 feet to the southwest corner of the E 3/4 of said Section 1; thence run N 00 deg 30 min 56 sec W, along the West Line of said E 3/4, a distance of 3827.88 feet to the southerly line of County Road No. 315 (also known as Springbank Road), an 80' Right of Way; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 1472.38 feet and an arc length of 682.87 feet and a chord bearing and distance of N 38 deg 58 min 45 sec E, 676.76 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 576+58.56 as shown on Right of Way Survey; thence run N 25 deg 41 min 34 sec E, along said right of way, 1990.18 feet to a point of curvature lying 40 feet right of and perpendicular to centerline Station 596+48.74 as shown on said Survey; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 5689.58 feet and an arc length of 702.43 feet and a chord bearing and distance of N 29 deg 13 min 46 sec E, 701.98 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 603+55.41 as shown on said Survey; thence run N 32 deg 45 min 24 sec E, along said right of way, 993.06 feet to its intersection with the westerly line of lands designated and described as Parcel S in Official Records Book 3793 on Page 1223 of the public records of said County; thence run along said westerly line in a general southerly direction with the following courses and distances: S 64 deg 29 min 34 sec E, 1007.11 feet to an Iron Rod; S 23 deg 41 min 54 sec E, 186.42 feet to an Iron Rod; S 09 deg 52 min 12 sec E, 604.22 feet to an Iron Rod; thence run S 66 deg 01 min 14 sec W, 2127.06 feet; S 17 deg 47 min 27 sec E, 294.25 feet to an Iron Rod; S 33 deg 17 min 39 sec E, 295.31 feet to an Iron Rod; S 26 deg 03 min 36 sec E, 965.86 feet to an Iron Rod; S 12 deg 33 min 24 sec E, 498.03 feet to an Iron Rod; S 23 deg 03 min 14 sec E, 675.57 feet to an Iron Rod; S 30 deg 05 min 37 sec E, 398.79 feet to an Iron Rod; S 06 deg 04 min 52 sec E, 308.39 feet to an Iron Rod; S 03 deg 01 min 28 sec W, 1069.06 feet to an Iron Rod; S 86 deg 00 min 15 sec W, 1159.45 feet to an Iron Rod; S 58 deg 46 min 21 sec W, 342.05 feet to an Iron Rod; S 24 deg 48 min 24 sec E, 1139.82 feet to a concrete monument on the south line of said Section 1 and the Point of Beginning
Said Tract containing 278.87 Ac. more or less

**PARCEL N - B (North of Springbank – Revised)**
A Tract of land situated in Sections 25 & 36, Township 6 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows: Commence at a concrete monument at the Southeast corner of Section 1, Township 7 South, Range 25 East and run N 00 deg 12 min 51 sec W, along the East line of said Section 1, a distance of 5300.10 feet to a concrete monument at the northeast corner thereof;

(Con't. on Page 2)

(Con't. from Page 1)

thence run N 41 deg 27 min 22 sec W, 2952.52 feet to an Iron Rod on the Northwesterly right of way line of County Road 315, (also known as Springbank Road), an 80' Right of Way and the southerly most corner of lands designated and described as Parcel N in Official Records Book 3793 on Page 1223 of the public records of said County; thence run N 32 deg 45 min 24 sec E, along said right of way line, 2766.69 feet to an Iron Rod at the intersection of said right of way with the easterly line of the aforesaid lands and the Point of Beginning; thence run along said easterly line with the following Five (5) courses and distances: N 55 deg 31 min 08 sec W, 810.24 feet to an Iron Rod; N 22 deg 26 min 22 sec E, 1594.41 feet; N 73 deg 02 min 10 sec E, 337.55 feet; N 01 deg 03 min 39 sec E, 713.07 feet; N 27 deg 32 min 40 sec W, 509.62 feet; thence leave said easterly line and run in a general southeasterly direction with the following Three (3) courses and distances: S 40 deg 08 min 06 sec E, 240.85 feet; S 45 deg 25 min 52 sec E, 215.13 feet; S 64 deg 36 min 48 sec E, 74.48 feet to a point on the east line of said Section 25; thence run S 00 deg 19 min 25 sec E, along said east line, 2012.82 feet to the Northeast corner of said Section 36; thence run S 00 deg 18 min 55 sec E, along the east line of said Section 36, a distance of 148.93 feet to its intersection with said northwesterly right of way line; thence run S 32 deg 45 min 24 sec W, along said right of way line, 793.04 feet to the Point of Beginning.
Said Tract containing 35.52 Ac. more or less


**TOTAL AREA COVERED BY PARCELS S-B & N-B = 314.39 Ac.**

**EXHIBIT C**
**To Real Estate Purchase Option Agreement**

**Agreements**

Hunting Lease dated on or about August 2, 2020, between Seller, as lessor, and Doug Doran (signatory on behalf of) Springbank Road Hunt Club, as lessee, with a term beginning July 1, 2020 and, subject to annual negotiation of lease payments, possibly extending until June 30, 2021, covering approximately 713 acres.

Hunting Lease dated on or about July 13, 2020 between Seller, as lessor, and Larry Floyd (signatory on behalf of) LJF Hunting Club, Inc., a hunting club, as lessee, with a term beginning July 1, 2020 and, subject to annual negotiation of lease payments, possibly extending until June 30, 2021, covering approximately 4,375 acres.

**EXHIBIT D**
**To Real Estate Purchase Option Agreement**

**Form Memorandum of Option**

This instrument prepared by or under the supervision of
(and after recording should be returned to):

John T. Sefton, Suite 1500, 1301 Riverplace Blvd.
Jacksonville, FL  32207

Parcel I.D. Nos:

(Space Reserved for Clerk of Court)

**SHORT FORM OF OPTION**

THIS SHORT FORM OF OPTION is executed dated this _____ day of _____, 20___ ("**Effective Date**"), by and between **Reinhold Corporation**, a Florida corporation ("**Seller**") , whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003, and **JAX-PALATKA FARMS LLC**, a Florida limited liability company ("**Purchaser**" , whose address is whose address is 7643 Gate Parkway, Suite 104-334, Jacksonville, FL 32256-2893).

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby covenant and agree as follows:

1.     **Option Granted**. Seller and Purchaser are the parties in and to an unrecorded Real Estate Purchase Option dated as of or around the Effective Date ("**Agreement**"), by which Seller has granted and does hereby grant to Purchaser an exclusive option ("**Option**") to purchase certain real property located in Clay County, Florida more particularly described on Exhibit A attached hereto and made a part hereof ("**Property**"), all upon terms as are set forth in the Agreement.

2.     **Option Terms**. The period during which the Option may be exercised began on the date when both Seller and Purchaser executed the Agreement, being _____, and shall continue for a period extending up to December 31, 2022 ("**Option Term**"). The Option automatically expires at the end of the Option Turn and no further action by either party shall be required to terminate this Short Form of Option. Purchaser may exercise the Option by giving written notice to Seller ("**Option Notice**") at any time during the Option Term as provided in the Agreement. Upon exercise of the Option, the Agreement shall constitute a binding agreement of sale and purchase, with closing terms and conditions as set forth in the Agreement.

3.     **Covenants Run with the Land**. All of the terms, covenants and conditions contained in the Agreement and this Short Form of Option shall be deemed covenants running with the land for all purposes.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Short Form of Option on the date hereinabove written.

*[End of page – signatures on following pages.]*

*Signature Page of Reinhold Corporation on*
*Short Form of Option*

Executed in the presence of:

**Seller**:

Reinhold Corporation
a Florida corporation

By: _____

Name: _____

Name:  George M. Egan
Title:   President

Name: _____

## ACKNOWLEDGEMENT

State of Florida;  County of _____

The foregoing instrument was acknowledged this _____ day of _____, 2020,   by George M. Egan as the President of **Reinhold Corporation**, a Florida corporation, on behalf of said corporation.  Such person physically appeared before me and *(notary must check applicable box)*

☐     Is/are personally known to me

☐     Produced a current Florida driver's license as identification

☐     Produced _____ as identification

{Notary Seal must be affixed}

_____

*printed name of notary:* ...................................................................

3247508_5

*Signature Page of JAX-PALATKA FARMS LLC on*
*Short Form of Option*

Executed in the presence of:                    **Purchaser**:

                                                JAX-PALTKA FARMS LLC,
                                                a Delaware limited liability company

_____              By: _____
Name: _____              Name: _____
                                                Title: _____


_____
Name: _____


## ACKNOWLEDGEMENT

State of _____; County of _____


The foregoing instrument was acknowledged this _____ day of _____, 2020, by

_____ as the _____ of **JAX-PALATKA**

**FARMS LLC,** a Delaware limited liability company, on behalf of said company.  Such person

physically appeared before me and *(notary must check applicable box)*

☐    Is/are personally known to me

☐    Produced a current _____ driver's license as identification

☐    Produced _____ as identification

{Notary Seal must be affixed}

                                      _____

                              *printed name of notary:* …………………………………………………

3247508_5

*Signature Page of Escrow Agent to*
*Option for Iluka Buffer Parcel*

## Exhibit A
## To Short Form of Option

### Legal Description of the Property

**PARCEL S - B** (South of Springbank)
A Tract of land situated in Section 36, Township 6 South, Range 25 East and Section 1, Township 7 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows:
Commence at a concrete monument at the Southeast corner of Section 1 and run S 89 deg 22 min 52 sec W, along the south line of said Section 1, a distance of 2455.89 feet to the Point of Beginning. thence continue S 89 deg 22 min 52 sec W, along said south line 1531.81 feet to the southwest corner of the E 3/4 of said Section 1; thence run N 00 deg 30 min 56 sec W, along the West Line of said E 3/4, a distance of 3827.88 feet to the southerly line of County Road No. 315 (also known as Springbank Road), an 80' Right of Way; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 1472.38 feet and an arc length of 682.87 feet and a chord bearing and distance of N 38 deg 58 min 45 sec E, 676.76 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 576+58.56 as shown on Right of Way Survey; thence run N 25 deg 41 min 34 sec E, along said right of way, 1990.18 feet to a point of curvature lying 40 feet right of and perpendicular to centerline Station 596+48.74 as shown on said Survey; thence run northeasterly along said right of way with a curve concave northwesterly having a radius of 5689.58 feet and an arc length of 702.43 feet and a chord bearing and distance of N 29 deg 13 min 46 sec E, 701.98 feet to a point of tangency lying 40 feet right of and perpendicular to centerline Station 603+55.41 as shown on said Survey; thence run N 32 deg 45 min 24 sec E, along said right of way, 993.06 feet to its intersection with the westerly line of lands designated and described as Parcel S in Official Records Book 3793 on Page 1223 of the public records of said County; thence run along said westerly line in a general southerly direction with the following courses and distances: S 64 deg 29 min 34 sec E, 1007.11 feet to an Iron Rod; S 23 deg 41 min 54 sec E, 186.42 feet to an Iron Rod; S 09 deg 52 min 12 sec E, 604.22 feet to an Iron Rod; thence run S 66 deg 01 min 14 sec W, 2127.06 feet; S 17 deg 47 min 27 sec E, 294.25 feet to an Iron Rod; S 33 deg 17 min 39 sec E, 295.31 feet to an Iron Rod; S 26 deg 03 min 36 sec E, 965.86 feet to an Iron Rod; S 12 deg 33 min 24 sec E, 498.03 feet to an Iron Rod; S 23 deg 03 min 14 sec E, 675.57 feet to an Iron Rod; S 30 deg 05 min 37 sec E, 398.79 feet to an Iron Rod; S 06 deg 04 min 52 sec E, 308.39 feet to an Iron Rod; S 03 deg 01 min 28 sec W, 1069.06 feet to an Iron Rod; S 86 deg 00 min 15 sec W, 1159.45 feet to an Iron Rod; S 58 deg 46 min 21 sec W, 342.05 feet to an Iron Rod; S 24 deg 48 min 24 sec E, 1139.82 feet to a concrete monument on the south line of said Section 1 and the Point of Beginning
Said Tract containing 278.87 Ac. more or less

**PARCEL N - B** (North of Springbank – Revised)
A Tract of land situated in Sections 25 & 36, Township 6 South, Range 25 East; Clay County, Florida; Said Tract being more particularly described as follows: Commence at a concrete monument at the Southeast corner of Section 1, Township 7 South, Range 25 East and run N 00 deg 12 min 51 sec W, along the East line of said Section 1, a distance of 5300.10 feet to a concrete monument at the northeast corner thereof;

*Signature Page of JAX-PALATKA FARMS LLC on*
*Short Form of Option*

(Con't. on Page 2)

(Con't. from Page 1)

thence run N 41 deg 27 min 22 sec W, 2952.52 feet to an Iron Rod on the Northwesterly right of way line of County Road 315, (also known as Springbank Road), an 80' Right of Way and the southerly most corner of lands designated and described as Parcel N in Official Records Book 3793 on Page 1223 of the public records of said County; thence run N 32 deg 45 min 24 sec E, along said right of way line, 2766.69 feet to an Iron Rod at the intersection of said right of way with the easterly line of the aforesaid lands and the Point of Beginning; thence run along said easterly line with the following Five (5) courses and distances: N 55 deg 31 min 08 sec W, 810.24 feet to an Iron Rod; N 22 deg 26 min 22 sec E, 1594.41 feet; N 73 deg 02 min 10 sec E, 337.55 feet; N 01 deg 03 min 39 sec E, 713.07 feet; N 27 deg 32 min 40 sec W, 509.62 feet; thence leave said easterly line and run in a general southeasterly direction with the following Three (3) courses and distances: S 40 deg 08 min 06 sec E, 240.85 feet; S 45 deg 25 min 52 sec E, 215.13 feet; S 64 deg 36 min 48 sec E, 74.48 feet to a point on the east line of said Section 25; thence run S 00 deg 19 min 25 sec E, along said east line, 2012.82 feet to the Northeast corner of said Section 36; thence run S 00 deg 18 min 55 sec E, along the east line of said Section 36, a distance of 148.93 feet to its intersection with said northwesterly right of way line; thence run S 32 deg 45 min 24 sec W, along said right of way line, 793.04 feet to the Point of Beginning. Said Tract containing 35.52 Ac. more or less

**TOTAL AREA COVERED BY PARCELS S-B & N-B = 314.39 Ac.**

Real Estate Purchase Option Agreement (Iluka Parcel) (00326631-7xAF098).DOC

## Exhibit 9.5

Relocated Access Easement to SJRWMD for Mitigation Bank

[see attached]

Prepared by and Return to:
Matthew S. McAfee, Esq.
Driver, McAfee, Hawthorne & Diebenow, PLLC
One Independent Drive, Suite 1200
Jacksonville, Florida 32202

## RELOCATED ACCESS EASEMENT AGREEMENT
### (St. Johns River Water Management District)

**THIS RELOCATED ACCESS EASEMENT AGREEMENT** (the "*Agreement*") is made and entered into as of the _____ day of _____, 2020, by REDSHIRT FARMS, LLC, a Florida limited liability company, having an address of 960194 Gateway Blvd #103, Fernandina Beach, Florida 32034 ("*Grantor*") to the ST. JOHNS RIVER WATER MANAGEMENT DISTRICT, a public body existing under Chapter 373, Florida Statutes, having a mailing address at 4049 Reid Street/Highway 100 West, Palatka, Florida 32177 ("*Grantee*").

### WITNESSETH:

**WHEREAS**, Grantor is the owner of a certain parcel of real property located in Clay County, more particularly described in **Attachment 1**, attached hereto and incorporated herein by reference ("*Property*");

**WHEREAS**, Reinhold Corporation ("*Reinhold*"), a Florida corporation, whose address is 1845 Town Center Blvd., STE 105, Fleming Island, FL 32003, is the owner of certain real property adjacent to the Property (the "*Reinhold Property*"). Reinhold previously granted to Grantee and the Florida Department of Environmental Protection that certain Conservation Easement dated January 3, 2012 and recorded in Official Records Book 3369, Page 1342 of the public records of Clay County, Florida and that certain Conservation Easement dated September 18, 2013 and recorded in Official Records Book 3578, Page 1369 of the public records of Clay County, Florida (collectively, the "*Conservation Easements*") over portions of the Reinhold Property (the "*Conservation Easement Area*") as more particularly described in the Conservation Easements.

**WHEREAS**, pursuant to that certain Access Easement Agreement between Reinhold and Grantee dated January 3, 2012 and recorded in Official Records Book 3369, Page 1374 of the public records of Clay County, Florida (the "*Prior Easement*") Reinhold previously granted an access easement over a portion of the Reinhold Property to Grantee for the purposing of monitoring compliance with the conditions of the Conservation Easements.

**WHEREAS**, Reinhold has sold the portion of the Reinhold Property over which the Prior Easement runs to Jax-Palatka Farms LLC, a Delaware limited liability company ("*Jax-Palatka*"), who is now the current owner of the property encumbered by the Prior Easement.

**WHEREAS**, Grantee has requested that Grantor grant Grantee a perpetual, non-exclusive access easement so that its staff will have the right to access the Conservation Easement Area to monitor compliance with the conditions of the Conservation Easements from time to time;

**WHEREAS**, Grantor has agreed to grant to Grantee a perpetual, non-exclusive forty-foot (40') access easement from Sharon Road over and across a private trail road located the Property to the Conservation Easement Area, as more particularly described and depicted in **Attachment 2**, attached hereto and incorporated herein by reference ("*Access Easement*"), subject to the terms herein; and

**WHEREAS**, the parties wish to create, grant and establish a certain perpetual, non-exclusive

access easement and wish to set forth their agreement with respect thereto below.

**NOW, THEREFORE**, in consideration of the premises, and the mutual benefits to be realized by the parties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties agree as follows:

1.     **Recitals and Definitions**. The recitals contained hereinabove are true and correct and are incorporated herein by reference. Capitalized terms used in this Agreement shall have the meanings given them unless the context shall otherwise clearly require.

2.     **Grant of Easement**.

     2.1     **Access Easement.** Grantor hereby grants unto Grantee, and its successors, a perpetual, non-exclusive forty-foot (40') access easement over and across the Access Easement described and depicted on **Attachment 2**.

     2.2     **Appurtenance.** The Access Easement shall be appurtenant to the Conservation Easement Area.

3.     **Purpose**. The Access Easement shall be for the purposes of providing Grantee legal access, ingress and egress to the Conservation Easement Area so that Grantee may inspect and monitor the Conservation Easement Area and exercise its rights under the Conservation Easement. Should the Conservation Easements be amended in the future to eliminate the need for this Access Easement, Grantor and Grantee agree to execute such instruments as may be reasonably required in order to effect and confirm the release of the Access Easement.

4.     **Restrictions on Use**. No part of the Access Easement may be used for any other purpose by Grantee, and the rights granted herein shall not be assignable. This Access Easement shall be private and shall confer no rights to the public. Nothing herein shall be construed to prevent Grantor from the full use and enjoyment of the Access Easement; provided, however, that the Grantor shall not unreasonably interfere with the rights granted to Grantee hereunder. Other than Grantee's employees or agents, Grantee shall not allow any persons onto the Access Easement without prior written consent from Grantor.  In connection with any use of the Access Easement by Grantee, Grantee shall keep gates on trail roads locked when Grantee or its staff or agents are not at the gate.  During any hunting season, Grantee shall notice Grantor and any hunt club designated by Grantor of the date and time of Grantee's intended access.

5.     **Improvements**. Grantee may not construct improvements within the Access Easement area without prior written consent from Grantor. Notwithstanding the foregoing, Grantee shall at all times be allowed meaningful access to the Conservation Easement Area.

6.     **Right to Relocate**. Grantor or any future successor in interest of the Property may further relocate and reconfigure the Access Easement, provided (a) the new access easement as so relocated will continue to provide both legal and practical access to and from the Conservation Easement Area; (b) the new access easement as so relocated shall not carry with it practical use impediments, such that the Conservation Easement Area cannot be reasonably accessed; (c) unless Grantee otherwise agrees, the new access easement as so relocated shall not be subordinate to any title matters other than those to which the Access Easement was subordinate prior to relocation; and (d) Grantor shall pay or cause to be paid all costs associated with the relocation and preparing and recording in the Public Records of Clay County, Florida, an instrument effecting such relocation. If all of the foregoing conditions are complied with, then Grantee shall execute such instruments as may be reasonably requested in order to effect and confirm the relocation of this Access Easement.  Grantee acknowledges that Grantor presently intends to further relocate this

Access Easement to a location near the Westerly edge of the Property after a trail road has been cleared and constructed in such location.

7.    **Maintenance**. Reinhold shall sufficiently maintain the Access Easement (or the new access easement if further relocated) such that it continues to provide Grantee with vehicular access to the Conservation Easement Area for the purposes specified in Section 3 above. In the event Grantee is unable to access the Conservation Easement Area for the purposes stated in Section 3 above, Grantee shall notify Grantor and Reinhold in writing of the inaccessibility and Reinhold shall take all necessary measures to restore access within forty-five (45) days of the date of receipt of Grantee's notice.

8.    **Devolution**. The terms and provisions contained in this Agreement are covenants running with the land, shall be binding upon and the benefits hereof inure to, the respective successors of the parties hereto.

9.    **Miscellaneous**. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. Any modification of this Agreement shall be binding only if evidenced in a written instrument signed by each party or an authorized representative of a party in appropriate format for filing of public record. This Agreement shall be construed under the laws of Florida, and shall not be construed more strongly against any party, regardless of the extent to which such party may have participated in the drafting of this Agreement. The singular shall include the plural, and the plural the singular, as the context may require, and any one gender shall include all genders, as the context may require.

[remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have caused this instrument to be executed in their names as of the day and year first above written.

**Grantor:**

Signed, sealed, and delivered
In the presence of:

**REDSHIRT FARMS, LLC**, a Florida limited liability company

_____

Print Name: _____    By: _____

_____    Name: _____

Print Name: _____    Its: _____

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this ____ day of _____, 20___, by _____, the _____ of REDSHIRT FARMS, LLC, a Florida limited liability company, who:

( )    is personally known to me;
( )    has produced a _____ Driver's License as identification; or
( )    has produced a _____ as identification.

{Notarial Seal Must be Affixed}

_____
Notary Signature
Print Name: _____
Notary Public, State and County Aforesaid
My commission expires:_____
Commission Number: _____

IN WITNESS WHEREOF, the parties have caused this instrument to be executed in their names as of the day and year first above written.

**Reinhold:**

Signed, sealed, and delivered
In the presence of:

**Reinhold Corporation**, a Florida corporation

_____

By: _____

Print Name: _____

Name:  George M. Egan

_____

Its: President

Print Name: _____

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this \_\_\_\_ day of _____, 20\_\_\_, by George M. Egan, the President of REINHOLD CORPORATION, a Florida corporation, who:

( )    is personally known to me;
( )    has produced a _____ Driver's License as identification; or
( )    has produced a _____ as identification.

{Notarial Seal Must be Affixed}

_____
Notary Signature
Print Name: _____
Notary Public, State and County Aforesaid
My commission expires:_____
Commission Number: _____

## Attachment 1

### Legal Description of the Property

THE FOLLOWING DESCRIBED LANDS LOCATED IN TOWNSHIP 7 SOUTH, RANGE 25 EAST, CLAY COUNTY, FLORIDA:

**SECTION 7:**
ALL LYING NORTH OF SHARON CHURCH ROAD, A COUNTY MAINTAINED ROAD

**SECTION 8:**
ALL LYING NORTH OF SHARON CHURCH ROAD

**SECTION 9:**
THOSE PORTIONS LYING NORTH OF SHARON CHURCH ROAD, LESS AND EXCEPT:

(1)     THE LANDS DESCRIBED IN O.R. BOOK 647, PAGE 40, PUBLIC RECORDS, CLAY COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS:

THE EAST 1/2 OF THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 OF SECTION 9; AND

THAT PORTION OF THE EAST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 LYING NORTH OF SHARON CHURCH ROAD;

(2)     THE LANDS DESCRIBED IN DEED OF GIFT TO SHARON BAPTIST CHURCH, INC. RECORDED AT O.R. 1557, PAGE 2018, PUBLIC RECORDS, CLAY COUNTY, FLORIDA BEING MORE PARTICULARLY DESCRIBED AS:

A PARCEL OF LAND SITUATED IN THE NORTHEAST 1/4 OF SECTION 9, TOWNSHIP 7 SOUTH, RANGE 25 EAST, CLAY COUNTY, FLORIDA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT A CONCRETE MONUMENT AT THE NORTHWEST CORNER OF THE NORTHEAST 1/4 OF SAID SECTION 9, AND RUN SOUTH 00 DEGREES 18 MINUTES 00 SECONDS EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4 A DISTANCE OF 408.62 FEET TO AN IRON ROD AND THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 00 DEGREES 18 MINUTES 00 SECONDS EAST, ALONG SAID WEST LINE A DISTANCE OF 465.13 FEET TO AN IRON ROD ON THE NORTHERLY MAINTAINED RIGHT OF WAY LINE OF COUNTY ROAD NO. 315, ALSO KNOWN AS SHARON ROAD; THENCE RUN NORTH 69 DEGREES 11 MINUTES 00 SECONDS EAST, ALONG SAID NORTHERLY MAINTAINED RIGHT OF WAY LINE A DISTANCE OF 100.00 FEET TO AN IRON ROD; THENCE RUN NORTH 00 DEGREES 18 MINUTES 00 SECONDS WEST, 465.13 FEET TO AN IRON ROD; THENCE RUN SOUTH 69 DEGREES 11 MINUTES 00 SECONDS WEST, 100.00 FEET TO THE POINT OF BEGINNING.

(3)     THOSE PORTIONS, IF ANY, OF:

THE EAST 1/2 OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF THE NORTHWEST 1/4, AND

THE WEST 1/2 OF THE E 1/2 OF THE SOUTHWEST 1/4 OF THE NORTHWEST 1/4,

WHICH LIE NORTH OF SHARON CHURCH ROAD.

(NOTE:  All references to roads are to the centerlines thereof.)

LESS AND EXCEPT THAT CERTAIN 1.0 ACRE PARCEL CONVEYED TO SHARON BAPTIST CHURCH MORE PARTICULARLY DESCRIBED IN THAT CERTAIN DEED RECORDED IN O.R. BOOK 1742, PAGE 370 OF THE PUBLIC RECORDS OF CLAY COUNTY, FLORIDA.

**Attachment 2**

Legal Description of the Access Easement

A Strip of land situated in Section 8, Township 7 South, Range 25 East; Clay County, Florida; Said Strip Lying 20.0 feet left (east) of and 20.0 feet right (west) of the following described centerline:

Commence at a concrete monument at the Northwest corner of Section 8 and run N 89 deg 24 min 25 sec E, along the North line of said Section 8, a distance of 483.49 feet to an Iron Rod at the intersection north line with the centerline of an existing private grade and the Point of Beginning. thence run in a general southeasterly direction, along said centerline with the following courses and distances: S 02 deg 48 min 58 sec E, 558.45 feet to a point of non-tangent curve having an arc length of 218.35 feet, a radius of 575.70 feet and a chord bearing and distance of S 15 deg 42 min 31 sec E, 217.04 feet to a point of compound curve with a non-tangent curve having an arc length of 583.58 feet, a radius of 3721.18 feet and a chord bearing and distance of S 28 deg 32 min 41 sec E, 582.98 feet; thence S 34 deg 10 min 08 sec E, 776.35 feet to a point of non-tangent curve having an arc length of 129.45 feet, a radius of 278.56 feet and a chord bearing and distance of S 21 deg 28 min 28 sec E, 128.28 feet; thence run S 11 deg 15 min 20 sec E, 737 feet more or less to the northerly maintained right of way line of Sharron Road, a county right of way and the terminus of said 40.0' Easement Centerline.

Depiction of the Access Easement on the current trail road.



**Exhibit 9.7**

Gary Road Development Agreement

[see attached]

This Instrument was Prepared by
and should be Returned to:

Matthew McAfee, Esq.
Driver, McAfee, Hawthorne & Diebenow, PLLC
One Independent Drive, Suite 1200
Jacksonville, Florida 32202

## DEVELOPMENT AGREEMENT
### (Gary Road)

**THIS DEVELOPMENT AGREEMENT** (this "**Agreement**") made to be effective the ___ day of September, 2020 (the "**Effective Date**"), by and between **REINHOLD CORPORATION,** a Florida corporation ("**Reinhold**"), whose post office address is 1845 Town Center Boulevard, Suite 105, Fleming Island, Florida 32203 and **JAX-PALATKA FARMS LLC,** a Delaware limited liability company ("**Jax-Palatka**"), whose post office address is 7643 Gate Parkway, Suite 104-334, Jacksonville, Florida 32256-2893.  Reinhold and Jax-Palatka may be referred to herein individually as a "**Party**" and collectively as the "**Parties**".

## WITNESSETH:

**WHEREAS,** Reinhold is the fee simple owner of certain real property located in Clay County, Florida;

**WHEREAS,** pursuant to the terms of that certain Purchase and Sale Agreement dated effective as of April 24, 2020 (as subsequently amended or modified, the "**Contract**"), Jax-Palatka acquired of even date herewith from Reinhold fee simple title to a portion of the property that is more particularly described on **Exhibit "A"** attached hereto and incorporated herein by this reference (the "**Jax-Palatka Property**"); and

**WHEREAS,** Jax-Palatka has agreed to complete the design, permitting and construction of certain infrastructure improvements related to State Road 16 and Gary Road both located in Clay County, Florida to benefit the Jax-Palatka Property as more particularly described herein; and

**WHEREAS,** the Parties acknowledge and agree that the completion of the Project (as defined below) are beneficial to both the Jax-Palatka Property and the property owned by Reinhold, and the Parties desire to enter into this Agreement to set forth the terms upon which Jax-Palatka will complete the Project;

**NOW, THEREFORE,** in consideration of the mutual agreements set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

1.     **Recitals**. The foregoing recitals are true and correct and are incorporated herein by this reference.

2.     **Project Construction; Construction Schedules; Temporary Easement; and No Liens.** Jax-Palatka shall complete the Project (as defined below) by the Completion Date (as defined below) upon the following terms and conditions:

(a)     **Gary Road Realignment**. Jax-Palatka shall relocate Gary Road, currently located south of State Road 16, at its intersection with State Road 16 in the general configuration set forth on described on **Exhibit "B"** attached hereto and incorporated herein by this reference (the "**Project**"). Jax-Palatka shall be solely responsible for the design, permitting and construction costs for the Project, which may include posting a bond with Clay County, Florida to secure completion of the Project. The Parties acknowledge and agree that the specific location of the Gary Road realignment will be permitted and approved by Clay County, Florida, and may not exactly comport with the configuration set forth on **Exhibit "B"**.

(b)     **Plans**. Reinhold has executed a contract for surveying, engineering and permitting services from England, Thims & Miller, Inc. ("**ETM**") dated May 8, 2020 (the "**ETM Contract**"). At the Closing of the Base Parcel (as defined in the Contract) as a part of the Jax-Palatka Property, Jax-Palakta shall (i) assume the ETM Contract and (ii) reimburse Reinhold for all amounts previously paid in connection with the ETM Contract. Pursuant to the ETM Contract, ETM will prepare plans for the Project (the "**Plans**"). Jax-Palatka shall construct the Project in accordance with the Plans and any change orders necessary to complete the construction of the Project in accordance with the Plans related to unknown or unforeseen circumstances and/or conditions as reasonably determined by Jax-Palatka or its designee and approved by Clay County, Florida (the "**Allowed Road Change Orders**"). Notwithstanding the foregoing, Jax-Palatka shall not make any material modification to the Plans without first obtaining the written consent of (i) Clay County, Florida and (ii) Reinhold, which consent, with respect to Reinhold, shall not be unreasonably withheld, conditioned or delayed. All improvements relating to the Project shall comply with all applicable laws, rules, permits, codes and regulations.

(c)     **Construction Schedule**. Promptly following the Effective Date of this Agreement, Jax-Palatka will timely commence and continuously pursue the design, permitting, engineering and construction of the Project in order to substantially complete construction of the Project in a good and workmanlike manner and in accordance with the Plans on or before June 30, 2022 (the "**Completion Date**"); provided, however, such timeframes shall be subject to Force Majeure (as defined in Section 26 below). Subject to properly noticed and documented Force Majeure events, the failure of Jax-Palatka to complete construction of the Projects by the Completion Date shall be a default under the terms of this Agreement.

3.     **Escrow of Funds to Complete**. As of the date hereof, Jax-Palatka shall escrow contemporaneously herewith $250,000.00 with Rogers Towers, P.A. as escrow agent (the "**Escrow Funds**") to pay the costs for the Project pursuant to that certain escrow agreement attached hereto as **Exhibit "C"** (the "**Escrow Agreement**").

2

4.      **Reinhold's Right to Complete the Project.** In the event that Jax-Palatka has not completed the Project by the Completion Date (as the same is subject to Force Majeure), Reinhold shall have the right, but not the obligation, to complete any or all of the Project and recover its out-of-pocket costs of completing the Project from Jax-Palatka in the manner set forth below. Once initiated, Reinhold agrees to use commercially reasonable efforts to complete the Project as soon as reasonably practicable. Jax-Palatka hereby grants to Reinhold a temporary, non-exclusive construction easement over such portions of the Jax-Palatka Property in Section 13, T6S, R25E as may be required for Reinhold to complete any portion of the Project. Upon completion of the Project, the construction easement over the Jax-Palatka Property shall automatically terminate and Reinhold shall provide an invoice to Jax-Palatka for the out-of-pocket costs of completing the Project (along with copies of all bids, invoices and other written evidence of the cost of completing the Project), and Jax-Palatka shall be required to pay such invoice and backup information reasonably requested by Jax-Palatka. Alternatively, Reinhold may request reimbursement for such costs from the Escrow Funds pursuant to the Escrow Agreement. If the Escrow Funds are not sufficient to pay Reinhold's out-of-pocket costs of completing the Project, the Reinhold shall send an invoice to Jax-Palatka setting forth amount of the outstanding out-of-pocket costs, which invoice will be due and payable by Jax-Palatka within thirty (30) days of Jax-Palatka's receipt of the invoice. If Jax-Palatka fails to reimburse Reinhold for its out-of-pocket costs within such thirty (30) day period, then Reinhold shall be entitled to file a lawsuit against the Jax-Palatka Property in the amount of such reasonable out-of-pocket costs, together with interest thereon at the Default Rate (defined below) as set forth above until Reinhold is repaid by Jax-Palatka, and to recover that amount in an action at law. In the event that Jax-Palatka disputes an invoice received from Reinhold, Jax-Palatka shall promptly notify Reinhold in writing of the dispute and the Parties shall promptly meet in good faith in an attempt to resolve any such dispute. The provisions of this Section 4 shall survive termination of the Agreement.

5.      **Insurance**. In the event Reinhold exercises its rights under Section 4, Reinhold or its assignee agrees to maintain insurance coverage in the following minimum amounts:

A.      Commercial General Liability with limits of not less than $1,000,000.00 combined single limit bodily injury & property damage each occurrence, $2,000,000.00 general aggregate and $2,000,000.00 products/completed operations aggregate including coverage for: premises and operations, products and completed operations, contractual liability insuring the obligations assumed by contractors of Reinhold in this Agreement, independent contractors, personal & advertising injury.

B.      Commercial Automobile Liability covering owned, hired and non-owned vehicles with limits of not less than $1,000,000.00 combined single limit bodily injury and property damage each occurrence.

C.      Follow Form Excess liability (umbrella) insurance for bodily injury and property damage over primary employer's liability, commercial general liability, and commercial automobile liability with limits in the amount of $1,000,000.00 each occurrence and aggregate;

3

D.      Workers' compensation insurance covering all employees of the Reinhold or its assignees who are engaged in any work under on the Jax-Palatka Property in an amount required by applicable laws. Employer's Liability coverage of not less than:

      i.      Bodily Injury by Accident (Each Accident) $1,000,000.00

      ii.     Bodily Injury by Disease (Policy Limit) $1,000,000.00

      iii.    Bodily Injury by Disease (Each Employee) $1,000,000.00

The insurance described above shall be obtained without liability on the part of Jax-Palatka for premiums. The insurance described in items (A), (B), and (C) above shall name Jax-Palatka as an additional insured. Each of the above policies will be primary and non-contributory with respect to any policies carried by any additional insured. Any coverage carried by Jax-Palatka shall be excess insurance. Such insurance shall be placed with reputable insurance companies licensed or authorized to do business in the state of Florida and have a minimum Best's rating of A-/VIII.

**6.      Term of Agreement**. The term of this Agreement (the "**Term**") shall commence on the Effective Date and shall terminate on the completion of construction and payment of all of the Project and thereafter the Parties shall have no rights or obligations hereunder except for provisions set forth herein that expressly survive termination of this Agreement.

**7.      Default**. If Jax-Palatka defaults in the observance or performance of its covenants and obligations under this Agreement (a "**Default**"), Reinhold shall be entitled to access the then-remaining Escrow Funds (per the terms of the Escrow Agreement), in addition to retaining the right to file an action against Jax-Palatka to recover the amounts in excess of the remaining Escrow Funds that Reinhold expends to complete the Projects subsequent to such default, plus interest at the Default Rate. For the purposes of this Agreement, "**Default Rate**" shall mean the prime rate of interest as quoted in the Wall Street Journal plus four percent (4%) (not to exceed the maximum rate of interest allowed by law). Notwithstanding anything else herein to the contrary, in no event will Jax-Palatka be liable for any consequential, indirect, incidental, special, speculative, punitive or exemplary damages (collectively, "**Special Damages**"), including but not limited to lost profits, and any claim or right to seek or recover any such Special Damages is hereby expressly waived. The provisions of this Section shall survive termination of the Agreement.

**8.      Notice and Opportunity to Cure**. Prior to declaring a default and exercising the remedies described herein, the non-defaulting Party shall issue written notice of default to the defaulting Party describing the event or condition of default in sufficient detail to enable a reasonable person to understand the default and determine the action necessary to cure the default. If the default is the non-payment of money, the defaulting Party shall have ten (10) days from receipt of the notice in which to cure the default. If the default is other than for the non-payment of money or failure to complete all of the Projects by the Completion Date(s), the defaulting Party shall have thirty (30) days from receipt of the notice to commence the curing of such default, and the defaulting Party shall diligently and continuously proceed to complete the cure of the default thereafter; provided, however, if such default cannot be reasonably cured within such thirty (30) day period, the defaulting Party shall have a longer period of time to cure such default, so long as

4

the defaulting Party commences to cure such default within said thirty (30) day period and diligently and continuously proceeds to final cure of such default within a reasonable period of time (but not to exceed ninety (90) days in total). If the default has not been cured within the period provided above, or in the case of a default other than for the non-payment of money, if the cure is not commenced within the period provided above or is not diligently and continuously pursued to completion within a reasonable period of time, (but not to exceed ninety (90) days in total) the non-defaulting Party may exercise the rights and remedies described herein.

9.     **Non-Terminable Agreement**. No default under this Agreement shall entitle any Party to cancel, rescind or otherwise terminate this Agreement, but such limitation shall not affect, in any manner, any other rights or remedies set forth in this Agreement which any Party may have against the other Party by reason of such defaulting Party's default under this Agreement.

10.     **Notices**. Any notice which must or may be given to Reinhold, Jax-Palatka or any successor or assign of any of the foregoing, under the provisions of this Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission to Reinhold or Jax-Palatka (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed, with regard to Reinhold and Jax-Palatka, as follows:

| | |
|---|---|
| If to Reinhold: | Reinhold Corporation<br>Attn: George M. Egan<br>1845 Town Center Blvd., Ste. 105<br>Fleming Island, Florida 32003<br>Phone: (904) 269-5857<br>Email: GEgan@reinholdcorporation.com |
| With a copy to: | Driver, McAfee, Hawthorne & Diebenow, PLLC<br>One Independent Drive, Suite 1200<br>Jacksonville, Florida 32202<br>Attn.: Matthew S. McAfee, Esq.<br>Phone: (904) 301-1269<br>Email: mmcafee@drivermcafee.com |
| If to Jax-Palatka: | JAX-PALATKA FARMS LLC<br>Attn: Rick Feaser<br>9 West 57th Street, Suite 5000<br>New York, NY 10019-2701<br>Fax: (212) 826-1265<br>E-mail: richie@ruanecuniff.com |

| With copies to: | Mr. Dennis Carey |
| (none if blank) | 977 Stagecoach Road |
| | Oglethorpe, GA 31068 |
| | Fax: (478) 472-7098 |
| | email: pinetimber@windstream.net |

and to

Rogers Towers, P.A.
Attn: John T. Sefton, Esq.
1301 Riverplace Boulevard, Suite 1500
Jacksonville, Florida 32207
Fax: (904) 396-0663
E-mail: jsefton@RTLAW.com

Any Party may change its address for notices by serving on the other Party a notice that provides the new address.

**11.    Headings**. The headings of the sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement.

**12.    Counterparts**. To facilitate execution, this Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the Parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

**13.    Assignment**. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns; provided however, neither Party may assign or transfer its rights and duties under this Agreement without the other Party's prior written consent, which consent may be granted or withheld in such other Party's sole discretion. Notwithstanding the foregoing, either Party may assign its rights under this Agreement to an entity controlling, controlled by or under common control with such Party without the consent to the other Party, provided that (i) the assignor remains liable for obligations arising from events theretofore occurring, (ii) the assignee has and retains sufficient net worth to perform its obligations hereunder and (iii) such control relationship is continuing thereafter. Upon the failure to of such control relationship to continue, the assignor shall thereupon become fully liable for the obligations of the assignee and any successor assignees.

**14.    Written Approval**. Unless otherwise specified in this Agreement, all approvals and consents hereunder must be requested in writing by the Party seeking such approval or consent to the other Party, and all approvals or consents shall not be effective unless in writing. Additionally, the Parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a Party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed.

**15.    Non-Waiver**. A failure of a Party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a

6

waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. In no way whatsoever shall a waiver of any term, provision or condition of this Agreement be valid unless in writing, signed by the waiving Party, and only to the extent expressly set forth in such writing.

16.     **No Joint Venture or Partnership**.   None of the terms or provisions of this Agreement shall be deemed to create a partnership between or among the Parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise.   Each Party shall be considered a separate entity and no Party shall have the right to act as an agent for the other Party unless expressly authorized to do so herein or by separate instrument signed by the Party to be charged.

17.     **Entire Agreement; Amendment**.   This Agreement and any Exhibits hereto constitute the entire agreement of the Parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the Parties, whether written or oral, with respect to the subject matter hereof.   To be effective, any modification and/or amendment to this Agreement must be in writing and executed by the Parties.

18.     **Applicable Law**.   This Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws.   Venue for any dispute between the Parties with regard to this Agreement and the subject matter hereof shall lie only in Clay County, Florida.

19.     **Joint Preparation**.   The Parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the Parties hereto.

20.     **Jury Waiver**.   EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT (INCLUDING INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT) OR PERFORMANCE UNDER THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

21.     **Attorneys' Fees**.   If any legal or equitable action is commenced by either Party against the other Party to enforce or interpret any provision of this Agreement or with regard to the subject matter hereof, the Party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing Party its reasonable attorneys' fees and costs incurred by the prevailing Party, in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

22.     **Severability**.   If any clause or provision of this Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement shall not be affected thereby. It is the express intention of the Parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

23.   **Time is of the Essence**. Time is of the essence of this Agreement.

24.   **Limitation on Damages**.   Neither party shall be liable to the other for any consequential, speculative or punitive damages incurred due to the fault of the other or their employees, consultants, agents, contractors or subcontractors, regardless of the nature of the fault or whether such liability arises in breach of contract or warranty, tort, statute, or any other cause of action. Consequential damages include, but are not limited to, loss of use, lost business opportunities, damage to representation and loss of profit, and all such claims are hereby waived and released.

25.   **Estoppel Letters**.   Within fifteen (15) business days after written request, each Party, or their respective successors and assigns, agrees to execute a commercially reasonable form of estoppel from time to time as requested by any of the other Party subject to this Agreement stating that the requesting Party and its property comply with matters set forth in this Agreement and whether any sums are due such Party from the requesting Party.

26.   **Force Majeure**.   In the event that either Party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of causes beyond the control of the Party whose performance is delayed, such as weather, acts of God, strikes, lock-outs, labor troubles, failure of power, restrictive governmental laws or regulations, inability to obtain permits due to delays of governmental authorities beyond typical approval timelines (not caused by any action or inaction of Jax-Palatka), riots, insurrection, public demonstrations or protests, war, epidemics, pandemics, disease outbreaks, quarantines or other health crises or public health events or other reasons of a like nature without limiting the same, then the delayed Party shall deliver prompt written notice (not to exceed seven (7) days) of such event to the other Party hereto and performance of such act shall be excused for the period of delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay (collectively, "**Force Majeure**").   Notwithstanding anything in this Section 26 to the contrary, none of the following shall constitute or be considered a Force Majeure event:  (i) the financial inability of a Party to perform any obligation under this Agreement; (ii) the failure of a Party to apply for a required permit or approval or to provide in a timely manner all information required to obtain a required permit or approval that is necessary to meet the requirements of this Agreement; and (iii) any event for which a delayed Party is claiming a Force Majeure event but for which such Party fails to timely provide the notice thereof as described above.

[THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties to this Agreement have set their hands and seals hereto as of the date first above written.

**WITNESSES:**                                              **"REINHOLD"**

                                                            **REINHOLD CORPORATION**, a Florida corporation

_____

Print Name:_____                       By: _____
                                                           Name: George M. Egan
                                                           Title: President

_____

Print Name:_____


STATE OF _____

COUNTY OF _____

     The foregoing Development Agreement was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this _____ day of _____, 2020 by George M. Egan as President of **REINHOLD CORPORATION**, a Florida corporation, on behalf of said corporation. He ☐ is personally known to me or ☐ has produced _____ as identification.


_____
Notary Public, State of Florida

_____
Notary's Printed Name
My Commission Expires:_____

**"JAX-PALATKA"**

**WITNESSES**:

**JAX-PALATKA FARMS LLC**, a Delaware limited liability company

_____
Witness #1 Signature
Print Name:_____

By:_____
Name:_____
Title:_____

_____
Witness #2 Signature
Print Name:_____

STATE OF _____    )
                         )    ss:
COUNTY OF _____    )

I hereby certify that the foregoing Development Agreement was acknowledged before me by means of ☐ physical presence or ☐ online notarization, this ____ day of _____ 2020, by _____, as _____ of **JAX-PALATKA FARMS LLC**, a Delaware limited liability company, on behalf of said company. He/She [__] is personally known to me, or [__] has produced _____ as identification.
NOTARY STAMP:

_____
Notary Public, State of _____

_____
Notary's Printed Name
My Commission Expires:_____

10

<u>**Exhibit "A"**</u>
**Legal Description – 30 Acre Parcel Jax-Palatka Property**

## MARK E. HARDENBROOK   P.S.M.
**Professional Surveyor and Mapper**
Fla. Cert. No. 5500
Member Florida Land Surveyors Council
(352) - 473 - 8523
(904) - 964 - 5777
(904) - 282 - 3136

**1656 NE 161ˢᵗ Street - Starke, Florida 32091**

August 4, 2020

Job No. H-20-036

<u>**DESCRIPTION:**</u> NLY 30 Ac

A Parcel of Land Situated in the Northwest 1/4 of Section 13, Township 6 South, Range 25 East, Clay County, Florida: Said Parcel Being More Particularly Described As Follows:

Commence At The Southeast Corner Of The Northeast 1/4 Of Said Section 13 And Run South 89°17'30" West, Along The Southerly Line Of Said Northeast 1/4, A Distance Of 1,942.83 Feet To The Centerline Of Construction Of State Road No. 23 (As Per Florida Department Of Transportation Right Of Way Map Section 71493, F.P. No. 4229382 & 4229383), And A Curve To The Right, Having A Radius Of 11,459.00 Feet; Thence Along Said Centerline Of Construction Of State Road No. 23, And The Arc Of Said Curve, Through An Angle Of 13°58'58", An Arc Distance Of 2,796.54 Feet, And A Chord Bearing And Distance Of North 36°17'37" West, 2,789.61 Feet; Thence South 60°41'52" West, A Distance Of 461.50 Feet To The Most Northerly Corner of Lands Described As Parcel 808 Part W In Official Records Book 4088, Page 1253 Of The Public Records Of Said County And The Point Of Beginning; Thence South 45°53'41" West, Along The Northerly Line Of The Aforesaid Lands, 487.91 Feet; Thence South 44°06'19" East, Along The Westerly Line Of Aforesaid Lands 501.97 Feet: Thence Leave Said Westerly Line And Run South 89°59'52" West, 1309.30 Feet To A Point On The West Line Of Said Section 13; Thence North 00°13'40" East, Along The West Line Of Section 13, A Distance Of 1190.86 Feet To The Southwest Corner of Lands Described As Parcel 179 Part T In Said Official Records Book 4088, Page 1253 Of Said Public Records; Thence Along The South Line of the Aforesaid Lands And Along The Southwesterly Line of Lands Described As Parcel 179 Part A In Said Official Records Book 4088, Page 1253 Of Said Public Records, Running In A General Easterly/Southeasterly Direction With The Following Four (4) Courses And Distances: (1) North 89°07'27" East, 529.19 Feet: (2) South 75°03'38" East, 414.57 Feet: (3) South 43°28'35" East, 441.99 Feet: (4) South 45°11'41" East, 101.12 Feet To The Point Of Beginning.

Containing 30.01 Acres, More Or Less.

11

## Exhibit "B"
## Gary Road Realignment



12

**Exhibit "C"**
**Form of Escrow Agreement**

**ESCROW AGREEMENT**

This Escrow Agreement (the "Agreement") is made to be effective the ___ day of September, 2020 (the "Execution Date") by and among **REINHOLD CORPORATION**, a Florida corporation ("**Reinhold**"), and **JAX-PALATKA FARMS LLC**, a Delaware limited liability company ("**Jax-Palatka**") and **ROGERS TOWERS, P.A.** ("Escrow Agent").

**RECITALS:**

A. Reinhold and Jax-Palatka have entered into that certain Development Agreement dated effective as of the Execution Date (the "Development Agreement") in which Jax-Palatka has agreed to construct the Project, as more particularly described in the Development Agreement.

B. Section 3 of the Development Agreement provides that Reinhold and Jax-Palatka will enter into an escrow agreement providing for payment by Jax-Palatka into escrow the costs for the Project in the total amount of $250,000.00 (the "Escrow Funds").

**AGREEMENT:**

Jax-Palatka, Reinhold, and Escrow Agent agree as follows:

1. **Recitals**

   The Recitals are agreed to be true and correct and are incorporated herein by this reference.

2. **Capitalized Terms**

   Capitalized terms not defined in this Agreement shall have the meaning ascribed to them in the Development Agreement.

3. **Creation of Escrow**

   Escrow Agent acknowledges receipt of the Escrow Funds and will deposit the Escrow Funds into a separate ledger in its trust account in the name of Jax-Palatka (the "Escrow Account") the Escrow Funds.

4. **Disbursements from Escrow**

   (a) All draws from the Escrow Account may only be made after delivery to Escrow Agent and the parties of the following items:

   i. A certification by the respective on-site architect or engineer of the party performing the Project that the Project or portions thereof for which payment is requested has been completed pursuant to the Plans and Allowed Road Change

13

Orders (each as defined in the Development Agreement), together with a list of the names of the general contractor, major subcontractors and the major suppliers of materials used in the Project (the "Identified Lienors") for which payment is requested.

ii. With respect to work covered by the immediately preceding application for payment, copies of conditional lien waivers signed by the general contractor, and other Identified Lienors in connection with performing such work or providing labor or materials in connection with such work, stating that the general contractor and such Identified Lienors waive any liens or right to lien with respect to work for which payment has been received or is to be received in connection with such draw, and further stating the amount theretofore received

(b) In the event Jax-Palatka fails to complete the Project by the Completion Date set forth in the Development Agreement and Reinhold elects to complete the Project in accordance with Section 4 of the Development Agreement, Reinhold shall be entitled to request a draw from the Escrow Funds in reimbursement for the out-of-pocket costs of completing the Project. Along with the written request for the draw for reimbursement to Jax-Palatka and Escrow Agent, Reinhold shall submit to Jax-Palatka and Escrow Agent the documentation required by Section 4 of the Development Agreement and upon submission of the same, Escrow Agent shall fund the draw of Escrow Funds to Reinhold within twenty (20) days of receipt of all required documentation.

(c) Each party may only request one (1) draw every thirty (30) days.

(d) Provided that Escrow Agent has not received written notice under Section 5 hereunder, upon written notice from Jax-Palatka to Escrow Agent and Reinhold accompanied by reasonable evidence of completion and final payment affidavits from all contractors per above requirements, with a copy to the other party, stating that the Project is complete, Escrow Agent shall be unconditionally and irrevocably authorized to disburse any remaining Escrow Funds then-held by Escrow Agent (if any) to Jax-Palatka.

5. **Dispute**

(a) If: (1) prior to the delivery of all or any part of the Escrow Funds described herein, Reinhold or Jax-Palatka has brought a suit to enjoin said delivery or for declaratory judgment with respect to an alleged breach of the Development Agreement or this Escrow Agreement (whether or not Escrow Agent is a party to such action); or (2) prior to the delivery of the Escrow Funds, Escrow Agent has been notified in writing by Reinhold or Jax-Palatka that a dispute exists with respect to the disposition of the Escrow Funds or Escrow Agent is otherwise aware that a dispute exists and Escrow Agent believes it is not possible to disburse the Escrow Funds; or (3) one party has delivered written notice and instructions to Escrow Agent and the other party has failed for any reason to join in such written notice and instructions for more than five (5) days, Escrow Agent shall have the right in its sole discretion either to retain the Escrow Funds until a court directs the proper disposition thereof or to deposit the same with a court.

14

Upon the deposit of the Escrow Funds in court, Escrow Agent shall be discharged of further responsibility in connection therewith.

(b)     Reinhold and Jax-Palatka shall be jointly and severally liable to Escrow Agent for all expenses of Escrow Agent, including reasonable attorney's fees and costs, in any such suit for injunctive relief, declaratory judgment, or interpleader. As between Reinhold and Jax-Palatka, such expenses shall be the responsibility of the non-prevailing party as determined by the court. Escrow Agent shall be entitled to be reimbursed all of such expenses and its reasonable attorney's fees and costs pursuant to this paragraph from the Escrow Funds.

6.   **Notices**

Any notice which must or may be given to Reinhold, Jax-Palatka or any successor or assign of any of the foregoing, under the provisions of this Agreement, shall be in writing, and shall be deemed to have been given one (1) day after the date deposited in Federal Express or other courier service that guarantees delivery on the following day that is not a legal holiday, or five (5) days after the date deposited in the United States Mail, certified or registered, postage prepaid, or when transmitted by facsimile or e-mail transmission to Reinhold or Jax-Palatka (provided a hard copy of such transmission is contemporaneously delivered in one of the other above prescribed methods) and addressed, with regard to Reinhold and Jax-Palatka, as follows:

| | |
|---|---|
| If to Reinhold: | Reinhold Corporation<br>Attn: George M. Egan<br>1845 Town Center Blvd., Ste. 105<br>Fleming Island, Florida 32003<br>Phone: (904) 269-5857<br>Email: GEgan@reinholdcorporation.com |
| With a copy to: | Driver, McAfee, Hawthorne & Diebenow, PLLC<br>One Independent Drive, Suite 1200<br>Jacksonville, Florida 32202<br>Attn.: Matthew S. McAfee, Esq.<br>Phone: (904) 301-1269<br>Email: mmcafee@drivermcafee.com |
| If to Jax-Palatka: | JAX-PALATKA FARMS LLC<br>Attn: Rick Feaser<br>9 West 57th Street, Suite 5000<br>New York, NY 10019-2701<br>Fax: (212) 826-1265<br>E-mail: richie@ruanecuniff.com |

15

With copies to:              Mr. Dennis Carey
(none if blank)              977 Stagecoach Road
                             Oglethorpe, GA 31068
                             Fax: (478) 472-7098
                             email: pinetimber@windstream.net

                             and to

                             Rogers Towers, P.A.
                             Attn: John T. Sefton, Esq.
                             1301 Riverplace Boulevard, Suite 1500
                             Jacksonville, Florida 32207
                             Fax: (904) 396-0663
                             E-mail: jsefton@RTLAW.com

If to Escrow Agent:          Rogers Towers, P.A.
                             Attn: John T. Sefton, Esq.
                             1301 Riverplace Boulevard, Suite 1500
                             Jacksonville, Florida 32207
                             Fax: (904) 396-0663
                             E-mail: jsefton@RTLAW.com

Notices shall be deemed given as of the date such notice is postmarked, if sent by certified mail, or is placed with an express courier, if sent by express courier. If the last day for giving any notice or taking any action required or permitted under this Agreement would otherwise fall on a Saturday, Sunday or legal holiday, that last day shall be postponed until the next legal business day.

7.  **Miscellaneous**

    (a)  **Entire Agreement; Enforceability**.  The headings of the sections of this Agreement are for convenience only and in no way limit or affect the terms or conditions of this Agreement

    (b)  **Counterparts**.  To facilitate execution, this Agreement may be executed in counterparts. It shall not be necessary that the signature on behalf of both of the parties hereto appear on each counterpart hereof. All counterparts hereof shall collectively constitute a single agreement.

    (c)  **Assignment**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided however, neither party may assign or transfer its rights and duties under this Agreement without the other party's prior written consent, which consent may be granted or withheld in such other party's sole discretion. Notwithstanding the foregoing, either party may assign its rights under this Agreement to an entity controlling, controlled by or under common control with such party without the consent to the other party, provided that (i) the assignor remains liable for obligations arising from events theretofore occurring, (ii) the assignee has and retains sufficient net worth to perform its

16

obligations hereunder and (iii) such control relationship is continuing thereafter. Upon the failure to of such control relationship to continue, the assignor shall thereupon become fully liable for the obligations of the assignee and any successor assignees.

(d)     **Written Approval**. Unless otherwise specified in this Agreement, all approvals and consents hereunder must be requested in writing by the party seeking such approval or consent to the other party, and all approvals or consents shall not be effective unless in writing. Additionally, the parties acknowledge and agree that except as otherwise expressly set forth herein, wherever a party's approval is required hereunder, said approval shall not be unreasonably withheld, conditioned or delayed

(e)     **Non-Waiver.** A failure of a party to enforce at any time any term, provision or condition of this Agreement, or to exercise any right or option herein, shall in no way operate as a waiver thereof, nor shall any single or partial exercise preclude any other right or option herein. In no way whatsoever shall a waiver of any term, provision or condition of this Agreement be valid unless in writing, signed by the waiving party, and only to the extent expressly set forth in such writing.

(f)     **No Joint Venture or Partnership**. None of the terms or provisions of this Agreement shall be deemed to create a partnership between or among the parties, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each party shall be considered a separate entity and no party shall have the right to act as an agent for the other party unless expressly authorized to do so herein or by separate instrument signed by the party to be charged.

(g)     **Entire Agreement; Amendment.** This Agreement and any exhibits hereto constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede any and all prior agreements, commitments, undertakings or understandings among the parties, whether written or oral, with respect to the subject matter hereof. To be effective, any modification and/or amendment to this Agreement must be in writing and executed by the parties.

(h)     **Applicable Law**. This Agreement shall be executed, construed and enforced in accordance with Florida law, excluding those laws dealing with conflicts of laws. Venue for any dispute between the parties with regard to this Agreement and the subject matter hereof shall lie only in Clay County, Florida.

(i)     **Joint Preparation**. The parties to this Agreement have participated fully in the negotiation and preparation hereof; and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.

(j)     **Jury Waiver**. EACH PARTY WAIVES THE RIGHT TO TRIAL BY A JURY IN ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT (INCLUDING INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT) OR PERFORMANCE UNDER THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER

17

HAS BEEN FREELY GIVEN AFTER CONSULTATION BY IT WITH COMPETENT COUNSEL.

(k)    **Attorneys' Fees**. If any legal or equitable action is commenced by either party against the other party to enforce or interpret any provision of this Agreement or with regard to the subject matter hereof, the party which does not prevail in such judicial or administrative proceeding shall pay to the prevailing party its reasonable attorneys' fees and costs incurred by the prevailing party, in all levels of such proceedings, including any declaratory action, at trial, on appeal, or post-judgment.

(l)    **Severability**. If any clause or provision of this Agreement is deemed by a court of law illegal, invalid, or unenforceable under any present or future law, the remainder of this Agreement shall not be affected thereby. It is the express intention of the parties that if any such clause or provision is held to be illegal, invalid, or unenforceable, there shall be added in lieu thereof a clause or provision as similar in terms to such clause or provision as is possible and still be legal, valid, and enforceable.

(m)    **Time is of the Essence**. Time is of the essence of this Agreement.

(n)    **Limitation on Damages**. Neither party shall be liable to the other for any consequential, speculative or punitive damages incurred due to the fault of the other or their employees, consultants, agents, contractors or subcontractors, regardless of the nature of the fault or whether such liability arises in breach of contract or warranty, tort, statute, or any other cause of action. Consequential damages include, but are not limited to, loss of use, lost business opportunities, damage to representation and loss of profit, and all such claims are hereby waived and released.

(o)    **Matters Pertaining to Escrow Agent and Limitations on its Duties and Liabilities.** The terms and provisions set forth on Schedule 1 are incorporated herein by reference.

18

IN WITNESS WHEREOF, the Parties to this Agreement have set their hands and seals hereto as of the date first above written.

**JAX-PALATKA:**

**JAX-PALATKA FARMS LLC**, a Delaware limited liability company


By: _____
Name:_____
Title:_____

**REINHOLD**

**REINHOLD CORPORATION,** a Florida corporation

By:_____
Name: George M. Egan
Title: President

**Escrow Agent**

**ROGERS TOWERS, P.A.**

By:_____

Name:_____

Title:_____

Schedule 1

## RIGHTS, DUTIES AND OBLIGATIONS OF ESCROW AGENT

(a)    If there is any dispute as to whether the Escrow Agent is obligated to deliver any monies and/or documents which it now or hereafter holds (collectively, the "Escrowed Property") or as to whom any Escrowed Property are to be delivered, the Escrow Agent shall not be obligated to make any delivery, but, in such event, may hold same until receipt by the Escrow Agent of an authorization, in writing, signed by all of the parties having an interest in such dispute directing the disposition of same; or, in the absence of such authorization, the Escrow Agent may hold any Escrowed Property until the final determination of the rights of the parties in an appropriate proceeding. Within three (3) business days after receipt by the Escrow Agent of (i) a copy of a final judgment or order of a court of competent jurisdiction, certified by the clerk of such court or other appropriate official, and (ii) an opinion of counsel, acceptable to the Escrow Agent, of the party to whom the Escrowed Property is to be delivered to the effect that such judgment or order is final within the meaning of this Agreement, the Escrowed Property shall be delivered as set forth in such judgment or order. A judgment or order under this Agreement shall not be deemed to be final until the time within which to take an appeal therefrom has expired and no appeal has been taken, or until the entry of a judgment or order from which no appeal may be taken. If such written authorization is not given or proceeding for such determination is not begun and diligently continued, the Escrow Agent may, but is not required to, bring an appropriate action or proceeding for leave to deposit the Escrowed Property in court, pending such determination. The Escrow Agent shall not be responsible for any acts or omissions and upon making delivery of the Escrowed Property which the Escrow Agent holds in accordance with the terms of this Agreement, the Escrow Agent shall have absolutely no further liability hereunder. The Escrow Agent shall have no liability for any loss resulting from financial or other failure of the financial institution into which the Escrowed Property is deposited. In the event that the Escrow Agent places any Escrowed Property and/or documents that have actually been delivered to the Escrow Agent in the Registry of the Circuit Court in and for Duval County, Florida and files an action of interpleader, naming the parties hereto, the Escrow Agent shall be released and relieved from any and all further obligation and liability hereunder or in connection herewith. The Escrow Agent shall be entitled to rely upon, and shall be fully protected from all liability, loss, cost, damage or expense in acting or omitting to act pursuant to, any instruction, order, judgment, certification, affidavit, demand, notice, opinion, instrument or other writing delivered to it hereunder without being required to determine the authenticity of such document, the correctness of any fact stated therein, the propriety of the service thereof or the capacity, identity or authority of any party purporting to sign or deliver such document. Seller and Buyer shall and do hereby, jointly and severally indemnify and hold the Escrow Agent harmless from any and all damages or losses arising hereunder or in connection herewith, including but not limited to, all costs and expenses incurred by the Escrow Agent in connection with the filing of such action including, but not limited to, reasonable attorneys' fees for the Escrow Agent's attorneys through all trial

3284765_5

and appellate levels; provided, however, the foregoing indemnification shall not apply to damages or losses arising under or in connection with Escrow Agent's gross negligence or willful misconduct. It is agreed that Escrow Agent shall not be disabled or disqualified from representing **JAX-PALATKA FARMS LLC** ("*Buyer*") in connection with any litigation which might arise out of or in connection with this Agreement by virtue of the fact that the Escrow Agent has agreed to act as the Escrow Agent hereunder and **Reinhold Corporation** ("*Seller*") does hereby waive any claim arising out of or in connection with the foregoing.

(b)     The duties of the Escrow Agent are only as herein specifically provided, and are purely ministerial in nature. The Escrow Agent shall neither be responsible for, or under, nor chargeable with knowledge of, the terms and conditions of any other agreements, instrument or document in connection herewith, and shall be required to act in respect of the Escrowed Property only as provided in this Agreement. This Agreement sets forth all the obligations of Escrow Agent with respect to any and all matters pertinent to the escrow contemplated hereunder and no additional obligations of Escrow Agent shall be implied from the terms of this Agreement or any other Agreement. The Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless and until it is provided with a copy of same fully executed and delivered by Seller and Buyer. Further, the Escrow Agent shall not be bound by any modification, amendment or rescission of this Section irrespective of whether such modification, amendment or rescission is signed by Seller and Buyer, unless in writing and also signed by the Escrow Agent. The Escrow Agent and any successor escrow agent may at any time resign as such by delivering the Escrowed Property to either (i) any successor escrow agent designated by all the parties hereto (other than Escrow Agent) in writing, or (ii) any court having competent jurisdiction. Upon its resignation and delivery of the Escrowed Property as set forth in this Section, Escrow Agent shall be discharged of, and from, any and all further obligations arising in connection with the escrow contemplated by this Agreement. The provisions of this Section shall survive the Closing or the termination of this Agreement.

3284765_5

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT

This SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of the 23rd day of March, 2021 (the "**Effective Date**") by and between **REINHOLD CORPORATION**, a Florida corporation ("**Seller**"), and **JAX-PALATKA FARMS LLC**, a Delaware limited liability company ("**Purchaser**").

RECITALS:

(A)    Seller and Purchaser entered into a "Purchase and Sale Agreement" dated as of April 24, 2020 (the "**PSA**").

(B)    Seller and Purchase amended the PSA by that "First Amendment to Purchase and Sale Agreement" dated September 8th, 2020 (the "First Amendment").

(C)    The PSA called for a survey and acreage figures to be completed prior to Closing.

(D)    Due to delays caused by COVID-19; issues locating Section corners, road rights-of-way, and other boundaries for portions of the Property; and other delays by the Surveyor, by virtue of "Note 2" to the Closing Statement, Seller and Purchaser further amended the PSA and extended the time for completion of the Survey and time within which to complete the acreage true-up and adjustments to the purchase price to be made based on the survey acreages until March 24, 2020.

(E)    The Surveyor is still experiencing delays based upon the above but has indicated the Survey and acreage figures should be completed, finalized, and delivered on or before April 16, 2021.

(F)    Seller and Purchaser desire to further amend the PSA as set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and promises herein contained, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree to amend the PSA as follows:

1. Extension of Time for Survey and Acreage Adjustments. The parties acknowledge and understand that the acreage figures from the survey are not yet available but may be delivered on or before April 16, 2021. The parties hereby amend the PSA and delay and extend the time within which to complete the acreage true-up and adjustments to the purchase price to be made based on the survey acreages until the later of April 30, 2021 or ten (10) days following receipt of the completed survey and acreage figures from the Surveyor, which must be completed and delivered before May 30, 2021.

2. Counterpart Execution; Electronic Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same instrument. This Agreement may be executed electronically, and a facsimile or electronic signature (including, but not limited to, a signature delivered by PDF or email) shall be deemed to have the effect of an original for all purposes and shall be valid and binding on the parties.

3. Ratification. Except as modified herein, the PSA, as amended by the First Amendment, and by this Agreement remains unchanged and in full force and effect, and the parties ratify and confirm the terms of the PSA as modified by the First Amendment and this Agreement. In the event of conflict between the terms and provisions of this Agreement and the PSA or any prior amendment(s), the terms and provisions of this Agreement shall control and be given effect.

Second Amendment to PSA (RT 03.23.2021) (002).DOCX



*Signature Page to Second Amendment*
*to Purchase and Sale Agreement*

**WHEREFORE,** Seller and Purchaser have each executed this Agreement as of the Effective Date.

| SELLER: | PURCHASER: |
|---|---|
| **REINHOLD CORPORATION**, a Florida corporation<br><br>By: *(signature)*<br>George M. Egan, CEO | **JAX-PALATKA FARMS LLC**, a Delaware limited liability company<br><br>By: _____<br>    Greg Alexander, as its sole member |
| **ESCROW AGENT:**<br><br>**FIRST AMERICAN TITLE INSURANCE COMPANY**<br><br><br>By: _____<br><br>Print Name: _____<br><br>Its: _____ | |

*Signature Page to Second Amendment*
*to Purchase and Sale Agreement*

**WHEREFORE,** Seller and Purchaser have each executed this Agreement as of the Effective Date.

| SELLER: | PURCHASER: |
|---|---|
| **REINHOLD CORPORATION**, a Florida corporation<br><br><br>By: _____<br>George M. Egan, CEO | **JAX-PALATKA FARMS LLC**, a Delaware limited liability company<br><br><br>By: _____<br>Greg Alexander, as its sole member |
| **ESCROW AGENT:**<br><br>**FIRST AMERICAN TITLE INSURANCE COMPANY**<br><br><br>By: _____<br><br>Print Name: _____<br><br>Its: _____ | |

### Third Amendment to Purchase and Sale Agreement

This THIRD AMENDMENT PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made and entered into this __3 1__ day of October, 2024 (the "*Third Amendment Effective Date*") by and between **REINHOLD CORPORATION**, a Florida corporation ("*Seller*"), and **JAX-PALATKA FARMS LLC**, a Delaware limited liability company ("*Purchaser*").

RECITALS:

(A)    Seller and Purchaser entered into a "Purchase and Sale Agreement" dated as of April 23, 2020 (the "*Original PSA*").

(B)    Seller and Purchaser amended the PSA by that "First Amendment to Purchase and Sale Agreement" dated September 8th, 2020 (the "*First Amendment*") and by that "Second Amendment to Purchase and Sale Agreement" dated March 23rd, 2021 (the "*Second Amendment*" and collectively with the Original PSA and the First Amendment, the "*PSA*")

(C)    Seller and Purchaser desire to amend the PSA as set forth herein.

NOW THEREFORE, Seller and Purchaser agree to amend the PSA as follows:

1. In Section 2.1, the date of "November 30, 2024" on Line 48 is hereby amended to "March 31, 2025".

2. In Section 2.2(c), the "November 30, 2024" on Line 67 is hereby amended to "March 31, 2025" and the date of "December 31, 2024" on Lines 67-68 is hereby amended to "April 30, 2025".

3. In Section 2.3(b), the date of "December 31, 2024" on Line 75 is hereby amended to "April 30, 2025".

4. In Section 5.2(b), the date of "November 30, 2024" on Line 249 is hereby amended to "March 31, 2025".

5. In Section 11.1, the date of "December 31, 2024" on Line 816 is hereby amended to "April 30, 2025".

6. Seller agrees to use commercially reasonable efforts to arrange a meeting with the Army Corps of Engineers (at which Buyer will be invited to be present) to discuss the removal of Phase III of the Mitigation Bank within six (6) weeks of the Third Amendment Effective Date.

7. If Phase III has not been released from the Mitigation Bank on or before March 31, 2025 and if the parties have not otherwise agreed in writing to the purchase of other property of Seller in lieu of Phase III of the Mitigation Bank, then the each of the new dates specified in Sections 1 through 6 above shall be extended automatically by an additional ninety (90) days.

Wherefore, Purchaser and Seller have executed this Agreement as of the day and year first above written.

6091556_5



*[remainder of page intentionally left blank; signature page to follow]*

6091556_5

| SELLER: | PURCHASER: |
|---|---|
| **REINHOLD CORPORATION**, a Florida corporation | **JAX-PALATKA FARMS LLC**, a Delaware limited liability company |
| By: _George M. Egan, President_ | By: _Dennis Carey, as its authorized representative_ |
| Date: _10/31_, 2024 | Date: _10/31_, 2024 |

6091556_5